JOHN YSLAS (BAR NO. 187324)
JENNIFER A. AWREY (BAR NO. 244332)
JOHN C. GRAY (BAR NO. 267686)
**NORTON ROSE FULBRIGHT US LLP**
555 South Flower Street
Forty-First Floor
Los Angeles, California  90071
Telephone:  (213) 892-9200
Facsimile:  (213) 892-9494
john.yslas@nortonrosefulbright.com
jennifer.awrey@nortonrosefulbright.com
john.gray@nortonrosefulbright.com

Attorneys for Defendant
WAL-MART STORES, INC.

## IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AFROUZ  NIKMANESH, ELVIS ATENCIO, ANNA NGUYEN, AND EFFIE SPENTZOS, on behalf of themselves, the general public, and all others similarly situated,<br><br>　　　　　Plaintiffs,<br><br>　　　v.<br><br>WAL-MART STORES, INC., a Delaware corporation, and WAL-MART ASSOCIATES, INC., a Delaware corporation, and  DOES 1 through 10, inclusive,<br><br>　　　　　Defendants. | Civil Action No.  8:15-CV-00202-AG-JCG<br><br>**DECLARATION OF JOHN YSLAS IN SUPPORT OF DEFENDANTS' WAL-MART STORES, INC.'S AND WAL-MART ASSOCIATES, INC.'S OPPOSITION FOR CONDITIONAL CERTIFICATION AND FOR AN ORDER CIRCULATING NOTICE PURSUANT TO 29 U.S.C. §216(B)**<br><br>Date: August 17, 2015<br>Time: 10:00 a.m.<br>Courtroom: 10D |

DOCUMENT PREPARED
ON RECYCLED PAPER

## DECLARATION OF JOHN YSLAS

I, John Yslas, based on my personal knowledge of the facts stated herein, hereby declare that the following facts are true and correct under penalty of perjury.

1.     I am an attorney at law duly licensed to practice in the State of California and before this Court.  I am a Partner at the law firm of Norton Rose Fulbright US LLP, and I am primarily responsible for the representation of Defendant Wal-Mart Stores, Inc. and Wal-Mart Associates, Inc. ("Wal-Mart").  I have personal knowledge of the facts recited in this declaration and, if called as a witness, I could and would competently testify to them.

2.     This action was originally filed in December 2014.  Thus far, Plaintiffs have propounded no formal discovery or taken any depositions.

3.     Attached hereto as Exhibit A is a true and correct copy of a chart summarizing deposition testimony of the four named plaintiffs (Afrouz Nikmanesh, Anna Nguyen, Elvis Atencio, and Effie Spentzos) and five declarants (Michael Denham, Brian Nguyen, Khanh Nguyen, Monita Trinh and Khawala Abueldija) regarding some key differences among their testimony.  They excerpts of this deposition testimony can be found in Exhibits C-K attached here.

4.     Attached hereto as Exhibit B is a true and correct copy of a chart summarizing deposition testimony of the four named plaintiffs (Afrouz Nikmanesh, Anna Nguyen, Elvis Atencio, and Effie Spentzos) and five declarants (Michael Denham, Brian Nguyen, Khanh Nguyen, Monica Trinh and Khawala Abueldija) regarding some key admissions in their testimony.  They excerpts of this deposition testimony can be found in Exhibits C-L attached here.

5.     Attached hereto as Exhibit C is a true and correct copy of excerpts of the deposition of plaintiff Afrouz Nikmanesh.

6.     Attached hereto as Exhibit D is a true and correct copy of excerpts of the deposition of plaintiff Anna Nguyen.

7.     Attached hereto as Exhibit E is a true and correct copy of excerpts of

DOCUMENT PREPARED
ON RECYCLED PAPER

1  the deposition of plaintiff Elvis Atencio.

2       8.    Attached hereto as Exhibit F is a true and correct copy of excerpts of

3  the deposition of plaintiff Effie Spentzos.

4       9.    Attached hereto as Exhibit G is a true and correct copy of excerpts of

5  the deposition of declarant Michael Denham.

6       10.    Attached hereto as Exhibit H is a true and correct copy of excerpts of

7  the deposition of declarant Brian Nguyen.

8       11.    Attached hereto as Exhibit I is a true and correct copy of excerpts of

9  the deposition of declarant Khanh Nguyen.

10       12.    Attached hereto as Exhibit J is a true and correct copy of excerpts of

11  the deposition of declarant  Monica Trinh.

12       13.    Attached hereto as Exhibit K is a true and correct copy of excerpts of

13  the deposition of declarant Khawala Abuelhija.

14       I declare under penalty of perjury under the laws of California and the United

15  States that the foregoing is true and correct.  Executed this 20th day of July 2015, in

16  Los Angeles, California.

17

18                                 /s/ *John Yslas*

                                      John Yslas

19

20

21

22

23

24

25

26

27

28

DECLARATION OF JOHN YSLAS IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR CONDITIONAL CERTIFICATION

## PROOF OF SERVICE

I, Diana Cardenas, declare:

I am a citizen of the United States and employed in Los Angeles County, California.  I am over the age of eighteen years and not a party to the within-entitled action.  My business address is 555 South Flower Street, Forty-First Floor, Los Angeles, California  90071.

On July 20, 2015, I electronically filed the attached document(s):

**DECLARATION OF JOHN YSLAS IN SUPPORT OF DEFENDANTS' WAL-MART STORES, INC.'S AND WAL-MART ASSOCIATES, INC.'S OPPOSITION FOR CONDITIONAL CERTIFICATION AND FOR AN ORDER CIRCULATING NOTICE PURSUANT TO 29 U.S.C. §216(B)**

with the Clerk of the court using the CM/ECF system which will then send a notification of such filing to the following:

| | |
|---|---|
| Eric M. Epstein | Dayton B. Parcells, III |
| Eric M. Epstein, APC | Parcells Law Firm |
| 1901 Avenue of the Stars, #1100 | 1901 Avenue of the Starts, #1100 |
| Los Angeles, CA 90067-6002 | Los Angeles, CA 90067 |
| Phone:         (310) 552-5366 | Phone:         (310) 201-9882 |
| emepstein@aol.com | dbparcells@parcellslaw.com |
| | |
| *Attorneys for Plaintiffs* | *Attorneys for Plaintiffs* |
| | |
| Mark R. Thierman | laborlawyer@pacbell.net, |
| Joshua D. Buck | legalfilings@thiermanlaw.com, |
| Thierman Law Firm | thier3@callatg.com |
| 7287 Lakeside Drive | thier5@callatg.com |
| Reno, NV 89511 | Josh@thiermanlaw.com |
| Phone:         (775) 284-1500 | |
| | *Attorneys for Plaintiffs* |

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on July 20, 2015, at Los Angeles, California.

*/s/ Diana Cardenas*
Diana Cardenas

PROOF OF SERVICE

**EXHIBIT A**

## EXHIBIT A: CHART SUMMARIZING SOME DIFFERENCES:

| 1. What constitutes the written policy mandating taking of the APhA Course: |
| --- |
| Plaintiff Nikmanesh stated the PAID Toolkit plus training module constitutes the written policy.  (Nikmanesh Depo., 72: 1-10; 75:8-11). |
| Plaintiff A. Nguyen stated that job postings[1] constitute the written policy. (A. Nguyen Depo., 75:6-77:11). |
| Plaintiff Spentzos stated no document constitutes a written policy. (Spentzos Depo., 71:19-23). |
| Plaintiff Atencio stated the PAID toolkit (but not training module) constitutes written policy, but admitted that nowhere in the PAID toolkit does it state that certification or training course was mandatory. (Atencio Depo., 95:11-16; 64:10-23). |
| Declarant Denham testified that he received an email that expressly told him that taking the course was voluntary, and the directive from his supervisor was contrary to the voluntary policy he understood. (Denham Depo., 42:14-43:12). |
| Declarant B. Nguyen testified there were no documents constituting a mandatory policy. (B. Nguyen Depo., 37:10-18). |
| Declarant K. Nguyen identified no documents constituting a mandatory policy. (K. Nguyen Depo., 25:20-25). |
| Declarant Trinh identified no policy communicating mandatory certification. (Trinh Depo., 94:6-10). |
| Declarant Abuelhija admitted no knowledge of any document indicating certification was mandatory.  (Abuelhija Depo., 46:16-25). |

---

[1] As noted below, some Plaintiffs and declarants admitted the job postings' "preferable" indication regarding immunization certification does not even constitute evidence that certification was  mandatory for new hires, let alone a written "policy" constituting mandatory nature of taking course.  (*See e.g.*, Nikmanesh Depo., 137:21-138:11; *see also* A. Nguyen Depo., 75:6-77:11 (acknowledging that her interpretation that a "preferred" qualification is a "mandatory" qualification is purely her own opinion)).

Exhibit A, Page 000003

| 2. | Statements causing belief mandatory, and limited authority of speaker: |
|----|----|
| | Plaintiff Nikmanesh identified the PAID Toolkit (Nikmanesh Depo., 74:5-7); and statements from management limited to two individuals (Nikmanesh Depo., 91:19-92:1). Nikmanesh has no knowledge of management communications beyond direct supervisors and admitted those supervisors had limited authority over only a few stores.  (Nikmanesh Depo., 27:15-20; 28:21-29:3; 34:5-11; 35:10-15; 37:14-19; 39:10-15; 97:25-98:6). |
| | Plaintiff A. Nguyen bases her opinion on statements made by one market manager in Southern California and admits to no knowledge of communication beyond that manager or outside the region.  A. Nguyen also stated supervisor's limited authority to 24 stores.  (A. Nguyen Depo., 28:22-24; 30:22-31:6; 84:17-87:2; 98:1-3). |
| | Plaintiff Spentzos identified the PAID Toolkit (Spentzos Depo., 72:14-19) and statements from one supervisor (Spentzos Depo., 81:6-11).  Spentzos has no knowledge of other communications from management/leadership about course being mandatory and acknowledged the limited authority of supervisors over distinct territories. (Spentzos Depo., 33:11-34:1; 35:15-21; 82:1-17; 83:21-25). |
| | Plaintiff Atencio's belief that the training course was mandatory stems solely from the existence of the PAID toolkit, but admits it does not state mandatory.  Atencio also admitted that managers or supervisors had limited authority over only a few stores. (Atencio Depo., 20:22-25; 31:4-23; 37:21-24; 95:11-16; 64:10-23). |
| | Declarant Denham admitted he had no knowledge of the training course's implementation, or the workings of pharmacies outside his own region and that his managers had limited authority. (Denham Depo., 17:23-18:1; 18:2-15; 19:20-25; 30:10-31:9). |
| | Declarant B. Nguyen testified that his opinion that the training course was mandatory came solely from emails from his supervisor, and he had no knowledge of how that information was transmitted to her.  B. Nguyen admitted managers' authority was limited to only 10-15 stores (B. Nguyen Depo., 16:5-7; 36:20-24; 42:13-24). |
| | Declarant K. Nguyen testified the basis of her knowledge was based on a statement from another pharmacist and an email. She also testified that her manager had limited authority over only a few stores in Southern California. (K. Nguyen Depo., 14:10-22; 17:11-14; 20:6-9; 22:2-22; 28:7-10; 33:21-34:1). |
| | Declarant Trinh stated she believed the course was mandatory due to some emails sent by managers. (Trinh Depo., 19:14-16; 56:4-20).  She also admitted her manager had limited authority.  (Trinh Depo., 19:14-19). |
| | Declarant Abuelhija based her belief on emails from Dabney and a conversation with a Sam's Club pharmacist.  Abuelhija also admitted  her managers' authority was limited to only a few stores.  (Abuelhija Depo., 22:18-20; 23:6-9; 46:6-11). |

| **3.** | **Job postings or description indications of "preferable" indicating evidence that taking course was mandatory:** |
|---|---|
| | Plaintiff Nikmanesh testified that preferred qualification meant it was a desirable qualification.  (Nikmanesh Depo., 137:21-138:11). |
| | Plaintiff A. Nguyen admitted that the postings indicated certification was "preferred" and her conclusion that preferred meant "mandatory" was her own opinion and was not based on concrete fact.  (A. Nguyen Depo, 75:6-77:11). |
| | Plaintiff Spentzos admitted that the word "preferable" (including for a job posting for position she applied for) does not mean mandatory.  (Spentzos Depo., 44:11-45:15). Spentzos also testified she was never aware of job postings making certification a "minimum" qualification (Spentzos Depo., 118:10-16). |
| | Declarant Denham admitted that the word "preferable" does not mean mandatory, so that job posting does not indicate taking course is mandatory.  (Denham Depo., 73:2-75:5). |
| | Declarant B. Nguyen admitted that the word "preferable" does not mean mandatory, so that job posting and job descriptions do not indicate taking course is mandatory.  (B. Nguyen depo., 46:1-47:5). |

Exhibit A, Page 000005

**EXHIBIT B**

## EXHIBIT B:  CHART SUMMARIZING SOME EXAMPLES OF KEY ADMISSIONS (APART FROM LACK OF EVIDENCE PROFFERED)

| |
|---|
| **1.   Not told reduced hours or transfer (per paragraph 26.i. of SAC – and contrary to Court order denying motion to strike and permitting Second Amended Complaint to proceed)** |
| Plaintiff Nikmanesh admitted that she was not directly told she would be transferred or have hours reduced if did not take the course. (Nikmanesh depo., 121:10-17). |
| Plaintiff A. Nguyen admitted that she was not she was not directly told she would be transferred or have hours reduced if did not take the course. (A. Nguyen depo., 88:15-25). |
| Plaintiff Spentzos admitted that she was not she was not directly told she would be transferred or have hours reduced if did not take the course. (Spentzos depo., 81:12-25). |
| Plaintiff Atencio testified that his individual market manager supervisor used the words in paragraph 12-13 of his declaration that "priority in hours" would be given if he took the course, but cannot recall if his supervisor used exact words that hours would be reduced (Atencio Depo., 108:3-110:1).  He also testified that his supervisor did not state that if he did not take the course he would be transferred. (Atencio Depo., 110:2-17). |
| Declarant Denham admitted that he was not directly told he would be transferred or have hours reduced if did not take the course. (Denham Depo., 59:8-25; 92:7-12). |
| Declarant B. Nguyen admitted that he was not directly told he would be transferred or have hours reduced if did not take the course. (B. Nguyen Depo., 52:1-8; 53:1-5). |
| Declarant K. Nguyen testified that her individual supervisor stated she better take the course or she would be removed (but he did not specifically state words would have hours reduced or transferred) (K. Nguyen Depo., 36:9-38:24).   But in deposition K. Nguyen then contradicted her sworn declaration at ¶9, expressly testifying that her supervisor never in fact told her that all pharmacists had to be immunization certified. (K. Nguyen Depo., 26:21-27:9). |
| Declarant Trinh stated she had never been told she would receive priority for being certified or not certified, also never told would be transferred or lose hours. (Trinh Depo., 97:18-98:2; 111:9-12). |
| Declarant Abuelhija testified she was never told she would be terminated or lose hours if she was not certified. (Abuelhija Depo., 48:24-49:6). |

**2.   No idea of who authored PAID Toolkit, job descriptions, job postings, or intent of any of these documents to demonstrate mandatory, and no idea of who, how, where the APhA Course was rolled out or intentions of mandatory.**

Plaintiff Nikmanesh could not identify origin of most of her exhibits, including the PAID toolkit. (Nikmanesh Depo., 74:5-7; 80:25-81:3; 134:20-135:3; 141:4-7).

Plaintiff A. Nguyen admitted not having any knowledge of the origins of the PAID toolkit, Standard Operating Procedures, or job postings. (A. Nguyen Depo., 107:14-108:1; 121:19-25).

Plaintiff Spentzos admitted she did not know the origins, authors of, or intent behind key exhibits. (Spentzos Depo., 67:3-18; 103:14-19; 105:6-12; 108:4-11).

Plaintiff Atencio admitted he did not know the origins, authors of, or intent behind key exhibits. (62:5-11; 104:25-105:6; 105:7-9; 113:15-22; 125:19-25).

Declarant Denham stated that he had no idea how the certification initiative was rolled out, who controlled it, or how it happened in other parts of the country. (Denham Depo., 75:17-76:7; 77:7-21).

Declarant B. Nguyen testified he had never spoken to anyone in management other than Fischer about the training course, and he had no idea how the program was implemented beyond what Fischer told him.   Declarant also testified he had no knowledge of who prepared documents like the PAID toolkit or job postings. (B. Nguyen Depo., 21:5-23; 30:23-31:23; 34:10-24; 42:13-24; 48:7-20).

**3.   Lack of evidence of uniform practice:**

Plaintiff Nikmanesh admitted that her only evidence of any policy was the PAID toolkit, that it did not state the training course was mandatory, and that she had no idea whether other pharmacists also interpreted the PAID toolkit as indicating the course was mandatory because there was no official, uniform policy. (Nikmanesh Depo., 75:12-76:9).

Plaintiff A. Nguyen admitted her knowledge was limited to pharmacists she personally knows or has spoken to in Southern California, has no knowledge of state or nationwide practices. (A. Nguyen Depo., 82:23-83:14).

Plaintiff Spentzos testified based on her "total experience" (an expression that repeatedly infected her wider speculation about Wal-Mart's practices) that 99% of pharmacists are immunization certified – a conclusion based on no facts and no data, and which is flat out wrong. (Spentzos Depo., 62:9-63:20).

Plaintiff Atencio admitted he had no knowledge of any transmission of information from upper management to supervisors, and that knowledge was limited to what he himself was told. (Atencio Depo., 104:25-105:6; 105:7-9).

Declarant Denham noted that decisions about whether immunization certification was required would be made by each market manager across the country (Denham Depo., 72:9-21). Denham also admitted he never spoke to anyone from Walmart management, except his

| |
|---|
| direct manager, about the training course. (Denham Depo., 29:1-18). |
| Declarant B. Nguyen admitted no knowledge of any uniform practice. (B. Nguyen Depo., 48:24-49:8). |
| Declarant K. Nguyen testified she had no knowledge of any pharmacy practices outside her own store and she had no idea who might have communicated about the certification course to her supervisors. (K. Nguyen Depo., 24:15-18; 39:15-20). |
| Declarant Trinh testified her knowledge is limited to two markets in Southern California. (Trinh Depo., 65:25-67:10). |
| Declarant Abuelhija has no knowledge of practices outside Southern California. (Abuelhija Depo., 47:1-5). |

| |
|---|
| **4.   If received continuing education ("CE") credit toward maintaining license (relevant to special circumstances exception under 29 CFR 785.31):** |
| Plaintiff Nikmanesh received CE credit.  (Nikmanesh Depo. 114:12). |
| Plaintiff A. Nguyen admitted she received CE credit, a "benefit." (A. Nguyen Depo. 78:15-80:15). |
| Plaintiff Spentzos received CE credit.  (Spentzos Depo., 100:10-11). |
| Plaintiff Atencio received CE credit.  (Atencio Depo., 101:10-24). |
| Declarant B. Nguyen received CE credit.  (B. Nguyen Depo., 56:16-24). |
| Declarant K. Nguyen received CE credit.  (K. Nguyen Depo., 35:13-19). |
| Declarant Trinh received CE credit.  (Trinh Depo., 71:23-25). |
| Declarant Abuelhija received CE credit. (49:24-50:1). |

| |
|---|
| **5.   No Minimum wage or overtime for class members (and no uniform evidence submitted of such in any event):** |
| Plaintiff Spentzos admitted that there were part-time employees working less than 40 hours a week in pharmacies, but that she had no way to know how many pharmacists would have been less than full-time, and thus not eligible for overtime hours at all (Spentzos Depo., 96:15-97:21). |
| Plaintiff Atencio admitted that some pharmacy employees are part-time and could work as little as one day a week, thus not being eligible for overtime for training course time at all (Atencio Depo., 70:3-20). |
| Declarant Denham agreed that it was possible for someone to complete the training course |

Exhibit B, Page 000008

| |
|---|
| without going over 40 hours in a week (Denham Depo., 86:20-87:13). |
| Declarant Trinh stated it was possible that pharmacists work less than 40 hours a week (Trinh Depo., 16:1-20). |
| Declarant Abuelhija has worked only two days a week almost exclusively since 2010 and thus would not have worked any overtime in the week she completed training.  (Abuelhija Depo., 16:1-21). |

**EXHIBIT C**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA — SOUTHERN DIVISION

| | |
|---|---|
| AFROUZ NIKMANESH, ELVIS ATENCIO, ANNA NGUYEN, AND EFFIE SPENTZOS, on behalf of themselves, the general public, and all others similarly situated, | ) CASE NO.: <br> ) 8:15-cv-00202-AG-JCG <br> ) <br> ) **CERTIFIED COPY** <br> ) <br> ) <br> ) |
| Plaintiffs, | ) |
| vs. | ) <br> ) |
| WAL-MART STORES, INC., a Delaware corporation, and WAL-MART ASSOCIATES, INC., a Delaware corporation, and DOES 1 through 10, inclusive, | ) <br> ) <br> ) <br> ) <br> ) |
| Defendants. | ) <br> ) |

VIDEO DEPOSITION OF AFROUZ NIKMANESH

Tuesday, June 23, 2015

Los Angeles, California

Reported By:

Jan M. Roper, RPR,

CSR No. 5705

File No.:  150623JR

1

Exhibit C, Page 000010

1    were?

2         A.    Some of them, yes.

3         Q.    Which were they?

4         A.    Laguna Hills, Santa Ana, Rancho Santa

5    Margarita, San Clemente, the other Irvine store, I

6    believe Buena Park.  That's all I can remember at this

7    point.

8         Q.    When you say Mr. Dukes was a district

9    manager, is that term the same as a market manager?

10        A.    Yes.

11        Q.    You say you know some of the stores that

12   Mr. Dukes oversaw.

13              Do you know all of them?

14        A.    No, I can't recall.

15        Q.    Mr. Dukes' authority was limited to those 12

16   stores, though; right?

17        A.    I believe it was 12 stores.  It was about 12

18   stores.

19        Q.    Approximately 12 stores?

20        A.    Yes.

21        Q.    And Mr. Dukes' authority was limited to those

22   approximate 12 stores; right?

23              MR. EPSTEIN:  Objection to the extent that --

24   lack of foundation and possible speculation.

25              But you can answer it.  If you know, you can

27

Exhibit C, Page 000011

```
 1    answer it.

 2              THE WITNESS:  I just know approximately how

 3    many stores he oversaw.  That's about it.

 4    BY MR. YSLAS:

 5         Q.   Okay.  And those stores that he oversaw, that

 6    was the limit of his authority; right?

 7              MR. EPSTEIN:  Same objection.

 8              But you can answer if you know.

 9              THE WITNESS:  I would assume so.

10    BY MR. YSLAS:

11         Q.   Do you know who Mr. Dukes reported to?

12         A.   Anthony Chung.

13         Q.   And what was Mr. Chung's title?

14         A.   He was regional manager.

15         Q.   And what region did Mr. Chung oversee?

16         A.   Southern California.

17         Q.   Do you know approximately how many stores?

18         A.   No.

19         Q.   No?

20         A.   No.

21         Q.   Mr. Chung's authority was limited to his

22    supervision of those stores in Southern California;

23    correct?

24              MR. EPSTEIN:  Objection.  Lacks foundation.

25    Calls for speculation.
```

28

```
 1            You can answer if you know.
 2            THE WITNESS:  Again, I would assume so, but
 3    it's just an assumption.
 4    BY MR. YSLAS:
 5       Q.   Okay.  And as we sit here today, you don't
 6    know the scope of Mr. Chung's authority; is that your
 7    testimony?
 8       A.   Yes.
 9       Q.   But you assume it was a -- limited to the
10    stores in Southern California that he oversaw; right?
11       A.   Yes.
12       Q.   Okay.  Do you know who Mr. Chung reported to?
13       A.   At some point, it was Mr. Warren Moore.
14       Q.   And who was Mr. Moore's -- sorry.  What was
15    Mr. Moore's title?
16       A.   Divisional manager.
17       Q.   And do you know what division Mr. Moore
18    oversaw?
19       A.   No.
20       Q.   Have you ever spoken to Mr. Moore?
21       A.   Yes.
22       Q.   How many occasions?
23            MR. EPSTEIN:  By "spoken," do you mean not --
24    not e-mails but personal communication?
25            MR. YSLAS:  You can just state an objection,
```

                                                          29

Exhibit C, Page 000013

1    that right?

2        A.   No.

3        Q.   Is that right?

4        A.   Oh, yes.

5        Q.   Okay.  So Ms. Fisher's authority was limited

6    to the 12 stores that she took over for Mr. Dukes and

7    the other stores she was supervising; right?

8            MR. EPSTEIN:  Objection to the extent it

9    lacks foundation.  Calls for speculation.

10           You can answer if you know.

11           THE WITNESS:  I believe so.

12   BY MR. YSLAS:

13       Q.   Okay.  You believe so, but you don't know

14   because you don't know the full scope of her

15   authority; is that right?

16       A.   Correct.

17       Q.   Do you have any reason to believe her

18   authority was extended beyond the stores she

19   supervised?

20       A.   I wouldn't know.

21       Q.   Okay.  Do you have any reason to believe that

22   it was?

23       A.   No.

24       Q.   Okay.  Ms. Fisher took over in May 2013.  Who

25   did she report to?

34

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

Exhibit C, Page 000014

```
 1      A.    Mr. Chung.

 2      Q.    How long was Ms. Fisher your direct

 3   supervisor as market manager?

 4      A.    Up until about February of 2014.

 5      Q.    From that period of time, then, Ms. Fisher

 6   supervised you as market manager.

 7            Did her reporting relationship ever change to

 8   somebody other than Mr. Chung?

 9      A.    I don't believe so.

10      Q.    And Mr. Chung was the regional manager for

11   Southern California; right?

12      A.    Correct.

13      Q.    And his authority was limited to the region

14   he oversaw, which was Southern California; correct?

15      A.    I would assume so.

16            MR. EPSTEIN:  Same objection as previously as

17   to lack of foundation.  Calls for speculation.

18            But if you know, you can answer it.

19            THE WITNESS:  I assume so.

20   BY MR. YSLAS:

21      Q.    Okay.  You assume so, but you don't know the

22   extent of his authority; is that right?

23      A.    No.

24      Q.    Is that correct?

25      A.    I mean yes, that's correct.
```

35

Exhibit C, Page 000015

1   clean answer here just because we talked over each

2   other a little bit.  And as I -- as I said earlier,

3   sometimes I may do this.

4          Ms. Dabney oversaw approximately 12 stores in

5   California; right?

6      A.   Correct.

7      Q.   Okay.  And those are the approximately same

8   12 stores that you mentioned earlier that Mr. Dukes

9   and Ms. Fisher oversaw, which were Laguna Hills,

10  Santa Ana, Rancho Santa Margarita, the other Irvine

11  store, Buena Park, and a few others you can't

12  remember; right?

13     A.   Correct.

14     Q.   And Ms. Dabney's authority was limited to

15  those approximate 12 stores; right?

16          MR. EPSTEIN:  Same objection based on

17  foundation and speculation.

18          But if you know, you can answer it.

19          THE WITNESS:  I believe so.

20  BY MR. YSLAS:

21     Q.   And Ms. Dabney supervised you from

22  February 2014 until the end of your employment in

23  September 2014?

24     A.   Correct.

25     Q.   And who did Ms. Dabney report to?

                                                    37

Exhibit C, Page 000016

1    BY MR. YSLAS:

2         Q.   Okay.   Ms. Bhatt was the regional manager;

3    right?

4         A.   Correct.

5         Q.   That Ms. Dabney reported to; right?

6         A.   Correct.

7         Q.   And do you know what region or stores

8    Ms. Bhatt oversaw?

9         A.   The Southern California region.

10        Q.   And Ms. Bhatt's authority was limited to

11   Southern California; correct?

12             MR. EPSTEIN:   Objection.   Lacks foundation.

13   Calls for speculation.

14             But you may answer if you know.

15             THE WITNESS:   Again, I believe so.

16   BY MR. YSLAS:

17        Q.   When you say you "believe so," you don't know

18   the full authority of Ms. Bhatt; is that right?

19        A.   Correct.

20        Q.   Did you ever speak to Ms. Bhatt about the

21   immunization training course?

22             MR. EPSTEIN:   Objection to the word "speak"

23   as being vague and ambiguous.

24             Do you understand the question?

25             THE WITNESS:   Speaking?   I did have a phone

39

```
 1      A.   Not to my recollection.

 2      Q.   And when I say "discussed," I mean did you

 3   ever discuss it in an e-mail or on the phone or in

 4   person with Mr. Beahm, whether or not taking the

 5   immunization training course was voluntary?

 6      A.   Not to the best of my recollection.

 7      Q.   So Mr. Beahm never told you that taking the

 8   immunization training course was mandatory; correct?

 9      A.   Correct.

10      Q.   Mr. Beahm never told you that taking the

11   immunization training course was voluntary; correct?

12      A.   Correct.

13      Q.   Because you didn't discuss it with him one

14   way or the other; is that correct?

15      A.   Not to the best of my recollection.

16      Q.   Okay.  And who did Mr. Beahm report to?

17      A.   I don't recall.  Dr. John.

18      Q.   Is John the first or last name?

19      A.   Well, it was his first name, but his last

20   name was a little bit difficult to pronounce, so he

21   was referred to as Dr. John.

22      Q.   Do you remember anything phonetically about

23   Dr. John's last name?

24      A.   No.

25      Q.   Have you ever spoken or communicated in any
```

48

Exhibit C, Page 000018

```
 1        Q.   Who did Dr. John report to?

 2        A.   I have no idea.

 3             MR. EPSTEIN:  Mr. Walton.

 4             MR. YSLAS:  The videographer has signaled to

 5   me that we're running out of tape.  So I think now is

 6   a good time to take a break to change the tape.

 7             THE VIDEOGRAPHER:  The time is 11:00 a.m.

 8   This is the end of Tape 1.  We are off the record.

 9             (Brief recess.)

10             THE VIDEOGRAPHER:  Back on the record.  The

11   time is 11:13 a.m.  This is the beginning of Tape 2.

12   BY MR. YSLAS:

13        Q.   From January 1, 2013, forward, other than

14   Mr. Moore and Mr. Patel, do you know the names of any

15   other divisional managers?

16        A.   Not that I can recall.

17        Q.   Did you ever have any communications with any

18   divisional managers from January 1, 2013, forward

19   other than Mr. Moore and Mr. Patel?

20        A.   Not that I can recall.

21        Q.   From January 1, 2013, forward, do you know

22   how many divisional managers there were?

23        A.   To the best of my recollection, two.

24        Q.   I'm sorry.  I'm asking for the entire United

25   States.
```

                                                              51

```
 1      A.   Oh, I'm sorry.  I have no idea.  I thought
 2   you were talking about Southern California.
 3      Q.   Well, let me try the questioning again to
 4   make sure we're on the same page.
 5           From January 1, 2013, forward, do you know
 6   the names of any other divisional managers that were
 7   divisional managers during that time frame in the
 8   United States other than Mr. Moore and Mr. Patel?
 9      A.   No.
10      Q.   January 1, 2013, forward, other than
11   Mr. Moore and Mr. Patel, did you have any
12   communications with any divisional managers other than
13   those two?
14      A.   Not that I recall.
15      Q.   So from January 1, 2013, forward, you never
16   had any conversation with any divisional manager about
17   the voluntariness of the immunization training course;
18   correct?
19      A.   Correct.
20      Q.   From January 1, 2013, forward, you never had
21   any conversation with any regional manager about
22   whether the immunization training course was
23   voluntary; correct?
24      A.   Except for Mr. Patel regarding the 12-hour
25   study.
```

52

Exhibit C, Page 000020

1      Q.    Mr. Patel was a divisional manager; right?

2      A.    Divisional, yes.

3      Q.    Okay.  So you -- you had the one conversation

4    with Mr. Patel regarding the immunization training

5    course that you've already testified?

6      A.    Yes.

7      Q.    Okay.  But in that conversation, as you've

8    already testified, you did not discuss whether the

9    training course was voluntary; right?

10     A.    I don't believe so.

11     Q.    Okay.  So now I'm moving from divisional

12   managers to regional managers.

13           Are you with me?

14     A.    Okay.

15     Q.    Okay.  So from January 1, 2013, forward, you

16   never had any conversation with any regional manager

17   about the immunization training course; correct?

18     A.    Like I said, with Anthony Chung through

19   Stephanie Fisher.  And I'm not quite sure if -- during

20   my conversation with Ami Bhatt, if I mentioned it or

21   not.

22     Q.    Okay.  Other than those two, Mr. Chung and

23   Ms. Bhatt, which you already testified to about, you

24   never had a conversation with any other regional

25   managers about the immunization training course;

53

Exhibit C, Page 000021

1    correct?

2        A.    Not to the best of my recollection.

3        Q.    No regional manager ever told you that the --

4    taking the immunization training course was mandatory;

5    correct?

6        A.    Correct.

7        Q.    No divisional manager ever told you that

8    taking the immunization training course was mandatory;

9    correct?

10       A.    Correct.

11       Q.    As we sit here today, do you know the names

12   of any divisional managers that were divisional

13   managers from January 1, 2013, forward, other than

14   Mr. Moore and Mr. Patel?

15       A.    Not that I can recall.

16       Q.    As we sit here today, do you even know how

17   many divisional managers there were from January 1,

18   2013, to present?

19            MR. EPSTEIN:  Are you talking about the

20   entire United States?

21            MR. YSLAS:  Right.

22            THE WITNESS:  I have no idea.

23   BY MR. YSLAS:

24       Q.    Do you know the specific territories that

25   those divisional managers supervised?

                                                        54

Exhibit C, Page 000022

```
 1      A.    No.

 2      Q.    Do you know how many pharmacies Wal-Mart has

 3   nationwide?

 4      A.    No.

 5      Q.    Do you have any approximation?

 6      A.    It would be a very, very rough one.

 7      Q.    Are you able to approximate, or would it be a

 8   guess?

 9      A.    It would be a guess.

10      Q.    Okay.  If you had to guess, how many

11   pharmacies?

12      A.    I would say 4,000.

13      Q.    Do you know approximately how many pharmacies

14   Wal-Mart has in California?

15      A.    No.

16      Q.    Could you give an estimate?

17      A.    No.

18      Q.    If you had to guess, how many in California?

19            MR. EPSTEIN:  Calls for speculation.  Lacks

20   foundation.

21            THE WITNESS:  I don't even want to guess.

22   BY MR. YSLAS:

23      Q.    So you have no idea?

24      A.    No.

25      Q.    Do you know how many states pharmacies --
```

55

Exhibit C, Page 000023

```
 1   Wal-Mart has pharmacies in throughout the United

 2   States?

 3       A.   No.

 4       Q.   Do you know how many pharmacists Wal-Mart has

 5   approximately nationwide?

 6       A.   I would say -- I would have to guess.

 7       Q.   Do you have an estimate?

 8       A.   Well, I can tell you according -- no, I

 9   couldn't guess.  No.

10       Q.   Do you know approximately how many

11   pharmacists there are in California?

12       A.   No.

13       Q.   Do you know how many pharmacists have taken

14   the immunization training course in the United States?

15       A.   No.

16       Q.   Do you have any estimate?

17       A.   No.

18       Q.   Any idea?

19       A.   No.

20       Q.   Do you have any idea how many pharmacists

21   have taken the immunization training course in

22   California?

23       A.   No.

24       Q.   When did the rollout of the immunization

25   training course take place at Wal-Mart?
```

56

Exhibit C, Page 000024

```
 1      A.    I don't know exactly.

 2      Q.    Can you give me an approximation?

 3      A.    It would be a guess.

 4      Q.    So you can't give me an estimation; is that

 5   right?

 6      A.    Correct.

 7      Q.    Because you don't know?

 8      A.    Correct.

 9      Q.    Okay.  Was it after sometime in January 1,

10   2013?

11      A.    I wouldn't be able to tell you.

12      Q.    When did you first hear about the

13   immunization training course at Wal-Mart?

14      A.    I believe it was summer of 2013.

15      Q.    Who did you hear it from?

16      A.    I can't recall.

17      Q.    Do you recall what you heard?

18      A.    Not exactly.

19      Q.    Do you recall any details of what you heard?

20      A.    Not details, no.

21      Q.    Do you recall anything generally?

22      A.    Yes.

23      Q.    What do you recall?

24      A.    Something about Wal-Mart wanted us

25   pharmacists to become immunization-certified.
```

57

Exhibit C, Page 000025

1      Q.    Do you -- do you know if any policy was ever

2   developed at Wal-Mart where taking the immunization

3   training course was -- was required?

4      A.    Not in those words.

5      Q.    Was there ever an official policy -- sorry.

6   Strike that.

7           Was there ever a policy developed by Wal-Mart

8   in any words, in your mind, that would apply uniformly

9   that taking the immunization training course was

10  mandatory?

11     A.    Yes.

12     Q.    Was that policy in writing?

13     A.    Yes.

14     Q.    Where was it in writing?

15     A.    On the Wire.

16     Q.    The Wire is W-i-r-e?

17     A.    Correct.

18     Q.    What does that stand for?

19     A.    I don't know.

20     Q.    Huh?

21     A.    I don't know.

22     Q.    What is the Wire?

23     A.    It's the Internet, the -- Wal-Mart's internal

24  Internet.

25     Q.    And where on the Wal-Mart -- well, where on

65

Exhibit C, Page 000026

1    the Wire was this policy?

2       A.   Under the tab PAID Toolkit.  P-A-I-D.

3       Q.   And P-A-I-D is capitalized?

4       A.   Correct.

5       Q.   What does that stand for?

6       A.   Pharmacist Administrative Immunization

7    Delivery.

8       Q.   Do you know who the author of the PAID

9    toolkit was -- author or authors?

10      A.   No.

11      Q.   Do you know the intent of the authors in

12   drafting the PAID toolkit?

13      A.   Yes.

14      Q.   What was it?

15      A.   To provide a step-by-step process as to how

16   to deliver immunizations and how important it was for

17   us to use it as a tool to drive sales and, therefore,

18   to make it a mandatory skill to earn.

19      Q.   When was the PAID toolkit made available?

20      A.   I'm sorry?

21      Q.   When was the PAID toolkit made available on

22   the Wire?

23      A.   I can't remember.

24      Q.   Sometime in 2013?

25      A.   I looked at it sometime during 2013.

66

Exhibit C, Page 000027

```
 1       Q.    You just don't remember when it -- you just
 2   don't know when it was made available?
 3       A.    No, I do not.
 4       Q.    Did the PAID toolkit specifically say that
 5   taking the immunization training course or becoming
 6   immunization-certified was mandatory?
 7       A.    Not in those words.
 8       Q.    What words?
 9       A.    I'm sorry?
10       Q.    What words did it use that, in your mind,
11   caused you to believe it was mandatory?
12       A.    To drive sales.  To start immunizations as
13   soon as we were certified.  And I believe on the last
14   page there were some references as to the importance
15   of becoming certified.
16       Q.    Can you turn to Exhibit 8, which is Exhibit 3
17   to the Second Amended Complaint, which is confidential
18   and has been sealed.
19       A.    (Witness complies.)
20       Q.    Do you have the document in front of you?
21       A.    Yes.
22       Q.    This document at the top says:  "Overview:
23   The toolkit provides all guidance and instruction for
24   Wal-Mart Pharmacist Administered Immunization Delivery
25   (PAID) program."
```

67

Exhibit C, Page 000028

1      A.   On Page 5 of 6, where it says "Wal-Mart

2  vaccine goal tracker."

3      Q.   Okay.

4      A.   Anytime there's a goal tracker, that means

5  it's got to do with your sales, and they would be

6  monitoring you -- "they" being Wal-Mart -- as to how

7  you're doing -- how many immunizations you're doing.

8  And they would keep a very close eye on you, and they

9  would set expectations, which is exactly what they

10  did.

11      Q.   Okay.  Do you know -- strike that.  Is there

12  anything else in this document, the PAID toolkit, that

13  caused you to believe that taking the immunization

14  training course was mandatory?

15      A.   Not that I can look at at the moment.

16      Q.   Do you know if the author of this document

17  intended to convey that taking the immunization

18  training course was mandatory?

19      A.   I can tell you that the intention was there,

20  I believe.

21      Q.   Well, you say "I believe."  Do you know?

22      A.   Like I said, I believe that that was the

23  intention.

24      Q.   Okay.  But you don't know for sure what the

25  intention was; true?

72

Exhibit C, Page 000029

1     Q.   Clearly, there's no words in this document

2   that say taking the immunization training course is

3   mandatory; correct?

4     A.   Not in so many words, no.

5     Q.   And you don't know who authored the document;

6   right?

7     A.   No, I do not.

8     Q.   So you're basing your belief on what you've

9   described in terms of promoting vaccines and the

10   in-store vaccine goal tracker; right?

11     A.   Correct.  And the fact that Wal-Mart has put

12   out this whole policy regarding the immunization.

13     Q.   And you say the policy is this document, the

14   PAID toolkit; right?

15     A.   There is another one, which was referred to

16   as pharmacist immunization training central.  There

17   was also a Q&A.  Those are the ones that come to my

18   mind at this point.

19     Q.   Okay.  So I want to make sure I understand.

20   Are those the documents that you, in your mind,

21   believe are an official policy of Wal-Mart making the

22   immunization training course mandatory, or are they

23   evidence that the training course was mandatory?

24     A.   They -- I believe they're policies.

25     Q.   Okay.  So the written policy isn't just the

74

Exhibit C, Page 000030

```
 1    PAID toolkit; it's the pharmacy immunization central

 2    and the Q&A?

 3          MR. EPSTEIN:   Training central.

 4    BY MR. YSLAS:

 5       Q.   Is that right?

 6       A.   No.  The Q&A, I don't believe, is a policy.

 7    The Q&A is just a Q&A.

 8       Q.   Okay.  So the policy is the PAID toolkit and

 9    the pharmacy immunization central?

10       A.   Those are the ones I can think of at the

11    moment.

12       Q.   Do you know whether other pharmacists

13    interpreted the PAID toolkit as conveying the message

14    that the -- taking the immunization certification

15    training program was mandatory?

16       A.   I wouldn't be able to tell you.

17       Q.   Because you don't know; right?

18       A.   Not that I can think of at the moment of any

19    pharmacist.

20       Q.   Okay.  In other words, the PAID toolkit

21    doesn't state that it's mandatory to take the

22    immunization training course; right?

23       A.   Not in those words.

24       Q.   Okay.  And whether a pharmacist interpreted

25    it the way you did depends on their individual
```

                                                      75

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

Exhibit C, Page 000031

1    experience of how they interpreted the PAID toolkit;

2    right?

3        A.   When it comes to the PAID toolkit, it's -- I

4    can tell you what my interpretation of it was.

5        Q.   Okay.  But you don't know the interpretation

6    of other pharmacists; correct?

7        A.   I can guess.

8        Q.   Okay.  But you don't know; correct?

9        A.   No.

10       Q.   Is that correct?

11       A.   Correct.

12       Q.   Okay.  It would be speculation on your part

13   as to how other pharmacists interpreted the intent of

14   the PAID toolkit; correct?

15       A.   By the conversations that we had.

16       Q.   Okay.

17       A.   One way or another, they felt that it was

18   mandatory.

19       Q.   Okay.  The pharmacists that you spoke to felt

20   it was mandatory; right?

21       A.   All of them.

22       Q.   Okay.  My question is a little bit different.

23   Two parts to it.

24            The first part is:  You don't know how every

25   pharmacist interpreted the intent of the PAID toolkit;

76

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

Exhibit C, Page 000032

```
 1   declaration.

 2            THE WITNESS:  Yes, it's on Page 4 of my

 3   declaration that talks --

 4   BY MR. YSLAS:

 5      Q.   It's -- yeah.  So you want to -- I want to

 6   look at the actual document.  And if you look at the

 7   exhibit that we've marked as Exhibit 4, which are

 8   the -- the documents that were sealed as a part of

 9   your declaration, within that document, if you look at

10   Exhibit 4, it's Bates-labeled P100 at the bottom.

11      A.   Correct.

12      Q.   Okay.  And it states -- it states at the top,

13   "Pharmacist Immunization Training Central."

14            Do you see that?

15      A.   Yes.

16      Q.   Okay.  Now, this document does not state that

17   taking the immunization training program was

18   mandatory; correct?

19      A.   I don't know.  I don't believe so.

20      Q.   Okay.  In fact, the -- the first item at the

21   top, it says, "Interested in becoming a certified

22   immunizer?"

23            Do you see that?

24      A.   Correct.

25      Q.   Okay.  Do you know who authored this
```

80

Exhibit C, Page 000033

1    document, the pharmacist immunization training central

2    document?

3        A.   No, I don't.

4        Q.   Do you know what the intent of the author of

5    this document was?

6        A.   The intent, I believe, was to explain the

7    process of becoming certified.

8        Q.   Okay.  If you're interested in becoming an

9    immunization -- certified immunizer?

10       A.   That's what it says.  It doesn't say "if"; it

11   says, "Interested in becoming a certified immunizer?"

12       Q.   Okay.  Did you interpret this, though --

13   there's a question mark there.  So my question to you

14   is:  Did you interpret this as meaning if you're

15   interested in becoming a certified immunizer, this is

16   what you do?

17       A.   This is after feeling the pressure and

18   feeling that if I didn't do it, it would adversely

19   affect my employment.  And they're asking me:  Now are

20   you interested in becoming a certified immunizer?

21            That's how I interpret it.

22       Q.   Okay.  What you're saying is you interpret

23   this as being disingenuous?  In other words, your

24   interpretation of this is, rather than the actual

25   words, was not really asking you if you're interested?

81

Exhibit C, Page 000034

1    is the people that were in management level -- had

2    management level authority that caused you to form

3    that understanding.

4            Do you understand?

5        A.    Yes, I believe so.

6        Q.    Okay.  So I think it's pretty clear that the

7    people that caused you to form the understanding that

8    taking the training course was mandatory were

9    Stephanie Fisher and MaryAnn Dabney; right?

10       A.    Directly?  Yes.

11       Q.    Okay.  Other than Ms. Fisher and Ms. Dabney,

12   there wasn't anyone else in management that caused you

13   to understand that taking the training course was

14   mandatory; is that correct?

15       A.    Again, directly?  Yes.

16       Q.    Okay.  So by "directly," you mean who made

17   direct statements to you?

18       A.    Correct.

19       Q.    Okay.  So the people at Wal-Mart that made

20   direct statements to you that taking the mandatory --

21   taking the training course was mandatory were MaryAnn

22   Dabney and Stephanie Fisher; correct?

23       A.    To the best of my recollection.

24       Q.    Okay.  There was no one else in management

25   who directly made such statements to you; correct?

91

Exhibit C, Page 000035

1       A.   To the best of my recollection, yes.

2       Q.   Okay.  Now, you used the word "direct."  So

3    was there anyone else in management that indirectly

4    made any statements to you that caused you or -- or

5    engaged in any other conduct that caused you to

6    believe that the training course was mandatory?

7       A.   Yes.

8       Q.   And who was that?

9       A.   Ami Bhatt had -- has told -- had told a

10   pharmacist that if someone refused to take the

11   training course and becomes certified, they would be

12   removed from their home store.

13      Q.   Now, Ms. Bhatt never told you that; right?

14      A.   At the beginning, you said "indirectly," so

15   that's what we're focusing on.

16      Q.   Right.  And so I have a clear record,

17   Ms. Bhatt never directly told you that; right?

18      A.   Correct.

19      Q.   Okay.  Now, your testimony is she told

20   another pharmacist that?

21      A.   Correct.

22      Q.   You weren't -- strike that.  Were you present

23   during that conversation?

24      A.   No.

25      Q.   Okay.  So you heard about the conversation

                                                           92

1   Wal-Mart encouraged its pharmacists to take the course

2   and become certified.

3       Q.   Okay.  We've already identified Ms. Dabney.

4   Do you know who told Ms. Dabney about this goal of

5   having two pharmacists --

6       A.   Who told Ms. Dabney?  No, I do not.

7       Q.   Okay.  Other than the statement by Ms. Dabney

8   about the goal which -- and the two statements by

9   Ms. Bhatt, is there any other statements by Wal-Mart

10  management that indirectly caused you to believe that

11  taking the immunization training course was mandatory?

12      A.   Actually, I do recall that a pharmacist by

13  the name Jason Berg, who works at the Laguna Hills

14  store, he directly told me that Ami Bhatt was a huge

15  fan of immunizations, and that if a store did not

16  perform at the expected level or didn't have all its

17  pharmacists immunized, that she would make sure they

18  would become certified.

19      Q.   Other than the statements you've testified

20  now as three by Ms. Bhatt -- again, the last statement

21  you just testified to, you didn't personally witness

22  that; right?  That's what Mr. Jason Berg told you;

23  right?

24      A.   Told me, yes.

25      Q.   Other than those three statements by

97

Exhibit C, Page 000037

1    Ms. Bhatt and then the e-mail of Ms. Dabney you

2    referred to, are there any other indirect statements

3    by Wal-Mart that caused you to believe that --

4    Wal-Mart management that caused you to believe that

5    taking the training course was mandatory?

6        A.   Not that I can recall at this point.

7        Q.   Have you ever spoken to a woman named Susanne

8    Hiland, H-i-l-a-n-d?

9        A.   Not that I recall at this moment.

10       Q.   Okay.  Ever had any written communications

11   with Ms. Hiland?

12       A.   Susanne Hiland?  Not that I recall.

13       Q.   Okay.  Have you ever had any communications

14   with a woman named Deanna, D-e-a-n-n-a, Seiler,

15   S-e-i-l-e-r?

16       A.   Not that I recall.

17       Q.   Okay.  And I know you -- you identified in

18   your declaration a -- a communication that you

19   received from Pam Piotrowski, P-i-o-t-r-o-w-s-k-i.

20            Have you ever spoken to Ms. Piotrowski

21   directly?

22       A.   I don't believe so.

23       Q.   Have you ever had any e-mail communications

24   with Ms. Piotrowski?

25       A.   I may have, but I cannot recall.

98

Exhibit C, Page 000038

1        Q.    Okay.   And did you work in the pharmacy 40

2    hours that week, or did you -- did you -- in other

3    words, that one day that you took the live portion,

4    was that substituted for your workday?

5        A.    It was substituted.

6        Q.    Okay.

7        A.    That's what I meant earlier; they had to find

8    coverage.

9        Q.    I see.   And where did you take the training

10   course?

11       A.    The home study, you mean?

12       Q.    Yeah.   Well, where did you take the live

13   portion?

14       A.    The live portion was at the regional office

15   in Irvine.

16       Q.    And the home study portion I assume you

17   studied for at home?

18       A.    Yes.

19       Q.    Okay.   As a pharmacist, were there certain

20   requirements to keep your license?

21       A.    What's -- I'm sorry?

22       Q.    Were there certain requirements, like

23   continuing education, that were required to keep your

24   license?

25       A.    Yes.

113

Exhibit C, Page 000039

1        Q.    Okay.  And did taking this immunization

2    training course qualify towards credit towards the

3    continuing education credit?

4        A.    Yes.

5        Q.    Okay.  So is it fair to say you received a

6    benefit from taking the immunization training course

7    inasmuch as it satisfied a portion of your continuing

8    education credit?

9        A.    I didn't need that benefit.

10       Q.    Well, I'm not asking if you needed it.  I'm

11   asking if you received it.

12       A.    I received CEs, yes.

13       Q.    Okay.

14       A.    Continuing education.

15       Q.    Okay.  So you received the benefit of CE

16   credit as a result of taking the immunization training

17   program; right?

18       A.    Correct.

19       Q.    And what -- what was the requirement of CE,

20   continuing education, to become -- to maintain your

21   license as a pharmacist?

22       A.    30 hours every 2 years.

23       Q.    Okay.  And 30 hours every 2 years as of -- do

24   you recall the period of time that you had to do that?

25   In other words, usually, you know, as a lawyer, I've

114

1    got to do it every three years, and there's sort of a

2    date by which I need to do it.

3           Do you recall, you know, as of December 2013,

4    what -- what your deadline date was?

5    A.   Yes.  It's every two years before the

6    expiration of your license or the time to renew it.

7    Q.   Okay.  And for you, when was that?

8    A.   May of 2014.

9    Q.   So from May of 2012 to May of 2014, you

10   needed to do 30 hours?

11   A.   Correct.

12   Q.   Okay.  And as of December 2013 -- before you

13   took the immunization training course, had you done

14   any of the CE?

15   A.   Yes.

16   Q.   How many hours?

17   A.   I can't remember.

18   Q.   Had you satisfied the 30-hour requirement at

19   that point?

20   A.   I can't remember.

21   Q.   Do you know how many hours of credit you

22   received for the immunization training course?

23   A.   Yes.  20 hours.

24   Q.   So taking the immunization training course

25   would satisfy two-thirds of the CE requirements?

115

Exhibit C, Page 000041

1      A.   If you had not done all your CEs already.

2      Q.   Right.  And hypothetically, somebody could

3   have not done any CE, take it, and have two-thirds of

4   their CE done; right?

5      A.   Hypothetically.

6      Q.   As we sit here today, you'd have no idea --

7   you'd have to individually look at every pharmacist to

8   figure that -- whether or not somebody had completed

9   their CE by the time that they took the immunization

10   training course; right?

11      A.   Correct.

12      Q.   Yeah.

13      A.   I wouldn't know they would.

14      Q.   Yeah.  And as a result of taking the

15   immunization-certified training course, you became

16   able to administer immunizations; right?

17      A.   Correct.

18      Q.   Do you understand that California law

19   requires any pharmacist who administers vaccines to

20   first take an immunization certification program?

21      A.   Yes.

22      Q.   Having obtained your immunization

23   certification, you could use that certification to

24   offer immunizations for other pharmacies; right?

25      A.   Other pharmacies?  Once you have the

116

Exhibit C, Page 000042

1    PAID toolkit or maybe the -- that it actually spells

2    that out, but I never really paid attention to that

3    section because it didn't really apply to me.

4        Q.   Okay.  So you don't really know?

5        A.   I'm going to say that I'm not 100 percent

6    sure --

7        Q.   Okay.

8        A.   -- if Wal-Mart would have accepted any other

9    certification.

10       Q.   Did anyone at Wal-Mart ever tell you directly

11   that if you didn't take the immunization training

12   course, you'd be transferred to a different store?

13       A.   Not directly.

14       Q.   Did anyone from Wal-Mart ever tell you that

15   if you didn't become immunization-certified, you would

16   lose hours?

17       A.   Not directly.

18       Q.   Did anybody from Wal-Mart ever indirectly

19   tell you in some way that you would be transferred if

20   you didn't become immunization-certified?

21       A.   I heard the message loud and clear through

22   others.

23       Q.   Through who?

24       A.   Like I said earlier, the comments that Ami

25   had made.

121

Exhibit C, Page 000043

1      A.   That is exactly what it says.

2      Q.   No, the -- exactly what it says is, "Wal-Mart

3  will only hire pharmacists who are IMZ-certified."

4           So your interpretation of what that is

5  intended to mean is what you've just testified to;

6  right?

7      A.   Again, to me, an indirect threat carries as

8  much weight as a direct threat.

9      Q.   Okay.  And you interpret that as an indirect

10  threat?

11     A.   It is a threat, yes.

12     Q.   Okay.  Looking at Exhibit 6 of your

13  declaration, which is a -- a national certificate

14  program for pharmacists, Module 1, Pharmacists as

15  Vaccine Advocates, it's Bates-labeled P191 through

16  194, is there anything in this document that conveys

17  that taking the immunization training program is

18  mandatory?

19     A.   No.  This is the training course by APhA.

20     Q.   Right.  In other words, this is not a

21  document authored by Wal-Mart; right?

22     A.   This is not a document created by Wal-Mart.

23     Q.   Right.  Or authored by anyone at Wal-Mart.

24  In other words, the author of this document is who?

25     A.   I don't believe so.

                                                    134

```
 1       Q.   Okay.  You don't believe that this document

 2  was authored by anyone at Wal-Mart; right?

 3       A.   I -- I don't believe so.

 4       Q.   Okay.  Was this document provided as part of

 5  the immunization training?

 6       A.   Yes.

 7       Q.   Is there any part of this document which

 8  states that immunizations are a part of a pharmacist's

 9  job?

10       A.   On Module 1 there is a section -- well,

11  there's one section that says, "Pharmacists are

12  uniquely positioned to be centers for the

13  dissemination of vaccine information.  Pharmacists in

14  all practice settings can serve as vaccine advocates,

15  providing" --

16       Q.   Which portion are you reading from?

17       A.   Second column on the right --

18       Q.   Of which page?

19       A.   -- the last paragraph.

20       Q.   Which Bates-labeled page?

21       A.   Oh.  192.

22       Q.   Okay.  And what does this -- the paragraph

23  start with?

24       A.   "Pharmacists are uniquely positioned."

25       Q.   Okay.  So, in your mind, that paragraph
```

135

Exhibit C, Page 000045

1    states how immunizations are a part of a pharmacist's

2    job?

3        A.   That, and, also, right next to it, to the

4    left, it says, "Almost two decades ago, pharmacists

5    began their modern-day involvement with immunization

6    services in an effort to provide high-quality

7    pharmaceutical care."

8            So obviously it's part of their job.

9        Q.   Okay.  When you were hired by Wal-Mart, was

10   it a requirement that you administer vaccines?

11       A.   Well, obviously, no.

12       Q.   So when you were hired by Wal-Mart, it wasn't

13   a part of your job to administer vaccines; right?

14       A.   No.

15           MR. YSLAS:   The videographer is letting me

16   know that we're almost out of tape.  So why don't we

17   take a short break.

18           MR. EPSTEIN:   I think that's all the tape he

19   brought.  He didn't bring any more tape.  We're done.

20           THE VIDEOGRAPHER:   The time is 3:00 p.m.

21   This is the end of Tape 3.  We are off the record.

22           (Brief recess.)

23           THE VIDEOGRAPHER:   Back on the record.   The

24   time is 3:18 p.m.  This is the beginning of Tape 4.

25   / / /

136

Exhibit C, Page 000046

1    BY MR. YSLAS:

2        Q.   Ms. Nikmanesh, looking at Exhibit 7 of your

3    declaration, which are job descriptions --

4        A.   Exhibit 7.

5        Q.   -- or I should say a job description.

6        A.   Exhibit 7.

7        Q.   So turning to Exhibit 3, which is -- is your

8    declaration, and then attached to it as Exhibit 7 is

9    the pharmacy manager description --

10       A.   I got it.

11       Q.   -- which is P126 --

12       A.   Yes, I got it.

13       Q.   -- through 129 --

14            Well, actually, I know there's a few of them.

15   There's two of them.  There's one, P126 through 129 is

16   for the pharmacy manager.  And then 130 through 132

17   are for the staff pharmacist.

18            Is there anything in this document that

19   indicates to you that being immunization-certified is

20   mandatory?

21       A.   One of the job qualifications, it states it's

22   preferred qualification.

23       Q.   Okay.  Does "preferred" mean required to you?

24       A.   It ties in with MaryAnn Dabney's comment

25   about Wal-Mart starting to only hire pharmacists who

                                                        137

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

Exhibit C, Page 000047

1     were certified.  To me, that's a requirement.

2         Q.   Okay.  So I want to make sure I understand.

3     This document doesn't directly say that being

4     immunization-certified is mandatory; right?

5         A.   It relays the message.

6         Q.   No.  But it doesn't directly say those words;

7     right?

8         A.   Not -- not in so many words, no.

9         Q.   Okay.  What it says is that immunization

10    certification is a preferred qualification; right?

11        A.   Correct.

12        Q.   Okay.  And is it fair to say the word

13    "preferred" means more desirable?

14        A.   Preferred is basically -- as far as Wal-Mart

15    is concerned, would give one pharmacist the

16    competitive edge.

17        Q.   Okay.

18        A.   Again, as far as Wal-Mart was concerned.

19        Q.   Okay.  And this job description is part of

20    your overall interpretation that taking the

21    immunization certification course is mandatory; right?

22        A.   Yes.  And if you'd pay attention, it's dated

23    September of 2013.  And as you move forward, the one

24    dated November 2014 specifically says "Minimum

25    qualifications is APhA Immunization-Certified."  So

138

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

Exhibit C, Page 000048

1    as a matter of fact.  This just basically confirms the

2    message that we have been given by Wal-Mart that

3    that's what Wal-Mart wants -- he wants its pharmacists

4    to be certified, immunization-certified.

5        Q.    Okay.  And you're looking in Exhibit 8,

6    Page P114?

7        A.    P114, yes.

8        Q.    Where it says APhA immunization-certified as

9    a minimum qualification; right?

10       A.    Yes.

11       Q.    Okay.  And this particular job posting, per

12   the top of the page, deals with the staff pharmacist

13   part-time jobs in Massachusetts?

14       A.    Yes.

15       Q.    Okay.  Do you have any idea of what the

16   demands for immunization certifiers were in

17   Massachusetts at Wal-Mart as of the time this was

18   posted?

19       A.    I'm sorry.  Repeat the question.

20       Q.    Do you have any idea what the demands were

21   for -- for pharmacists to be immunization-certified in

22   Massachusetts at the time that this job posting was

23   posted in November 2014?

24       A.    There's a high demand all over the country.

25       Q.    Okay.  Do you specifically know what the

140

1    demand was in Massachusetts when this was posted?

2        A.    I wouldn't know specifically in

3    Massachusetts.

4        Q.    Do you know who authored this job posting?

5        A.    It was by Wal-Mart.

6        Q.    Do you know who specifically at Wal-Mart?

7        A.    I wouldn't know.

8        Q.    Okay.  Do you have any idea what the intent

9    was behind this job posting?

10        A.    One of the intentions is to make it very

11    clear that if you're not immunization-certified, you

12    are not qualified to apply for the job.

13        Q.    Okay.  As a new hire; right?

14        A.    Yes.

15        Q.    Okay.  Now, going to Page P116, this is

16    another job posting for pharmacy managers in Dallas.

17    Now, this one actually has a minimum qualification --

18    has a -- immunization certification as a preferred

19    qualification; right?

20        A.    Correct.

21        Q.    Okay.  So is there anything in this document

22    here on P116 that, in your mind, indicates that a

23    current pharmacist must be immunization-certified?

24        A.    If it's a preferred one, yes, because then

25    again Wal-Mart is going to choose the pharmacist who's

141

1      Q.   In your pharmacy.

2      A.   On a daily basis?  Yes.

3      Q.   Okay.  So you do have some idea of what the

4   prescription demands are in the pharmacies that you

5   worked in?

6      A.   A rough idea.

7      Q.   Okay.  But you just don't know about

8   pharmacies that you didn't work in; right?

9      A.   Correct.

10      Q.   Looking at Exhibit 9 of your declaration,

11   which is an e-mail -- well, it's an e-mail chain.  The

12   e-mail chain is Bates-labeled P73 through 74.  And the

13   first e-mail comes from Joan Ordonez, who's a pharmacy

14   manager in Store 3796, Ontario, California.

15           Do you see that?

16      A.   Yes.

17      Q.   Then eventually Ms. Fisher forwards it to a

18   number of people, including you, on December 2; right?

19      A.   Correct.

20      Q.   Is there anything in this e-mail chain, in

21   your mind, that indicates that taking the immunization

22   certification program is mandatory?

23      A.   This is an informational e-mail regarding the

24   12-hour study not being reimbursable.

25      Q.   Okay.  So the answer to my question is no,

145

1    then?  There's nothing in this e-mail chain, which is

2    Exhibit 9, that indicates that -- to your declaration

3    that indicates that taking the immunization

4    certification program is mandatory; is that correct?

5        A.   Correct.

6            MR. YSLAS:  Did you need a minute, Eric?  I

7    saw you motioning towards her.  Is there something you

8    wanted to point out?

9            THE WITNESS:  No.

10           MR. EPSTEIN:  Not now.

11           THE WITNESS:  Not the e-mail from Joan

12   Ordonez and not the e-mail from Stephanie Fisher, but

13   my e-mail to them.

14   BY MR. YSLAS:

15       Q.   Okay.  So, for the record, Mr. Epstein just

16   motioned and pointed to a portion of Exhibit 12 in the

17   e-mail and pointed you to the provision that you're

18   talking about right now; is that right?

19       A.   No, actually.  I am talking about my --

20       Q.   Okay.  But your attorney just pointed to a

21   portion of the exhibit.  What I'm asking you is:  He

22   just pointed to the portion that you're talking about

23   right now?

24       A.   No.  He actually just pointed to the

25   number -- to the name of the -- of the people there,

146

1    which I didn't understand what he meant by that.

2        Q.   Okay.

3        A.   Okay.  There's --

4        Q.   And now you're going to clarify your answer

5    as to a portion of this e-mail; right?

6        A.   Yes.

7        Q.   That's what you wanted to do now?

8        A.   Yes.

9        Q.   Okay.  Go ahead.

10       A.   Because you were talking about their -- their

11   e-mail, does it indicate if it's -- the course is

12   mandatory?  So am I allowed to ask my lawyer why he

13   was pointing to the names of the --

14            MR. EPSTEIN:  No, not now.

15   BY MR. YSLAS:

16       Q.   You can do whatever you want.

17            MR. EPSTEIN:  No, just answer the question,

18   though.  You were going to reference your e-mail, so

19   go ahead.

20            THE WITNESS:  No, but what I'm saying is:

21   Not in their e-mails, but in my e-mail, you read what

22   it says I was -- I just was informed that I had been

23   signed up for the class.

24   BY MR. YSLAS:

25       Q.   Where does it say that?

147

1      A.    My e-mail, not theirs.  Right -- right above.

2      Q.    Okay.  So you're looking at --

3      A.    The very first sentence on top, where I say,

4    "Hi, Stephanie."

5      Q.    Okay.  Maybe -- this is Exhibit 9; right?

6      A.    Bate No. 73.

7      Q.    Okay.  It says, "Sorry.  But I was just

8    informed that I had been signed up for the class."

9      A.    Correct.

10     Q.    Okay.  That's the portion that, in your mind,

11   indicates that taking the course -- training course

12   was mandatory?

13     A.    Well, I didn't sign up for it; I was signed

14   up for it.

15     Q.    Who signed you up for it?

16     A.    I believe it was Stephanie Fisher.

17     Q.    Do you know?

18     A.    That's what my belief was.  I can't think of

19   anyone else.

20     Q.    Okay.  But I -- I'm asking you a very

21   specific question about personal knowledge.

22           Do you know if Ms. Fisher signed you up for

23   the immunization training course?

24     A.    That's what I assumed.

25     Q.    I'm not asking you what you assumed; I'm

148

1    asking what you know.

2              Do you understand the difference?

3       A.   Well, I don't know, then, in that case.  I'm

4    not 100 percent sure who did.

5       Q.   Okay.  So I have a clear record, you don't

6    know for sure who signed you up for the immunization

7    training course; correct?

8       A.   Correct.

9       Q.   All right.  But you know that you didn't do

10   it on your own?

11      A.   Correct.

12      Q.   Okay.  Somehow it came to your attention that

13   you were signed up for it; is that right?  Is that

14   your testimony?

15      A.   Correct.

16      Q.   Okay.  And you never took any voluntary act

17   to indicate that you were signing up for the

18   immunization training course; is that your testimony?

19      A.   Not that I recall.

20      Q.   Okay.  Did you ever write any e-mails or

21   engage in any communications with anyone in which you

22   said that the immunization training course was

23   voluntary?

24      A.   I apologize.  Repeat the question.

25      Q.   Did you ever write any e-mails or engage in

149

1    document that indicates to you that taking the

2    immunization training course is mandatory?

3         A.   Not that I can see.

4         Q.   Turning to Exhibit 11 of your declaration,

5    which is also referenced at Paragraph 27 of your

6    declaration, in Paragraph 27 of your declaration, you

7    indicate that you spoke to numerous pharmacists in

8    other states by calling them up on the phone; right?

9         A.   Correct.

10        Q.   All right.  This is a list of phone numbers,

11   and it's got states next to it.

12             I guess my first question for you is:  Where

13   did you get these phone numbers from?

14        A.   I believe I collected it off Google.

15        Q.   Okay.  So these are -- these are the phone

16   numbers of pharmacies in various states -- sorry.

17   Strike that.

18             These are the phone numbers of Wal-Mart

19   pharmacies in various states; is that right?

20        A.   Correct.  Two pharmacies in each state.

21        Q.   Okay.  So, for example, next to Alabama, it

22   says 205-926-6553.

23             Do you see that?

24        A.   Correct.

25        Q.   Okay.  So that's the number of a pharmacy in

153

Exhibit C, Page 000056

1    Alabama?

2         A.    Wal-Mart pharmacy.

3         Q.    Okay.  It's not the number of a pharmacist;

4    it's the number of a pharmacy in Wal-Mart; right?

5         A.    Wal-Mart pharmacy, correct.

6         Q.    Okay.  So you went on Google; you got the

7    phone numbers of two pharmacies in each state listed

8    here; right?

9         A.    Correct.

10        Q.    And then you started calling these

11   pharmacies; is that right?

12        A.    Correct.

13        Q.    And what phone number did you call from?

14        A.    I believe it was my cell phone.

15        Q.    Cell phone number that you've provided

16   already?

17        A.    Yes.

18        Q.    Okay.  When you called up these pharmacies,

19   did you identify -- well, strike that.

20               When did you do this?

21        A.    I can't remember.

22        Q.    Did you do it after you stopped working for

23   Wal-Mart?

24        A.    I can't remember.

25        Q.    So you can't remember if you placed these

154

Exhibit C, Page 000057

1    phone calls while you were employed with Wal-Mart or

2    after you left?  You don't know one way or the other;

3    right?

4        A.   No, I can't remember.

5        Q.   When you called up the pharmacy, each person,

6    did you speak to a pharmacist in each of these

7    numbers?

8        A.   Yes.

9        Q.   Did you identify yourself as a Wal-Mart

10   employee?

11       A.   I -- I can't remember.  I would just tell

12   them -- I would ask them if they have taken the

13   immunization training course.

14       Q.   Okay.  So I want to make sure I have a clear

15   answer to one question.

16            When you called up these pharmacies and you

17   talked to a pharmacist, did you tell them that you

18   were a current Wal-Mart employee?

19       A.   I can't remember because I can't remember if

20   I did it prior or after my termination.

21       Q.   Okay.  So it's possible you made these calls

22   after your termination?

23       A.   It's possible.

24       Q.   Okay.  And you don't recall whether or not

25   you identified yourself as a Wal-Mart employee?

155

Exhibit C, Page 000058

```
 1      A.   If I -- I -- the way I would do it normally,

 2   like I did with JoLynn Coleman, is that, "I took the

 3   training course with Wal-Mart" -- so that was a true

 4   statement -- "and I wanted to know if you have taken

 5   the course."

 6           This is the -- to the best of my

 7   recollection.  I would not lie.  So I wouldn't say,

 8   "I'm a Wal-Mart employee," if I were not a Wal-Mart

 9   employee at the time.

10      Q.   Okay.  So what you're clearly testifying to

11   right now is that you didn't misrepresent that you

12   were a Wal-Mart employee?

13      A.   Absolutely not.

14      Q.   Okay.  But you don't remember one way or the

15   other if -- if you affirmatively told somebody one way

16   or the other if you were a Wal-Mart employee.

17           Do you understand the difference?

18      A.   Yes.  I could tell you that I would never

19   lie.

20      Q.   Okay.  I know you wouldn't lie, but the issue

21   is an omission -- is really, I think -- that's what

22   I -- what I'm asking is:  Did you call up these

23   employees after you left Wal-Mart and didn't tell them

24   one way or the other if you were a Wal-Mart employee?

25   That's my question.
```

                                                          156

Exhibit C, Page 000059

```
 1        A.    I can't remember.

 2        Q.    Okay.  For each of these pharmacists that you

 3   spoke to, did you take down what their name was?

 4        A.    Not all of them.

 5        Q.    Did you take down the name of some of them?

 6        A.    Yes.

 7        Q.    And do you have -- do you know what those

 8   names are?

 9        A.    There was Lisa in Alabama and then Scott in

10   Alaska.

11        Q.    That's it; right?

12        A.    Oh, Cindy in Florida.  It's right there.

13        Q.    So as we sit here today, you can give me the

14   first name of three of the people that you talked to

15   on this list; right?

16        A.    Yes, with their phone numbers.

17        Q.    The phone numbers --

18        A.    The phone numbers of the Wal-Mart that they

19   worked at at the time.

20        Q.    Okay.  But you can't remember when you

21   called; right?

22        A.    No.

23        Q.    Okay.  Did you call on different days or on

24   a -- one day only?

25        A.    No, I believe it was all on the same day.
```

157

Exhibit C, Page 000060

1      Q.   As we sit here today, do you know if any of

2   the pharmacists on this list were classified as exempt

3   pharmacists?

4      A.   Actually, right next to their names, you see

5   "S"?  That stands for salary.

6      Q.   Show me.  I'm not seeing it.

7      A.   Where it says "No, No, No, No," right next to

8   it --

9      Q.   Okay.

10     A.   -- to the right of it.

11     Q.   Okay.  So you have a circle around some of

12  them and -- and not a circle around other ones.

13          Is it your testimony that all of the S's,

14  circled or uncircled, are salaried employees?

15     A.   Correct.

16     Q.   So for those that you spoke to in Alabama,

17  Alaska, Arizona, Arkansas, Colorado, Connecticut,

18  Delaware, Florida and Georgia -- those pharmacists

19  that you spoke to were exempt salaried employees;

20  right?

21     A.   Yes.  But some of them did say that floaters

22  would be nonexempt.

23     Q.   Well, what did -- what did you do when you

24  called these people up?  What did you say to them?

25     A.    If they felt that the immunization

158

Exhibit C, Page 000061

1    certification was mandatory.

2        Q.   So just -- let's just back up for a second.

3    I want to make sure I understand kind of the totality

4    of the conversation.

5            You called up the pharmacy; somebody answers

6    and says, "Hello," whatever, you know.

7            Then what happens?

8        A.   Then I would ask to speak to the pharmacist.

9        Q.   And then what happened?

10       A.   Then I said something to the effect that I

11   took the training course with Wal-Mart for the

12   immunization, and I wanted to know if they took it.

13           And if they would say yes, then I would say,

14   "Did you feel that you had to do it?  Did you feel it

15   was mandatory?  Or did you feel it was voluntary?"

16           And unanimously they said, "Are you kidding?

17   Of course it was mandatory."

18       Q.   Okay.  So every one of the pharmacists on

19   this list that you called said it was mandatory?

20       A.   Yes.  Hence, I stopped after the tenth one.

21       Q.   Oh, okay.  So you made ten -- in other words,

22   you called two in Alabama.  Explain to me.  Which ten

23   did you call?

24       A.   The first ten states.

25       Q.   I see.  Okay.  So you didn't call Hawaii,

159

Exhibit C, Page 000062

1    Idaho, Illinois, Indiana, all the way down to New

2    Mexico; right?

3        A.    No.

4        Q.    The only states you called were Alabama,

5    Alaska, Arizona, Arkansas, Colorado, Connecticut,

6    Delaware, Florida and Georgia; right?

7        A.    Yes.

8        Q.    And each one of these that you called

9    involved salaried employees; right?

10       A.    Correct.

11             I did ask them one more question.

12       Q.    Okay.

13       A.    If they got paid for the 12-hour study.

14       Q.    And what did they say?

15       A.    No.

16       Q.    So I guess I'm confused.  If they're exempt

17   employees, how do they get paid for the 12 hours?

18       A.    That's what I didn't understand at the time,

19   so -- and they kept saying, "Well, because we're

20   salary, so we get paid the same amount of money no

21   matter what."

22             So that was the explanation.

23       Q.    Okay.  And in these phone calls, you never

24   talked to any nonexempt pharmacists; right?

25       A.    I believe Cindy was nonexempt, I believe,

160

Exhibit C, Page 000063

1    because, to the best of my recollection, she was a

2    floater.

3        Q.    Okay.  Other than Cindy, you didn't talk to

4    any other nonexempt pharmacists; right?

5        A.    I don't believe so.

6        Q.    Okay.  As we sit here today, you haven't

7    talked to any nonexempt pharmacists outside of

8    California; right?

9        A.    Not to the best of my recollection.

10       Q.    Okay.  So that I have a clean answer to make

11   sure, as we sit here today, you haven't talked to any

12   nonexempt pharmacists outside of California, other

13   than Cindy, whether or not the training course was

14   mandatory; right?

15       A.    Not that I can recall.

16       Q.    Outside of California, you really don't know

17   what was conveyed about the program being mandatory or

18   voluntary; right?

19       A.    That was my question for the pharmacists, and

20   they unanimously said that they felt that it was

21   mandatory.

22       Q.    Okay.  Did they tell you anything

23   specifically about how they came to that

24   understanding?

25       A.    No.  We didn't specifically talk about the

161

```
 1                    REPORTER'S CERTIFICATE

 2

 3          I, Jan M. Roper, a Certified Shorthand

 4    Reporter No. 5705, do hereby certify:

 5          That, prior to being examined, the witness

 6    named in the foregoing deposition, AFROUZ NIKMANESH,

 7    was by me duly sworn to testify the truth, the whole

 8    truth, and nothing but the truth.

 9          That said deposition was taken down by me in

10    shorthand at the time and place therein named and

11    thereafter transcribed under my direction, and I

12    hereby certify that the foregoing deposition is a true

13    and correct transcript of my shorthand notes so taken.

14          I certify that a request has been made by, or

15    on behalf of, the witness to review, correct and sign

16    the transcript of these proceedings.

17          I further certify that I am neither counsel

18    for nor related to any party to said action nor in

19    anywise interested in the outcome thereof.

20          IN WITNESS WHEREOF, I have hereunto

21    subscribed my name this 24th day of June, 2015.

22

23

24    _____
      JAN M. ROPER, RPR, CSR NO. 5705
25

                                              236
```

**EXHIBIT D**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA — SOUTHERN DIVISION


| | |
|---|---|
| AFROUZ NIKMANESH, ELVIS ATENCIO, ANNA NGUYEN, AND EFFIE SPENTZOS, on behalf of themselves, the general public, and all others similarly situated, | ) CASE NO.: ) 8:15-cv-00202 AG-JCG ) ) VOLUME I ) ) (Pages 1 — 143) ) |
| Plaintiffs, | ) ) |
| vs. | ) ) |
| WAL-MART STORES, INC., a Delaware corporation, and WAL-MART ASSOCIATES, INC., a Delaware corporation, and DOES 1 through 10, inclusive, | ) ) ) ) ) |
| Defendants. | ) ) |
| _____ | ) |


VIDEO DEPOSITION OF ANNA LINH NGUYEN

Friday, June 26, 2015

Los Angeles, California


Reported By:

Jan M. Roper, RPR,

CSR No. 5705

File No.: 150626JR

1

Exhibit D, Page 000066

```
 1        Q.   And Ms. Fisher, was she supervising

 2   another -- another market?

 3        A.   Yes.

 4        Q.   What was that?

 5        A.   I don't remember the market number, but it

 6   was more in the L.A. area.

 7        Q.   Do you know how many stores, approximately?

 8        A.   Approximately the same.

 9        Q.   About 12 or 13?

10        A.   About 12 or 13.

11        Q.   Okay.  So Ms. Fisher supervised at the time

12   anywhere from 24 to 26, approximately, stores; right?

13        A.   That is correct.

14        Q.   Okay.  And they were all in Southern

15   California; correct?

16        A.   Yes.

17        Q.   Just -- you're almost getting ahead of me on

18   the answers.

19        A.   I'm sorry.

20        Q.   That's okay.  I think we got an okay

21   transcript there, but --

22             So Ms. Fisher's authority was limited to

23   these 24 to 26 stores in Southern California; correct?

24        A.   Yes.

25             MR. PARCELLS:  Objection.  Speculation.
```

28

Exhibit D, Page 000067

```
 1      A.   Okay.

 2      Q.   -- Market 70 and then the market that you --

 3      A.   I don't remember.

 4      Q.   -- can't remember the name of, but it was in

 5  the Los Angeles area.

 6           Other than those two markets, do you have any

 7  reason to believe Ms. Fisher's authority extended

 8  beyond those two markets?

 9      A.   I am unsure.

10      Q.   Are there any facts that you can provide me

11  today that would lead you to believe that her

12  authority extended beyond those two markets?

13      A.   No.

14      Q.   At the time, who was the regional manager, as

15  of January 1st -- well, strike that.

16           Ms. Fisher became your direct supervisor, did

17  you say, in the summer of 2013?

18      A.   Yes.

19      Q.   Okay.  And before then it was Mr. Dukes;

20  right?

21      A.   Yes.

22      Q.   Okay.  So focusing on now the January 2013

23  time frame when Mr. Dukes was your supervisor, his

24  region was Market 70; right?

25      A.   Yes.
```

30

Exhibit D, Page 000068

1      Q.   Same 12 to 13 stores that you've already

2    talked about regarding Market 70; right?

3      A.   Yes.

4      Q.   Okay.  And his authority was limited to those

5    12 to 13 stores; correct?

6      A.   Yes.

7      Q.   And at the time Mr. Dukes was your supervisor

8    in around January 2013, who did he report to?

9      A.   Anthony Chung.

10      Q.   And Mr. Chung was a regional manager?

11      A.   Yes.

12      Q.   And ultimately Mr. Chung -- when Ms. Fisher

13    became your -- strike that.

14           Mr. Chung:  What area did he supervise?

15      A.   I don't recall.

16      Q.   Okay.  So, as we sit here today, you don't

17    recall what area Mr. Chung supervised as regional

18    manager; correct?

19      A.   Yes.

20      Q.   As we sit here today, you don't know the

21    extent of Mr. Chung's authority while he was regional

22    manager; correct?

23      A.   Yes.

24      Q.   When Ms. Fisher became your direct supervisor

25    as a market manager, did Mr. -- was Mr. Chung still

31

Exhibit D, Page 000069

1          MR. YSLAS:  Can we just take a couple-minute

2     break.  There's something going on with the live feed.

3          THE VIDEOGRAPHER:  We're off the record.  The

4     time is 10:59.

5          (Brief recess.)

6          THE VIDEOGRAPHER:  This begins Media No. 2 of

7     the deposition of Anna Nguyen.  We're on the record at

8     11:10.

9          MR. YSLAS:  Okay.  The videographer took a

10    few minutes to change the tape at the break.

11      Q.   Ms. Nguyen, from January 1, 2013, to present,

12    do you know how many market managers there were for

13    areas covering California?

14      A.   How many market managers?

15      Q.   Right.

16      A.   I don't have that answer.

17      Q.   Do you have any estimate?

18      A.   I can't even estimate.

19      Q.   Because you don't have enough personal

20    knowledge to know that; right?

21      A.   That is correct.

22      Q.   And from January 1, 2013, can you give any

23    estimate as to how many market managers there were for

24    Wal-Mart throughout the United States?

25      A.   I don't have that answer.

56

Exhibit D, Page 000070

```
 1      Q.   You have no idea; correct?

 2      A.   I have no idea.

 3      Q.   From January 1, 2013, to present, do you have

 4  any idea how many regional managers there were for

 5  Wal-Mart in the United States?

 6      A.   No, I do not.

 7      Q.   Do you have any way of giving me an estimate?

 8      A.   No.

 9      Q.   Do you have any idea the territories that

10  these regional managers -- even if you don't know

11  their names or the number, do you have any idea how

12  they were divided up?

13      A.   No, I do not.

14      Q.   From January 1, 2013, to present, do you have

15  any idea how many divisional managers there were?

16      A.   No, I do not.

17      Q.   Do you have any idea how the divisional

18  managers' territories were divided up?

19      A.   No, I do not.

20      Q.   Do you have any idea of the divisional

21  managers' level of supervisorial authority?

22      A.   Could you restate or reclarify.

23      Q.   Sure.  The divisional managers supervise

24  certain territories within the United States; correct?

25      A.   Yes.
```

57

1      Q.   Do you have any idea the extent of those

2   territories?

3      A.   I do not.

4      Q.   So you really don't have any idea of the

5   authority the divisional managers had; correct?

6           MR. PARCELLS:  Objection.  I'm sorry.  You

7   mean the extent of their territory or -- what

8   authority are you talking about?

9   BY MR. YSLAS:

10      Q.   Your counsel has objected that the question's

11   vague.

12           Do you understand it?  You can go ahead and

13   answer if you understand.  Let me state it again.

14      A.   Okay.

15      Q.   As we sit here today, you cannot tell me the

16   level of authority divisional managers had from

17   January 1, 2013, to present; correct?

18           MR. PARCELLS:  Objection as to "the level of

19   authority."  Vague and ambiguous.

20           If you understand, go ahead.

21           THE WITNESS:  I don't.

22   BY MR. YSLAS:

23      Q.   Do you understand what the word "authority"

24   means?

25      A.   I do.  But "level," I'm not --

                                                          58

Exhibit D, Page 000072

1      Q.   Okay.  Do you have any idea what the

2  divisional managers' authority was -- what their --

3  strike that.

4           Do you have any idea what the divisional

5  managers' duties were?

6      A.   To -- from my understanding, to cover their

7  regionals.  So each divisional has a number of regions

8  that they cover.

9      Q.   Okay.  And when you say "cover," would it be

10  fair to say that the divisional managers had authority

11  over those regions?

12      A.   Yes.

13      Q.   Okay.  Beyond that superficial knowledge of

14  their authority, do you have any other knowledge about

15  what the divisional managers' authority was?

16      A.   No.

17      Q.   Other than Mr. Paresh Patel, as we sit here

18  today, can you give me the names of any other

19  divisional managers from January 1, 2013, to present?

20      A.   No.

21      Q.   As we sit here today, can you give me the

22  names of any other regional managers other than

23  Ms. Bhatt, Mr. Chung -- Ms. Bhatt and Mr. Chung?

24      A.   Scott Voigt is my current regional since I'm

25  in a different market.

59

Exhibit D, Page 000073

```
 1      Q.   How do you spell Voigt?

 2      A.   V-o-i-g-t.

 3      Q.   Other than Mr. Voigt, Mr. Chung and

 4  Ms. Bhatt, do you know the names of any other regional

 5  managers in United States?

 6      A.   No.

 7      Q.   Other than Ms. Fisher, Ms. Dabney and

 8  Mrs. Neil, do you know the names of any other market

 9  managers in the United States?

10      A.   I've worked under Mr. Paul Dukes.

11      Q.   Anyone else?

12      A.   No.

13      Q.   Other than Ms. Dabney, Ms. Neil, Ms. Fisher

14  and Mr. Dukes, have you ever spoken to any other

15  market managers?

16      A.   I have currently.  Mr. Craig Crawford.

17      Q.   Is that your current market manager?

18      A.   He will be soon, yes.

19      Q.   Other than Mr. Crawford, Mrs. Neil,

20  Ms. Dabney, Ms. Fisher and Mr. Dukes, have you ever

21  spoken to any other market managers?

22      A.   No.

23      Q.   Other than -- well, strike that.  Other than

24  Mr. Patel, you've never spoken to any divisional

25  managers; correct?
```

                                                        . 60

Exhibit D, Page 000074

1     A.   Yes, that's correct.

2     Q.   Other than Mr. Chung, Ms. Bhatt -- sorry --

3   and Mr. Voigt, you haven't spoken to any other

4   regional managers; correct?

5     A.   That is correct.  I do want to correct.

6   Mr. Voigt, I've never spoken to him.

7     Q.   Okay.

8     A.   Okay?  He just became my recent regional.

9     Q.   So the two regional managers you've spoken to

10   are Mr. Chung and Ms. Bhatt?

11     A.   That's correct.

12     Q.   Looking at your declaration, Ms. Nguyen, does

13   this declaration include the reasons that you believe

14   that taking the training course was mandatory?

15     A.   Yes.  I do believe that, yes.

16     Q.   Okay.  And were you careful in reviewing this

17   declaration to make sure that it included complete

18   information as to why you believe the -- taking the

19   training course was mandatory?

20     A.   Yes.

21     Q.   And is this declaration based on your

22   individual experience?

23     A.   That is correct.

24     Q.   A couple other background questions.  Have

25   you ever -- sorry.  Do you know how many pharmacies

61

1   the training course is mandatory?

2      A.   There's a policy that it's preferred.  So how

3   we would read that, even if I was a pharmacist to

4   apply, it would be mandatory.

5      Q.   Okay.  So let's focus on a couple of things.

6   In your mind, is there a written policy that indicates

7   that taking the training course is mandatory?

8      A.   I don't recall a written policy that

9   specifically directly says it is mandatory, but that

10   doesn't mean that Wal-Mart is indicating it's not.

11      Q.   Okay.  In your mind, is there an indirect

12   written policy that states that taking the training

13   course is mandatory?

14      A.   Like I mentioned earlier, there is a policy

15   for anyone that needs to be hired by Wal-Mart, it does

16   say preferred.

17      Q.   And, in your mind, how does that indicate

18   that taking the training course is mandatory?

19      A.   Well, not just in my mind in general, but I

20   would say for all pharmacy Wal-Mart -- for pharmacists

21   at Wal-Mart that to be hired as an employee for

22   Wal-Mart pharmacy, they would want you to basically be

23   certified.

24      Q.   Okay.  I understand those are the words of

25   it.  But my question is:  How, in your mind, does

75

Exhibit D, Page 000076

1    that -- strike that.

2          This preferred qualification applies to new

3    hires; right?

4    A.   New hires or even now, I would say.  So the

5    ones that -- from what I've experienced in floating

6    around, the ones that have not been certified are

7    slowly getting certified now because it's -- they're

8    being pressured, and I see it.

9    Q.   Okay.  And I'm -- right now I want to focus

10   on what you think constitutes a written policy by

11   Wal-Mart indirectly stating that the -- taking the

12   training course is mandatory or becoming, you know,

13   immunized -- a certified immunizer is mandatory.

14         Are you with me?

15   A.   Yes.

16   Q.   Okay.  In your mind, the written policy that

17   indirectly indicates that is the fact that for new

18   hires, the -- being immunization-certified is a

19   preferred qualification; right?

20   A.   So for the new hires, how I would interpret

21   it is they would -- even though it's typed as

22   preferred, they would want a new hire that's already

23   certified.  And on top of that, the current ones that

24   are currently working for Wal-Mart and are not,

25   they're slowly being pressured to basically be

76

Exhibit D, Page 000077

1    certified as well.

2        Q.   Okay.  I want to make sure -- because I'm

3    trying to focus on what you think the written policy

4    is.  Now, you're saying about pressure now.

5            But in your mind, even -- by the way, I think

6    you -- I know you did.  You testified earlier that you

7    thought that the written indirect policy was this new

8    hire, you know, say, job postings listing it as a

9    preferred qualification.

10           Is that, in your mind, the written policy?

11       A.   That is, in my mind, the written policy.

12       Q.   Okay.  And you mentioned this policy --

13   this -- job postings in your declaration at

14   Paragraph 9, and then it refers to Exhibit 5 of the

15   second amended complaint.  So I want to make sure

16   we're talking about the same document.

17       A.   Which one?  This one?

18           MR. YSLAS:  So I'm going to -- I'm handling,

19   for the record, the exhibits right now.

20       Q.   I am handling, and I'll hand to you,

21   Exhibit 7 from Ms. Nikmanesh's deposition in the

22   common exhibits we've referred to, and these are the

23   Exhibits 1, 2, 4-9 and 11 through 13 to plaintiffs'

24   second amended complaint, which were refiled per court

25   order on May 12, 2015.  I'm going to turn -- it's

77

1   marked at the bottom as 7-23.

2           Is this the kind of job posting you're

3   referring to where at the bottom it lists as a

4   minimum -- a preferred qualification being

5   immunization-certified?

6       A.   This -- which -- this is not -- this is just

7   a description of what a manager -- oh, "Preferred

8   Qualifications."  I see.  Okay.  Yes.  Yes.

9       Q.   And this is the kind of job posting you're

10  referring to which is the indirect policy of Wal-Mart

11  that the training course is mandatory --

12      A.   Yes.

13      Q.   -- correct?

14      A.   Yes.

15      Q.   Okay.  Ms. Nguyen, when you took the training

16  course in February 2014, did you receive any

17  continuing education credit for it?

18      A.   I did.

19      Q.   How much continuing education credit did you

20  receive?

21      A.   That should be worth 12 CE, continuing

22  education, units.

23      Q.   What is the continuing education requirement

24  for you for being a pharmacist?

25      A.   Every 2 years they require 30 hours to renew

78

```
 1    our license.
 2         Q.    And when is the 2-year mark for you?
 3         A.    For me it's 2017.
 4         Q.    What month?
 5         A.    February.
 6         Q.    Okay.  And your previous deadline was
 7    February --
 8         A.    '15.
 9         Q.    -- 2015; correct?
10         A.    Yes.
11         Q.    Okay.  And you took the course in February
12    2014; right?
13         A.    Yes.
14         Q.    At the time you took the course in February
15    2014, had you completed any of the 30-hour requirement
16    for CE?
17         A.    Yes.
18         Q.    How many hours had you prior to taking the
19    training course?
20         A.    Oh, by -- let me repeat.  Let me rephrase
21    that.  By the 15th I've completed 30 hours.
22         Q.    Okay.  Let's -- let me just back up for a
23    second.
24         A.    Okay.
25         Q.    As of February 2013, by February 2015 you had
```

79

```
 1   to do 30 hours for CE credit; right?

 2       A.   Yes.

 3       Q.   And that was to maintain your license as a

 4   pharmacist; correct?

 5       A.   Yes.

 6       Q.   And as of February 2014, just prior to the

 7   time you took the training course, had you completed

 8   any of the 30 hours of CE that you needed to maintain

 9   your license?

10       A.   Just a few hours.

11       Q.   Approximately how many?

12       A.   Probably three, four.

13       Q.   So by taking the immunization course, you

14   received a benefit of getting CE credit; correct?

15       A.   Yes.

16       Q.   You said 12 hours.  Wasn't the course a total

17   of 20 hours?

18       A.   20 hours is how long it took me.  So 12 hours

19   is the actual what they consider, which is only take

20   12 hours, but it actually took a lot longer.

21       Q.   How did it take longer?  What do you mean?

22       A.   Longer to complete the home study course.

23       Q.   How long did it take to do the home study?

24       A.   About 20 hours.

25       Q.   How long did it take to do the live -- yeah,
```

                                                                80

Exhibit D, Page 000081

```
 1    than Wal-Mart administer immunizations?

 2         A.   Yes.

 3         Q.   Do you know if it's a requirement as a

 4    minimum qualification by other retailers?

 5         A.   I don't have that answer.

 6         Q.   Is it fair to say that becoming an

 7    immunization -- strike that.

 8              Is it fair to say that becoming immunization-

 9    certified made you more marketable for getting jobs

10    with other retailers?

11         A.   I wouldn't say that.

12         Q.   Why not?

13         A.   I don't think it should be based on whether

14    we're certified or not.

15         Q.   You don't think it should, or you don't think

16    it is?

17         A.   I don't think it is or I -- both.  I don't

18    think it should or is.

19         Q.   Because you don't know if it's required by

20    other retailers; right?

21         A.   Right.  I know other retailers do it.  I

22    don't know if it's required.

23         Q.   Do you know what percentage of pharmacists --

24    Wal-Mart pharmacists have taken the training course?

25         A.   I don't know based on percentage.
```

82

Exhibit D, Page 000082

1     Q.   Do you have any way of estimating?

2     A.   No.

3     Q.   Do you have any way of estimating what

4   percentage of pharmacists have taken the training

5   course in California?

6     A.   No.

7     Q.   Do you have any way of estimating the

8   percentage of pharmacists that have taken the training

9   course in Southern California?

10     A.   No, I do not.

11     Q.   Do you know any pharmacists employed by Wal-

12   Mart that have not taken the training course or are

13   not immunization-certified?

14     A.   As of now, no.

15     Q.   So, in other words, every pharmacist you know

16   that works for Wal-Mart is immunization-certified?

17     A.   Every pharmacist that I know that I've --

18   worked in that market or worked at that store is

19   immunized -- or are immunized.

20     Q.   Okay.  And as we sit here today, you can't

21   think of one immunization -- sorry.

22          As we sit here today, you can't think of one

23   pharmacist that you know that's employed by Wal-Mart

24   that is not immunization-certified; is that right?

25     A.   That is correct.

83

1      Q.    Do you know what percentage of pharmacists

2    for Wal-Mart are hourly, that is, salaried -- I'm

3    sorry.

4           Do you know what percentage of pharmacists

5    for Wal-Mart are hourly, that is, nonexempt?

6      A.    That is not -- every single one of us.

7      Q.    Every single one of you in California you

8    mean?

9      A.    Right.

10     Q.    Okay.  Do you have any idea of what

11   percentage of pharmacists are salaried or exempt

12   outside of California?

13     A.    Would be my friend Tom, who works in

14   Missouri.

15     Q.    Other than Tom -- I'm not even really asking

16   about Tom.

17          What I'm asking is:  Outside of California,

18   do you have any idea what percentage of Wal-Mart

19   pharmacists are salaried-exempt?

20     A.    No, I do not know.

21     Q.    You really don't know what the practices are

22   outside of California; right?

23     A.    That is correct.

24     Q.    This policy that you have in your mind that

25   taking the training course was mandatory, even if

84

1    conveyed indirectly, do you know who developed this

2    policy?

3        A.   I don't know in particular the names, but I

4    can say, like, the person -- upper management or just

5    Wal-Mart in the Health and Wellness.

6        Q.   You're speculating that it's somebody in

7    upper management in Health and Wellness; is that

8    right?

9        A.   I mean, that's all I can say.  I don't --

10   that's correct.

11       Q.   You really don't know?

12       A.   I don't -- I don't have names, no.

13       Q.   Okay.  But you don't have any specific

14   information about how this policy was developed;

15   correct?

16       A.   Yes, that is correct.

17       Q.   And other than your own personal individual

18   experience, you don't have any personal knowledge

19   about how this policy was communicated; correct?

20       A.   It was -- I did hear that it was communicated

21   once at a conference call by Ms. Dabney.

22       Q.   Other than hearing about what Ms. Dabney said

23   in your own conversations, though, outside of Southern

24   California you really have no idea how this policy

25   that taking the training course is mandatory was

85

Exhibit D, Page 000085

1    communicated; correct?

2        A.    Outside of California, that is correct.

3        Q.    Outside of --

4        A.    Outside of Southern California, that's

5    correct.

6        Q.    Okay.  You don't know when this policy was

7    developed; correct?

8        A.    That is correct.

9        Q.    You don't know the specific people that

10   developed the policy; correct?

11       A.    That is correct.

12       Q.    You don't know how divisional managers

13   conveyed to regional managers this policy; correct?

14       A.    That is correct.

15       Q.    You don't know how regional managers conveyed

16   this policy about being mandatory, the training

17   course, to market managers; correct?

18       A.    Based on just physical evidence or just

19   direct conversations?  Can you please specify?  Or

20   just in general?

21       Q.    Outside of your own personal knowledge

22   regarding communications that you've actually

23   witnessed and overheard about in Southern California,

24   you have no idea how regional managers told market

25   managers about this policy that you allege that the

86

Exhibit D, Page 000086

1    training course is mandatory; correct?

2        A.    That is correct.

3        Q.    Did you ever tell those that reported to you

4    that taking the training course was mandatory?

5        A.    I told my staff that -- actually, besides

6    telling that it was going to be a mandatory, they

7    already knew.

8        Q.    Okay.  I'm not asking about what they know in

9    this question.

10       A.    Okay.

11       Q.    I'm asking about what you said to them.

12       A.    I basically conveyed the message to them that

13   it's something that they want and to -- just for the

14   business.  Even though it started off as just one per

15   store or per pharmacy, it eventually, obviously,

16   increased, and we talked about it.

17       Q.    Okay.  And you talked about those in

18   individual conversations or all together in one

19   conversation?

20       A.    Individuals.

21       Q.    Okay.  And each conversation you had was

22   separate; right?

23       A.    That is correct.

24       Q.    And those conversations were unique?  In

25   other words, they weren't the exact same conversation

87

1    you had with each one of your subordinates; correct?

2         A.    It wasn't, like, the exact same words, but it

3    was exact -- it was the general same idea.

4         Q.    Okay.  And it was based on your

5    understanding; correct?

6         A.    My -- yes.

7         Q.    Did anyone ever tell you that taking -- if

8    you didn't take the training course, your hours would

9    be reduced?

10        A.    No one told me directly, but I have heard

11   from other colleagues.

12        Q.    Okay.  So I want to focus on your individual

13   experience right now.  Okay?

14        A.    Okay.

15        Q.    No one ever told you that -- including

16   management, of course.  But nobody ever told you that

17   if you didn't take the training course, your hours

18   would be reduced; correct?

19        A.    Not to me personally, no.

20        Q.    Nobody, including in management, ever told

21   you that you'd be transferred to a different pharmacy

22   if you didn't take the training course; correct?

23        A.    No.

24        Q.    Is that correct?

25        A.    That is correct.

88

Exhibit D, Page 000088

```
 1            LOS ANGELES, CALIFORNIA

 2        FRIDAY, JUNE 26, 2015; 1:11 P.M.

 3                  --o0o--

 4

 5            ANNA LINH NGUYEN,

 6        having been previously first duly

 7        sworn, was examined and testified

 8        further as follows:

 9

10        THE VIDEOGRAPHER:  We're back on the record.

11   The time is 1:11.

12

13            EXAMINATION (Continued)

14   BY MR. YSLAS:

15      Q.   All right.  Ms. Nguyen, before the break we

16   talked extensively about communications regarding what

17   caused you to believe taking the training course was

18   mandatory.

19            I want you to just tell me in your own words:

20   What caused you ultimately to conclude that taking the

21   training course was mandatory?

22      A.   Well, I mean, first it started off as they

23   need one pharmacist per store, to start with, to do --

24   to be certified, and just the communication that we

25   had in the conference call for how immunizations will
```

93

Exhibit D, Page 000089

1    increase our business and help bring in more customers

2    and satisfy, like, their needs to get vaccinations, I

3    mean, that alone just tells me that Wal-Mart is trying

4    to extend that program, and they want all of us to be

5    certified.

6         Q.   Now, the conference calls that you just

7    mentioned about increasing business, when was the

8    first such conversation that occurred?

9         A.   The first conversation was -- I don't know

10   the exact date or month.  I mean, again, we have

11   conference calls once a week.  But it was with

12   Stephanie Beauchene.  She was my market director that

13   started off initiating about the immunization program.

14        Q.   And were these calls in 2014?

15        A.   Yes, these calls were in 2014.

16        Q.   And you don't recall the approximate month?

17        A.   Month?  In terms of maybe just talking about

18   how the program will start, exactly when the date will

19   start, I don't recall.  But I would say around 2013,

20   beginning 2014.

21        Q.   You mean the end of 2013 or early 2014?

22        A.   Yes.  Sorry.  End of 2013.

23        Q.   And this is when she held conference calls

24   with -- covering the market that she was responsible

25   for, which at the time was -- was it Market 70 or 270?

94

Exhibit D, Page 000090

1      A.   She was at the time covering for both.

2      Q.   Okay.  And approximately how many conference

3  calls did she have where she discussed this?

4      A.   I can't really say.  But we have conference

5  calls once a week.  I don't know the number of times

6  we talked about immunizations.  Basically I can't

7  total the number of conference calls we had solely

8  just talking about immunization or just mentioning it.

9      Q.   And when -- who discussed having one

10 pharmacist per store?

11     A.   I had that discussion -- not personally, but

12 just within the market -- was with Stephanie Fisher --

13 or Stephanie Beauchene.

14     Q.   I'm sorry.  Did you have this conversation

15 directly with Stephanie Fisher or not?

16     A.   No, not directly.  It was amongst the team,

17 the market.

18     Q.   Who told you that one pharmacist per store

19 was going to be -- was it -- strike that.

20          So Ms. Fisher never directly told you that

21 there needed to be one pharmacist per store; correct?

22     A.   Not directly to me personally, but directly

23 to the whole team.

24     Q.   And what team?

25     A.   Her -- in her market.  So at the time being,

95

Exhibit D, Page 000091

1    I was in her market, which was 270.

2        Q.   And did you -- were you not on a call where

3    you were told this happened or -- I'm not following.

4            You didn't personally hear her say this.  How

5    did you come to learn of it?

6        A.   No, I did hear her.  I was on the conference

7    call.  I was manager at the time.  So I was on the

8    conference call for that matter.

9        Q.   And on the conference call that you were on,

10   Ms. Fisher said there needed to be one certified

11   immunizer pharmacist per store?

12       A.   Yes.

13       Q.   Did she say there needed to be or that it was

14   a goal or something different?

15       A.   I'm not too sure, to be quite honest.  From

16   what I understand and from what I recall from the

17   conference call, it was we need to have -- we need to

18   have one pharmacist per store -- one certified

19   pharmacist per store.

20       Q.   Okay.  So is it fair to say, then, she wasn't

21   saying -- let me be super clear here.

22           Ms. Fisher wasn't saying that every single

23   pharmacist had to become certified; she was saying at

24   least one per store had to become certified; right?

25       A.   Yes.  To start off with the immunization

96

Exhibit D, Page 000092

1    program, she said at least one per store.

2         Q.   Didn't that mean to you, then, that not every

3    pharmacist had to become certified?  Correct?

4         A.   No, not necessarily.  Because once we knew

5    this program was going to be initiated, it would come

6    to that point where Wal-Mart's going to want every

7    pharmacist to be certified.

8         Q.   Okay.  But nobody ever told you that; right?

9         A.   Not directly.  But indirectly we all knew, as

10   a group.

11        Q.   How did you all know as a group?

12        A.   Because they know that -- I mean, Wal-Mart

13   knows immunization is a new program for them.  It's

14   going to be something big that will help just with the

15   company or with the pharmacy department.  I mean,

16   we're pretty much the only ones that haven't done

17   immunizations, let's say, compared to other retailers.

18   So that alone, we just knew that it was going to be to

19   that point that everyone's going to have to be

20   certified, and till this day it seemed like that's the

21   case.

22        Q.   Okay.  So, basically, you're reaching your

23   conclusion based on the circumstances as you're

24   interpreting them; right?

25        A.   Yes.

97

Exhibit D, Page 000093

```
 1      Q.   Okay.  And the circumstances that you're

 2   aware of, based on your own experience, is limited to

 3   the Southern California market; right?

 4      A.   Yes.

 5           MR. PARCELLS:  Excuse me.  I think that

 6   misstates her testimony.  I thought there was some

 7   evidence of a St. Louis market as well that she had

 8   talked about.  I could have that wrong but I -- I'm

 9   not sure that that --

10           THE WITNESS:  I did have a -- like, a small

11   conversation with him, but that was just, yeah, what

12   they're initiating on their side.

13   BY MR. YSLAS:

14      Q.   Okay.  But you don't really know what was

15   going on in that market; right?

16      A.   I don't.  But I just know that they were

17   initiating the same protocol, like the immunization.

18      Q.   You knew that they were -- people were

19   becoming able to take the immunization training

20   course; right?

21      A.   I don't know exactly in terms of the

22   immunization course over in Missouri, but I knew that

23   they were initiating the immunization program, so --

24   to the point where they would have to do it.  Now, I

25   don't know who has been certified, who's not.
```

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

```
 1    discussing with my colleagues.

 2        Q.   Okay.  And those colleagues being in Southern

 3    California; right?

 4        A.   That is correct.

 5        Q.   Okay.  Now, looking at Paragraph 11, you

 6    refer to Exhibit 8 of the second amended complaint,

 7    which is the standard operating procedures for

 8    providing immunizations.

 9             There's nothing in that document that states

10    that taking the immunization training course was

11    mandatory; correct?

12        A.   That's correct.  It's very clear it doesn't

13    say mandatory.

14        Q.   Okay.  And, incidentally, the job

15    descriptions in 6 and 7, you don't know -- Exhibits 6

16    and 7, you don't know who authored those documents;

17    correct?

18        A.   I do not.

19        Q.   And you don't know what the intent of that

20    author was; correct?

21        A.   I -- that's correct.

22        Q.   Okay.  And you don't know who authorized

23    exhibit -- strike that.

24             You don't know who authored Exhibit 8, the

25    standard operating procedures; correct?
```

107

Exhibit D, Page 000095

1      A.   That is correct.

2      Q.   And you don't know what the intent of that

3 author was; correct?

4      A.   Well, if there is an SOP of anything, their

5 intent to make it clear this is the procedure that we

6 have to follow when we --

7      Q.   All right.  It's the procedure you have to

8 follow, but it's not saying anything about taking

9 the -- whether or not the immunization training course

10 is mandatory; correct?

11      A.   But you don't have to say it or -- once it's

12 established in SOP guideline or any sort of guideline,

13 it's established that this is what they want us to do.

14 So whether it doesn't state in the SOP that it's

15 mandatory, it's pretty much indirectly saying, Get it

16 certified, and get this -- and follow these

17 directions.

18      Q.   Okay.  Now, you earlier testified that one

19 pharmacist had to be -- that Ms. Fisher had said one

20 pharmacist needs to be certified; correct?

21      A.   That is correct.

22      Q.   Okay.  So it's possible that you'd have one

23 certified pharmacist who would use those standard

24 operating procedures, and the others that are working

25 in the pharmacy wouldn't; is that true?

108

1   manager, they're relaying that message to us.

2     Q.   Okay.  But the -- when you say "Wal-Mart," I

3   want to make sure:  The market managers that

4   communicated to you were Stephanie Fisher and MaryAnn

5   Dabney; correct?

6     A.   Yes, that is correct.

7     Q.   Okay.  So when you use the word "Wal-Mart

8   strongly encouraged," you are referring to Ms. Dabney

9   and Ms. Fisher; correct?

10     A.   I would say they're included.  But when I

11   mean "Wal-Mart," I mean Wal-Mart as a company, as a

12   whole.  So whoever is above the market directors, the

13   regionals, divisionals, vice president, president, I

14   mean, they all have a say in how they're going to

15   initiate a program and so forth.

16     Q.   Okay.  Ms. Nguyen, but you've already

17   testified that you have absolutely no idea how the

18   program was developed, who developed it, how it was

19   developed or what was said.

20     So my question is -- I'm trying to make sure

21   I understand as to your personal, not your

22   speculation -- who at Wal-Mart strongly encouraged its

23   pharmacists to administer immunizations?

24     A.   In terms of direct supervising, it would be

25   my market director.

110

Exhibit D, Page 000097

```
 1      Q.   Not just direct supervising, but direct

 2   personal knowledge, your knowledge is the market

 3   managers you reported to, Ms. Fisher and Ms. Dabney;

 4   correct?

 5      A.   Yes.

 6      Q.   Now, in Paragraph 15 you refer to an e-mail

 7   that Ms. Dabney wrote on November 10, 2014.

 8           Do you see that?

 9      A.   Yes.

10      Q.   Okay.  And you attach as Exhibit 1 to your

11   declaration -- actually, it's an unsealed exhibit;

12   therefore, it's attached to your actual declaration.

13      A.   Okay.

14      Q.   It should be right at the last page, this

15   particular one.

16      A.   Okay.  I see it.

17      Q.   Okay.  So that e-mail is dated November 10,

18   2014; correct?

19      A.   Yes.

20      Q.   And you had taken the immunization training

21   course eight months earlier; correct?

22      A.   Yes.

23      Q.   Okay.  So there's nothing in that e-mail that

24   caused you to take the training course, right, because

25   you'd already taken it?
```

111

```
 1        A.   I've already -- correct, I've already taken
 2   it at that point.
 3        Q.   And in Paragraph 16 you refer to an e-mail
 4   dated December 12, 2014, and that's Exhibit 2, which
 5   actually is under seal.  So I'll point this one out to
 6   you here.
 7             Do you see this?
 8        A.   Yes.
 9        Q.   Okay.  So this one by Ms. Dabney is ten
10   months after you took the immunization training
11   course; right?
12        A.   That is correct.
13        Q.   Okay.  So there's nothing in this e-mail that
14   caused you to feel pressured to take the training
15   course because you'd already taken it; right?
16        A.   In that particular context, yes, that is
17   correct.
18        Q.   As of December 12, 2014, do you know if any
19   of the people on that e-mail had not taken the
20   immunization training course by that point?
21        A.   I do not know.
22        Q.   Okay.  As of November 10, 2014, looking at
23   Exhibit 1, do you know if any of the people in that
24   e-mail had not taken the training course?
25        A.   I do not know.
```

112

Exhibit D, Page 000099

1     Q.   .Paragraph 17 -- it's also part of

2   Exhibit 2 -- you refer to an e-mail from Ms. Bhatt

3   dated December 12, 2014.

4          Do you see that?

5     A.   Yes, I do.

6     Q.   Okay.  At that point it had also been ten

7   months since you'd taken the immunization training

8   course; correct?

9     A.   That is correct.

10    Q.   Okay.  So there's nothing in Ms. Bhatt's

11  e-mail that made you feel pressured in some way that

12  caused you to take the training course; right?

13    A.   No, because I've already taken it by that

14  point.

15    Q.   Do you have any idea if any of the recipients

16  of that e-mail had not taken the training course by

17  that point?

18    A.   I do not know.

19    Q.   Paragraph 19, you refer to an e-mail which is

20  one of the ones under seal, Exhibit 3.  Actually --

21  sorry.  It's not an e-mail.  It's a -- notes of a

22  conference call.

23          Do you see that?

24    A.   Uh-huh -- yes, I do.

25    Q.   Yes?

113

Exhibit D, Page 000100

1      A.    Yes.

2      Q.    And the date of that conference call was

3  October 21, 2014; correct?

4      A.    Yes.

5      Q.    Okay.  And that was eight months after you'd

6  taken the immunization training course; right?

7      A.    Yes.

8      Q.    So there's nothing that happened in that

9  conference call that led you -- sorry.  Strike that.

10          There was nothing in that conference call

11  that caused you to feel pressured in a manner that --

12  to take the training course; correct?

13     A.    That's correct.

14     Q.    Who else was on that call?

15     A.    All the managers in Market 70.

16     Q.    At the time of that conference call, had all

17  those market managers -- sorry -- had all those

18  managers in Market 70 already taken the training

19  course?

20     A.    From my understanding, yes.

21     Q.    And then in Paragraph 20 of your declaration

22  you refer to an e-mail by Ms. Dabney dated January 12,

23  2015.

24          Do you see that?

25     A.    Yes, I do.

114

Exhibit D, Page 000101

1      Q.   And that was dated -- this is also under

2   seal.  So turning your attention to Exhibit 4, which

3   is dated January 12, 2015, this is an e-mail from

4   Ms. Dabney to you and 20 other pharmacists; right?

5      A.   Yes.

6      Q.   And this was a status update of -- on a

7   contest who could administer the most immunizations?

8      A.   Yes.

9      Q.   At that point you'd already taken the

10  immunization training course; right?

11     A.   Yes.

12     Q.   So nothing in this e-mail caused you to take

13  the training course; correct?

14     A.   That is correct.

15     Q.   And everybody on that e-mail chain had

16  already taken the -- or do you know -- the training

17  course at that point?

18     A.   By that point I believe majority -- I would

19  say 90 percent, if we're going to give a percentage,

20  have already taken the training course.

21     Q.   Okay.  So there were pharmacists, in fact,

22  who had not taken the training course as of

23  January 2015; right?

24     A.   I -- yes.

25     Q.   Okay.  Is there some --

115

Exhibit D, Page 000102

1      A.   I'm not 100 percent sure.

2      Q.   Okay.  So earlier I think I asked you about

3   this, and I thought you said you didn't know anyone

4   who had taken the training course.

5           Does this help refresh your recollection?  Is

6   there anyone on this list that had not taken the

7   training course?

8      A.   No, I do remember that.  By this time I

9   believe -- from what I understand -- or from what I

10  know, I believe at that point the majority had.

11     Q.   Is there anybody on this list as of

12  January 2015 who had not taken the immunization

13  training course?

14     A.   On this list?  List of --

15     Q.   The recipients of the e-mail of January 12,

16  2015, which is Exhibit 4 to your declaration.

17     A.   Based on looking at this list, it seems like

18  everyone has taken it.  But there could be a staff or

19  two, like they're third floaters, I'm not too sure of.

20     Q.   Okay.  In Paragraph 21 you say:  It was

21  emphasized time and time again to me, as well as all

22  the other Pharmacists in my district, that

23  administering immunizations was critical to our

24  success, that it is extremely important to Wal-Mart.

25  Immunizations are very profitable and, therefore,

116

Exhibit D, Page 000103

 1    being immunization-certified was not an option.

 2              Do you see that?

 3        A.   Yes, I do.

 4        Q.   You were referring to communications that

 5    came from Ms. Dabney and Ms. Fisher; correct?

 6        A.   More with Ms. Dabney.

 7        Q.   Okay.  So in Paragraph 21 you're referring to

 8    Ms. Dabney; correct?

 9        A.   That is correct.

10        Q.   Okay.  Now, Paragraph 22 you say, "During a

11    conference call with Bhatt, I was told, along with

12    20 other Pharmacists on the conference call, that we

13    would not get paid for the home study" --

14              Do you see that?

15        A.   Yes, I do.

16        Q.   Okay.

17              -- "and test portions of the Training Course,

18    although Wal-Mart would pay for the actual cost of the

19    Training Course itself and the live classroom

20    portion."

21              My question is:  When did that call with

22    Ms. Bhatt take place?

23        A.   The one with Ms. Bhatt -- there might be a --

24    it should be, also, Anthony.  Because when Anthony and

25    Ms. Bhatt -- Ms. Bhatt replaced Anthony.  So I don't

                                                          117

Exhibit D, Page 000104

```
 1   know the exact date, but I know with Anthony Chung,

 2   when the program initiated, or started, we did ask

 3   and -- more like I -- we -- as a market, we asked on a

 4   conference call with Stephanie, and her regional was

 5   with Anthony.  And at that point her answer was no, we

 6   do not get paid for that.

 7       Q.   Okay.  So I want to make sure I understand.

 8            Looking at Paragraph 22 --

 9       A.   Okay.

10       Q.   -- is that a mistake in saying "during a

11   conference call with Bhatt"?  Did you mean to say

12   Mr. Chung?

13       A.   Mr. Chung and Ms. Beauchene, yes.

14       Q.   Okay.  So -- and I'm not -- I mean, I'm

15   asking, you know.

16       A.   Okay.

17       Q.   Is Paragraph 22 incorrect?  When you say

18   "during a conference call with Bhatt," did Ms. Bhatt

19   ever have a conversation that you're describing in

20   Paragraph 22, or is that -- did you mean to say

21   Mr. Chung and/or Ms. Dabney or Fisher?

22       A.   I meant to say Mr. Chung and Ms. Fisher.

23       Q.   Okay.

24       A.   Ms. Bhatt, she just -- she came on board --

25       Q.   Right.
```

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

Exhibit D, Page 000105

```
 1      A.    -- but then I wasn't under her -- I got
 2   realigned.  I was probably under her market at the
 3   time, but at the same time I'm not sure what
 4   conference call she -- because I know for sure it was
 5   Anthony and Stephanie.
 6      Q.    Okay.  And the conversation you are referring
 7   to in Paragraph 22 really is with Ms. Fisher and
 8   Mr. Chung; correct?
 9      A.    Right.
10      Q.    Okay.  And this is before you took the
11   immunization training course; right?
12      A.    This was about during the time we were taking
13   it.
14      Q.    Okay.  So about February 2014?
15      A.    Right.
16      Q.    Okay.  And describing what you'd be paid for,
17   but in this conversation whether or not it was
18   mandatory was not discussed; is that right?
19      A.    Whether it was mandatory?
20      Q.    Right.
21      A.    Within -- in 2014 with Ms. Fisher and
22   Mr. Chung?
23      Q.    I want to take you to the conversation that
24   you're describing in Paragraph 22.
25            Are you with me?
```

119

Exhibit D, Page 000106

1      A.    Okay.

2      Q.    Which you said is in about February 2014.

3   Okay?

4      A.    Okay.

5      Q.    In that conversation I do see you're

6   describing what you'd get paid for as described now --

7   as corrected by Ms. Fisher and Mr. Chung.

8          But what I'm asking you is:  In that

9   conversation you didn't discuss whether or not taking

10  the training course was mandatory or not; right?

11     A.    The -- that is correct.

12     Q.    Okay.  Mr. Chung never made any statements to

13  you that taking the training course was mandatory;

14  correct?

15     A.    Not directly.

16     Q.    Ms. Bhatt never made any statements to you

17  that taking the training course was mandatory;

18  correct?

19     A.    Again, not directly.

20     Q.    Looking at Exhibit 3 to the second amended

21  complaint -- so this is going to be a little

22  different.  If you'd hand back the confidential

23  documents, which is the thinner binder.

24     A.    This one right here?

25     Q.    I think it's that one, yeah.  These were --

                                                      120

Exhibit D, Page 000107

```
 1    this is Exhibit 3.  So this is Exhibit 8 to the

 2    sealed -- which are sealed in the confidential binder,

 3    Exhibit 8 to Ms. Nikmanesh's deposition, and it is

 4    Exhibit 3 to the second amended complaint.  And it's

 5    the Pharmacist Administered Immunization Delivery, or

 6    PAID, toolkit.

 7             There's nothing in that document that states

 8    that the -- taking the immunization training course is

 9    mandatory; correct?

10       A.   Again, it doesn't say the word "mandatory"

11    or -- but having -- when this is out, it's pretty

12    clear this is --

13       Q.   Okay.  So it's your testimony that the

14    existence of that document leads you to believe that

15    taking the training course is mandatory; right?

16       A.   That's correct.

17       Q.   It's nothing in the words of it; correct?

18       A.   That is correct.

19       Q.   Okay.  Do you know who authored the PAID

20    toolkit?

21       A.   I don't.

22       Q.   Do you know -- do you have any idea what the

23    intent of the PAID toolkit was, other than to tell

24    people the procedures for administering immunizations?

25       A.   I -- no, I don't.
```

121

```
 1                    REPORTER'S CERTIFICATE

 2

 3          I, Jan M. Roper, a Certified Shorthand

 4   Reporter No. 5705, do hereby certify:

 5          That, prior to being examined, the witness

 6   named in the foregoing deposition, ANNA LINH NGUYEN,

 7   was by me duly sworn to testify the truth, the whole

 8   truth, and nothing but the truth.

 9          That said deposition was taken down by me in

10   shorthand at the time and place therein named and

11   thereafter transcribed under my direction, and I

12   hereby certify that the foregoing deposition is a true

13   and correct transcript of my shorthand notes so taken.

14          I certify that a request has been made by, or

15   on behalf of, the witness to review, correct and sign

16   the transcript of these proceedings.

17          I further certify that I am neither counsel

18   for nor related to any party to said action nor in

19   anywise interested in the outcome thereof.

20          IN WITNESS WHEREOF, I have hereunto

21   subscribed my name this 27th day of June, 2015.

22

23

24          _____

                JAN M. ROPER, RPR, CSR NO. 5705

25
```

                                                      143

**EXHIBIT E**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA — SOUTHERN DIVISION

| | |
|---|---|
| AFROUZ NIKMANESH, ELVIS ATENCIO, ANNA NGUYEN, AND EFFIE SPENTZOS, on behalf of themselves, the general public, and all others similarly situated, | ) CASE NO.:<br>) 8:15-cv-00202 AG-JCG<br>)<br>)<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| vs. | )<br>) |
| WAL-MART STORES, INC., a Delaware corporation, and WAL-MART ASSOCIATES, INC., a Delaware corporation, and DOES 1 through 10, inclusive, | )<br>)<br>)<br>)<br>)<br>) |
| Defendants. | )<br>) |
| _____ | ) |

VIDEO DEPOSITION OF ELVIS ATENCIO

Tuesday, June 30, 2015

Los Angeles, California

Reported By:

Jan M. Roper, RPR,

CSR No. 5705

File No.:  150630JR

1

1      A.   Yes.  Yeah, well, to my knowledge.

2      Q.   And just -- it hasn't been a problem so far,

3  but let's try -- just a reminder to let me finish my

4  question before you give an answer.

5           When you were a market manager -- or a

6  district manager -- and now it's termed a market

7  manager -- from 2002 to 2004, do you remember the area

8  that you supervised?

9      A.   Yes.

10     Q.   What was it?

11     A.   It was the south San Diego area.

12     Q.   And did it have a market number or an area

13  number?

14     A.   It probably did.  I don't recall the number.

15     Q.   And what -- do you recall what stores

16  specifically you supervised?

17     A.   More or less, yes.

18     Q.   What were they?

19     A.   The Chula Vista stores, some of the San Diego

20  stores, the El Cajon stores, and the stores out in the

21  Imperial Valley.

22     Q.   Okay.  And when you were a district manager,

23  was your authority limited to supervising those

24  stores?

25     A.   Yes.  I did have to cover some areas.  And

20

Exhbit E, Page 000111

1     Q.   Approximately how many stores?

2     A.   Approximately, I'll say, in between 12 to 14.

3   That's roughly.

4     Q.   And was Ms. Jones' authority limited to those

5   12 to 14 stores?

6          MR. EPSTEIN:   Objection to the extent it

7   calls for speculation.   Lacks foundation.

8          If you know, you can answer.

9          THE WITNESS:   No knowledge.

10  BY MR. YSLAS:

11    Q.   Okay.   So as we sit here today, you don't

12  know the extent of Ms. Jones' authority as a market

13  manager; correct?

14    A.   I don't know what her terms were with her

15  supervisor.   So it would be just an estimate for me.

16    Q.   Okay.   Well, what I'm asking you is:   Do you

17  know the stores that she supervised?

18    A.   I knew the stores that she was covering, yes.

19    Q.   Okay.   And were those stores the ones that

20  you've just mentioned, the 12 to 14 stores in

21  San Diego, Chula Vista, El Cajon and the Imperial

22  Valley?

23    A.   Yes.

24    Q.   As we sit here today, do you have any reason

25  to believe she had authority over any other stores

31

Exhbit E, Page 000112

1      A.   Both districts, I would estimate about 20

2   stores.  Probably a little bit more than that.

3      Q.   How many markets were in San Diego?

4      A.   Generally two markets.

5      Q.   And beyond San Diego, do you know any of the

6   other markets that Mr. Chung supervised?

7      A.   I believe, like I mentioned before, there

8   were some in Orange County.  There were some in the

9   Inland Empire.  And he had some supervision, I

10  believe, in the L.A. area also.

11     Q.   Okay.  But you don't know the specific

12  stores; correct?

13     A.   No.

14     Q.   And Ms. Bhatt, was her -- as a regional

15  manager, did she supervise the same stores that

16  Mr. Chung supervised?

17     A.   I believe so.

18     Q.   And those stores were in Southern California;

19  correct?

20     A.   Yes.

21     Q.   So Ms. Bhatt's authority was limited to

22  stores in Southern California, to your knowledge;

23  correct?

24     A.   To my knowledge, yes.

25     Q.   Now, while Mr. Michael Moore was the

37

Exhbit E, Page 000113

1      Q.   Okay.  So you don't have personal knowledge

2   about the substance of any of those personal

3   conversations that Mr. Othman may have had with any

4   regional supervisor, for example, Mr. Chung or

5   Ms. Bhatt; right?

6      A.   Correct.

7      Q.   Now, as of late November 2013, when you

8   enrolled in the training course, had anyone told you

9   at that time that taking the training course was

10  mandatory?

11     A.   In the conference call with Khoi Le when he

12  first rolled out the program.

13     Q.   And when was that conference call?

14     A.   It was either in October or November of 2013,

15  my estimation.

16     Q.   Okay.  And at that time he was a market

17  manager over a market different than the one you were

18  working in?

19     A.   Yes.  He was covering our area also.

20     Q.   This is the conversation that you were

21  referring to in Paragraph 12 of your declaration --

22  Paragraphs 12 and 13?

23     A.   Let me take a look.

24          Correct.

25     Q.   And at the time he was temporarily your

50

1    market manager; is that correct?

2        A.   At that time he was covering our district.

3        Q.   And at the time, he was the market manager

4    then that you reported to; correct?

5        A.   Correct.

6        Q.   Okay.  Other than that statement by Mr. Le in

7    that conversation, prior to the time that you enrolled

8    in the training course, did anyone else make any

9    statement that caused you to believe that taking the

10   training course was mandatory?

11       A.   I had a conversation with Mr. Le after that

12   conference call where he was stating the importance of

13   everybody getting on the program and making sure that

14   all pharmacists were on board.

15       Q.   Okay.  Other than your conversations with

16   Mr. Le, nobody else made a statement to you about

17   enrolling in the training course that caused you to

18   believe it was mandatory prior to the time you

19   enrolled; is that correct?

20       A.   Correct.

21       Q.   At the time you enrolled in the training

22   course, what was your rate of pay?

23       A.   I would have to estimate in the high 60s or

24   low 70.

25       Q.   High 60s or low 70s per hour; correct?

51

1       A.   Correct.

2       Q.   From January 1, 2013, until your last date of

3    employment with Wal-Mart, did you have other

4    pharmacists that reported to you?

5       A.   Other pharmacists that reported to me?

6       Q.   Right.

7       A.   Yes.

8       Q.   Who were they?

9       A.   Off the top of my head, John Carlson, Michael

10   Rick, Abbas Moghadam.

11      Q.   How do you spell it?

12      A.   A-b-b-a-s.  Moghadam is M-o-g-h-a-d-a-m.  My

13   estimate on the spelling of his name.

14      Q.   Anyone else?

15      A.   That I could recall right now, that's the

16   only ones that I had.

17      Q.   Okay.  So those were the three pharmacists

18   that you supervised from January 21, 2013, until your

19   last date of employment with Wal-Mart?

20      A.   I believe so.

21      Q.   Did all three of those pharmacists eventually

22   become certified to administer immunizations?

23      A.   Michael Rick was already certified when he

24   came to Wal-Mart.  John Carlson did go through the

25   program.  And Abbas, I believe, left my area, so I'm

52

Exhbit E, Page 000116

1    Court and is a confidential document, which is

2    attached to Exhibit 8 to Ms. Nikmanesh's deposition,

3    and it was Exhibit 3 to the second amended complaint.

4    I'm going to show it to you now.

5              Is that the PAID toolkit that you were

6    referring to?

7         A.   Correct.

8         Q.   Do you know who authored that document?

9         A.   Who what?

10        Q.   Who authored it.

11        A.   No, I do not know.

12        Q.   Do you know the intent of that author?

13        A.   The intent's pretty clear for me is our --

14   what we're -- us, as pharmacies, are going to be doing

15   to ensure that this program is done.

16        Q.   Okay.  Then, do you know that the intent of

17   that author was to convey that taking the training

18   course was mandatory?

19        A.   It seems to me it would be.

20        Q.   Okay.  What do you base that --

21        A.   On the contents of this toolkit.

22        Q.   Is there anything specifically in that

23   toolkit that states that taking the training course is

24   mandatory?

25        A.   What you read out of it tells me that it's

62

1          MR. YSLAS:  No.  I'd like to stay on the

2     record.

3          MR. EPSTEIN:  Well, it's -- we've been going,

4     like, an hour and 20 minutes.

5          MR. YSLAS:  Why don't we give him a minute to

6     review it, and then I'll finish my question.

7          (Pause in proceedings.)

8          THE WITNESS:  Okay.

9     BY MR. YSLAS:

10     Q.   Okay.  Is there anything in that document,

11     that PAID toolkit, that specifically states that

12     taking the training course is mandatory?

13     A.   It implies that if you're doing the

14     immunization, you have to be trained, right.

15     Q.   Okay.  So my question -- I'm going to ask you

16     about what -- how -- what you think is implied by the

17     document.  I want to make a distinction right now,

18     though.

19          There's nothing in that document that

20     specifically states that taking the training course is

21     mandatory; is that correct?

22     A.   It does not say taking this training course

23     is mandatory on this document.

24     Q.   Okay.  You think it's implied by the document

25     based on your interpretation of it; correct?

                                                          64

Exhbit E, Page 000118

```
 1    BY MR. YSLAS:

 2        Q.    Mr. Othman [sic], a couple of background

 3    questions I meant to cover.

 4              While you were a pharmacist with Wal-Mart,

 5    what were your job duties?

 6        A.    As a pharmacist, my duty is to take in

 7    prescriptions, either physically or by phone or

 8    nowadays by electronic means; enter those

 9    prescriptions; put it into the systems; process the

10    prescriptions; dispense it to the patient; provide

11    counseling or not provide counseling, depending on the

12    patient and the circumstance; and oversee that

13    process.

14        Q.    Do you know whether or not Mr. Othman ever

15    hired pharmacists that were not certified to conduct

16    immunizations?

17        A.    I would not have any knowledge of that time.

18    He came in right when we started the program.  So I'm

19    not sure.

20        Q.    Okay.  In the market you worked in, do you

21    know if -- in 2013 through the time that you left, do

22    you know if pharmacists were ever hired that were not

23    certified to conduct immunizations?

24        A.    I don't have knowledge about the hiring

25    procedures my bosses did.  So I don't have that
```

66

Exhbit E, Page 000119

1   knowledge.

2     Q.   So as we sit here today, you don't know one

3   way or the other if pharmacists were hired in your

4   district that weren't qualified to administer

5   immunizations; is that correct?

6     A.   That's correct.

7     Q.   As we sit here today, do you know if any

8   pharmacists at Wal-Mart did not take the training

9   course or is not otherwise certified to conduct

10   immunizations?

11     A.   I wouldn't have that knowledge.

12     Q.   So you can't think of one person, though, as

13   we sit here today that you know isn't qualified to

14   conduct immunizations that's presently employed by

15   Wal-Mart?

16     A.   Off the top of my head, I do not know either

17   way.

18     Q.   Looking at your declaration, which I'll --

19   pardon my reach just to get that in front of you

20   again.  In Paragraph 5 -- well, why don't you read

21   Paragraph 5 to yourself, and I've got a question about

22   it, which is Page 2 of your declaration.

23     A.   Okay.

24     Q.   Okay.  So in your declaration, you state:

25   Since approximately 2002, the pharmacists in

67

1    to take the training course?

2        A.    Approximately.

3        Q.    Okay.  So if a floater worked 8 hours in a

4    week, and it took them 20 hours -- let's just say that

5    they took the course all in one week, including the

6    self-study -- that would be 28 hours; right?

7        A.    Correct, if it was done in the same week.

8        Q.    Okay.  So it's possible that a floater would

9    have worked less than 40 hours in a week including the

10   training course; correct?

11       A.    There's that possibility.

12       Q.    Okay.  And as you already testified, the

13   hours of floaters vary; correct?

14       A.    Floaters' hours do vary.  There's part-time

15   floaters, and there's full-time floaters.  So that all

16   varies.

17       Q.    Okay.  And the part-time floaters may work a

18   day a week, two days a week, as little as one day a

19   month; right?

20       A.    Possibly, yes.

21       Q.    Okay.  And you don't know the hourly wage of

22   these -- every single one of these floaters; right?

23       A.    No.

24       Q.    Now, your statement in here includes there's

25   2500 pharmacists outside of California that are

70

1      Q.   Was there any presentation about it, like --

2  strike that.

3          Was there any written presentation about the

4  training course?

5      A.   No.  It was a conference call.

6      Q.   That's described in page -- Paragraphs 12 and

7  13 of your declaration; correct?

8      A.   Let me take a look.  Correct.

9      Q.   In your mind, is there a written policy that

10  taking the mandatory -- strike that.

11          In your mind, is there a written policy from

12  Wal-Mart that indicates that taking the training

13  course is mandatory?

14      A.   Yes, the PAID toolkit.

15      Q.   Okay.  Anything else?

16      A.   That sums it up.

17      Q.   Okay.  I know it sums it up, but I want to

18  make sure there's nothing else in your mind that

19  constitutes a written policy from Wal-Mart that taking

20  the training course is mandatory.  Correct?

21      A.   Correct.

22      Q.   And the reason you believe that that states

23  the written policy -- strike that.

24          And the reason you believe that the PAID

25  toolkit states that taking the training course is

95

Exhbit E, Page 000122

1    mandatory is the existence of the document which you

2    previously testified about; right?

3        A.   Repeat that to me one more time.

4        Q.   The reason you believe the PAID toolkit

5    states that taking the training course is mandatory is

6    the existence of that document which you previously

7    testified; right?

8        A.   Which document?

9        Q.   The PAID toolkit.

10       A.   Yes.

11       Q.   Okay.  You don't know who developed the PAID

12   toolkit; correct?

13       A.   Correct.

14       Q.   You don't know how the PAID toolkit was

15   developed; correct?

16       A.   Correct.

17       Q.   Other than what you've already testified to

18   as to the markets you worked in, you don't know how

19   the training course was communicated in terms of it

20   being available; correct?

21       A.   Repeat that one more time for me.

22       Q.   So, in other words, other than the

23   communications you've already testified to as to the

24   communications within your market in California, the

25   availability of the PAID toolkit or taking the

96

Exhbit E, Page 000123

1   training course, you don't know how that was

2   communicated in other regions of the country; correct?

3       A.   I know it was communicated in other regions

4   from the conversations I had with other pharmacists in

5   other areas.

6       Q.   Okay.  Those are the conversations that

7   you're speaking about that you already testified to

8   that you can't remember the pharmacy number, you can't

9   remember the pharmacist's name, and you don't know if

10  they were exempt or nonexempt.

11           Are those the conversations you're referring

12  to?

13      A.   That includes them, but there was also some

14  pharmacists in California that I had conversations

15  with that --

16      Q.   Okay.  Outside of California, you really have

17  no idea how the availability of the training course

18  was communicated; right?

19      A.   No.

20      Q.   Is that correct?

21      A.   Correct.

22      Q.   Okay.  And inside California, your knowledge

23  is limited in terms of the conversations that you were

24  personally present about or heard from someone else;

25  right?

97

1      A.   Correct.

2      Q.   Okay.  And the conversations that you heard

3  from someone else, you weren't present during those

4  conversations; right?

5      A.   Correct.

6      Q.   Okay.  So it's clear to me, Mr. Atencio, that

7  your personal experience led you to believe, based on

8  what was told to you and the totality of your

9  circumstances, that taking the training course was

10  mandatory.  Is that fair to say?

11      A.   Correct.

12      Q.   Okay.  But you really don't know if that same

13  message was conveyed in the same way in other parts of

14  the country; right?

15      A.   From my conversation, it seemed really clear

16  to me that that was the same message.

17      Q.   Okay.  But the conversations that you're

18  talking about with pharmacists you don't remember the

19  names of, you don't know the pharmacy number, and you

20  don't know if they were exempt or nonexempt; right?

21      A.   Correct.

22      Q.   Okay.  Did any of those people tell you

23  that -- the specifics of how it was communicated to

24  them that the training course was mandatory?

25      A.   They pretty much summed it up that it was

98

Exhbit E, Page 000125

1    December 2013 -- I assume the period to take the 30

2    hours was from July 2013 to July 2015; right?

3        A.    Correct.

4        Q.    Okay.  Just prior to the time you took the

5    training course, how many CE hours had you finished?

6        A.    I can't recall.

7        Q.    Had you finished all of them --

8        A.    No.

9        Q.    -- at that point?

10             Did you get CE credit for taking the training

11   course?

12       A.    Yes.

13       Q.    How many hours?

14       A.    20 hours, I believe.

15       Q.    So you received a benefit from taking the CE

16   course in terms of 20 hours of CE credit; right?

17       A.    Benefits?  I'm not sure how you define

18   "benefits."  You could submit this as part of your CEs

19   if you wanted to.

20       Q.    Okay.  Taking the training course helped you

21   complete a portion of your CE; correct?

22       A.    If you wanted to.

23       Q.    Did it for you?

24       A.    For me, yeah, I used it.

25       Q.    Okay.  I just want to be clear.  You don't --

101

Exhbit E, Page 000126

1    immunization training course; right?

2        A.    Correct.

3        Q.    Do you know whether you could have just on

4    your own gone out and done it somewhere else other

5    than -- and not get paid for it by Wal-Mart?

6        A.    There's that possibility to do it, but

7    that's -- that was never told to me.

8        Q.    Mr. Atencio, other than what you've already

9    testified to in your declaration and the deposition

10   testimony this morning, is there anything else that

11   caused you to believe that taking the immunization

12   training course was mandatory?

13       A.    Let me think.  I think I already stated

14   everything.

15       Q.    Okay.  And as far as you know, it was left to

16   the discretion -- well, strike that.

17             As we sit here today, do you have any

18   knowledge that a policy was formulated by Wal-Mart

19   from the top, so to speak, from top management that

20   taking the training course was mandatory?

21       A.    That's the message we got.

22       Q.    Okay.  It's the message you got.  But do you

23   have any idea who authored the policy?

24       A.    All we listened was to the message.

25       Q.    Okay.  Based on the communications you've

                                                    104

```
 1    already talked about from your regional manager and
 2    your market manager; correct?
 3        A.   Correct.
 4        Q.   Okay.  But you don't know how this policy was
 5    developed or who developed it; right?
 6        A.   Correct.
 7        Q.   Okay.  And you don't know how it was conveyed
 8    other than what you've already testified to; right?
 9        A.   Correct.
10        Q.   Okay.  And as far as you know, it was left to
11    the discretion of divisional managers how to convey to
12    regional managers who would convey it to market
13    managers; correct?
14             MR. EPSTEIN:  Objection --
15             THE WITNESS:  I don't know that.
16             MR. EPSTEIN:  -- calls for speculation.
17    Lacks foundation.
18    BY MR. YSLAS:
19        Q.   It would be speculation on your part; right?
20        A.   Yeah.
21        Q.   You really don't know; correct?
22        A.   I don't know.
23             MR. EPSTEIN:  About how the divisional
24    managers may have communicated?  I'm not -- what
25    question are we answering?
```

105

Exhbit E, Page 000128

1    to be reduced?

2        A.    The implication was that.

3        Q.    Okay.  Before we get to the implication, did

4    anyone ever directly tell you that if you didn't take

5    the training course, your hours were to be reduced?

6        A.    You want to know if they told me in those

7    exact words that you phrased it?

8        Q.    Yes.

9        A.    If they said those exact words.  I don't

10   remember if they used those exact words that you just

11   used right now.

12       Q.    Okay.  Did anyone ever tell you in any other

13   words that if you don't take the training course --

14   did anyone ever tell you in substance if you don't

15   take the training course, your hours will be reduced?

16       A.    Yes.

17       Q.    Who told you that?

18       A.    Khoi Le.

19       Q.    Okay.  And that's in the conversation that's

20   in your declaration at Paragraph 12 through 13; right?

21       A.    Correct.

22       Q.    Okay.  Do you know personally if Mr. Le ever

23   told anyone else that?  That if their hours -- strike

24   that.  Do you know if Mr. Le ever -- strike that.

25             Do you personally know if Mr. Le ever told

108

Exhbit E, Page 000129

1    any other pharmacist that if they didn't take the

2    training course, their hours would be reduced?

3        A.    From conversations I've had with other

4    people, they said they talked to Khoi Le.  They asked

5    them what happens if they don't do the training.  Khoi

6    Le -- they said that Khoi Le said we're doing this

7    program.  In order to do this program, we got to have

8    pharmacists that are immunizing, which led them to

9    believe that their hours would be reduced or cut if

10   they didn't do it.

11       Q.    Okay.  And who are those people?

12       A.    Teresa Corbala, Maricela Ochoa.  There must

13   have been some others that slip my mind right now.

14       Q.    Okay.  And these are pharmacists that

15   reported to Mr. Le; right?

16       A.    At that particular time, he was covering our

17   district.

18       Q.    So, to your knowledge, Mr. Le never directly

19   said if you don't take the training course, your hours

20   would be reduced; correct?

21       A.    I'm not sure if he used those exact words.

22       Q.    Okay.  And other than Mr. Le, are you aware

23   of anyone else in Wal-Mart management ever saying to

24   pharmacists that if they didn't take the training

25   course, their hours would be reduced?

                                                        109

Exhbit E, Page 000130

1      A.   I'm not sure.

2      Q.   Did Mr. Le ever tell you that if you didn't

3    take the training course, you'd be transferred to

4    another pharmacy?

5      A.   He did not use those words with me.

6      Q.   He used the words that you've described on

7    page -- Paragraph 12 and 13 of your declaration;

8    correct?

9      A.   Yeah, the words I used in -- on that

10   statement, yes.

11     Q.   Okay.  Are you aware of anybody in Wal-Mart

12   management ever telling a pharmacist that if they

13   didn't take the training course, they'd be transferred

14   to another pharmacy?

15     A.   Transferred?  The word "transfer" came into

16   conversation.  I don't remember in what context it

17   was.  But not that I could recall.

18     Q.   All right.  Did Mr. Le ever tell you directly

19   that if you didn't take the training course, your

20   employment with Wal-Mart would be terminated?

21     A.   He never mentioned the word "termination."

22     Q.    Are you aware of anybody in Wal-Mart

23   management ever telling a pharmacist that if they

24   didn't take the training course, their employment

25   would be terminated?

110

Exhbit E, Page 000131

```
 1      A.   It's vaguely familiar.

 2      Q.   As we sit here today, can you recall if

 3 you've ever seen this document before?

 4      A.   It looks like the -- I vaguely remember the

 5 home study that we had to do.

 6      Q.   This document, the home study you had to do,

 7 you mean it was part of the training course materials

 8 that you studied at home?

 9      A.   Yes.

10      Q.   Okay.  I just want to make sure.  Are you

11 sure or are you a little uncertain?

12      A.   I'm a little uncertain because I don't recall

13 the exact page-by-page material -- material that we

14 covered.

15      Q.   Now, this document is not authored by Wal-

16 Mart; correct?

17      A.   I got no knowledge of that.

18      Q.   You don't know one way or the other; right?

19      A.   This particular document?

20      Q.   Right.

21      A.   It says American Pharmacists Association, so

22 it's not by Wal-Mart.

23      Q.   Okay.  Is there anything in this document

24 that ever caused you to think that taking the training

25 course was mandatory?
```

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

Exhbit E, Page 000132

1      Q.   I assume that applies for all the documents

2   in here.  The next one is Dallas, then Philadelphia,

3   Atlanta.  And then we get to California in Silicon

4   Valley at the end.

5      A.   Okay.

6      Q.   You don't have personal knowledge about any

7   of the circumstances that led to these job postings

8   being posted; right?

9      A.   No.

10      Q.   Is that correct?

11      A.   Correct.

12      Q.   In looking at the documents, though, these

13   appear to be for hiring somebody into Wal-Mart; in

14   other words, they don't apply to existing, currently

15   employed pharmacists; right?

16      A.   Are you stating that as a fact or --

17      Q.   I'm asking you.

18      A.   Okay.  I don't know.

19      Q.   Okay.  And turning to Exhibit 6, which is the

20   next document, it's a job description, as is

21   Exhibit 7.  One is for the staff pharmacist; another

22   is for the pharmacy manager.

23          Do you know who authored either of these

24   documents?

25      A.   No, I do not.

125

Exhbit E, Page 000133

1                    REPORTER'S CERTIFICATE

2

3          I, Jan M. Roper, a Certified Shorthand

4    Reporter No. 5705, do hereby certify:

5          That, prior to being examined, the witness

6    named in the foregoing deposition, ELVIS ATENCIO, was

7    by me duly sworn to testify the truth, the whole

8    truth, and nothing but the truth.

9          That said deposition was taken down by me in

10   shorthand at the time and place therein named and

11   thereafter transcribed under my direction, and I

12   hereby certify that the foregoing deposition is a true

13   and correct transcript of my shorthand notes so taken.

14         I certify that a request has been made by, or

15   on behalf of, the witness to review, correct and sign

16   the transcript of these proceedings.

17         I further certify that I am neither counsel

18   for nor related to any party to said action nor in

19   anywise interested in the outcome thereof.

20         IN WITNESS WHEREOF, I have hereunto

21   subscribed my name this 1st day of July, 2015.

22

23

24         _____

           JAN M. ROPER, RPR, CSR NO. 5705

25

                                                          196

Exhbit E, Page 000134

**EXHIBIT F**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA — SOUTHERN DIVISION


AFROUZ NIKMANESH, ELVIS      )  CASE NO.:
ATENCIO, ANNA NGUYEN, AND    )  8:15-cv-00202-AG-JCG
EFFIE SPENTZOS, on behalf of )
themselves, the general      )
public, and all others       )
similarly situated,          )
                             )
             Plaintiffs,      )
                             )
vs.                          )
                             )
WAL-MART STORES, INC., a     )
Delaware corporation, and    )
WAL-MART ASSOCIATES, INC., a )
Delaware corporation, and    )
DOES 1 through 10, inclusive, )
                             )
             Defendants.      )
_____)



VIDEO DEPOSITION OF EFFIE SPENTZOS
Thursday, July 2, 2015
Los Angeles, California



Reported By:

Jan M. Roper, RPR,

CSR No. 5705

File No.:  150702JR

1

Exhibit F, page 000135

1     training course with Mr. Patel; correct?

2         A.   Yes.

3         Q.   Have you ever -- strike that.  Mr. Moore:  Do

4     you know -- do you know the territory that he oversaw?

5         A.   It was the western regional territory.

6         Q.   And do you know what specifically the western

7     regional territories covered?

8         A.   I believe it was definitely California,

9     Oregon, Washington, Alaska, Hawaii, Arizona, Colorado,

10    Utah, Montana and Idaho, if I remember correctly.

11        Q.   Okay.  Okay.  So Mr. Moore's authority was

12    limited to the western regional states you've just

13    mentioned; correct?

14        A.   Yes.

15        Q.   And Mr. Patel's authority was limited to the

16    western regional states you've just mentioned; right?

17        A.   Yes.

18        Q.   Now, Mr. Voigt, as your regional -- as the

19    regional supervisor that covered the territory you

20    worked in when you were in Windsor, what area did he

21    supervise?

22        A.   I am not 100 percent sure.

23        Q.   So you don't know the territory that

24    Mr. Voigt supervised; correct?

25        A.   I believe it was, besides Northern

33

1    California, Oregon, Washington and, I believe, Alaska.

2        Q.   And so Mr. Voigt's authority was limited to

3    the territory you've just described; correct?

4        A.   As I remember, yes.

5        Q.   Did you ever discuss the training course with

6    Mr. Voigt?

7        A.   No.   I didn't see the need.

8        Q.   Have you ever spoken to Mr. Voigt at all?

9        A.   Yes.

10       Q.   How many occasions?

11       A.   He actually had come to the store -- visited

12   the store a couple times, and I have seen him at

13   conferences and talked to him, and I have talked to

14   him again over some other issues.   So I would say

15   maybe half a dozen times.

16       Q.   Approximately six times?

17       A.   Yes.

18       Q.   Now, Mr. Jeremy Smith, what -- as the market

19   manager from January 2013 to July 2014 in Windsor,

20   what stores did he oversee?

21       A.   He oversaw the -- would you like numbers or

22   locations?   What do you prefer?   Actually, maybe

23   locations because I don't know all the numbers.

24       Q.   Okay.

25       A.   Okay.   So Rhonert Park was one of them --

34

1      Q.   How do you spell that?

2      A.   R-h-o-n-e-r-t.

3           -- and my store, Windsor; Ukiah, U-k-i-a-h;

4   the Richmond store, the Fairfield store, Vacaville

5   store.  I'm trying to recall.  I can't recall all of

6   them, to be honest with you, because the districts had

7   changed at some point as well.  So those are the ones

8   I remember the most.

9      Q.   Approximately how many stores did Mr. Smith

10  oversee?

11     A.   About 12, I would say.

12     Q.   And they included the ones you've just

13  mentioned; correct?

14     A.   Yes.

15     Q.   Mr. Smith's authority was limited to the 12

16  stores he supervised; correct?

17     A.   Whatever numbers exactly he was supervising.

18  About 12, yes.

19     Q.   Okay.  So the approximate number of stores

20  was 12; right?

21     A.   Yes.

22     Q.   So his authority was limited to the -- strike

23  that.

24          Mr. Smith's authority was limited to the

25  approximately 12 stores he supervised; correct?

35

Exhibit F, page 000138

```
 1              MR. PARCELLS:  Objection.  Speculation.

 2              To the extent you know.

 3    BY MR. YSLAS:

 4         Q.   Go ahead.

 5         A.   No.

 6         Q.   No, that's not correct?

 7         A.   No.

 8         Q.   Why is that incorrect?

 9         A.   Well, the districts did change, so he was

10    overseeing other stores.  I think he moved further

11    south on the East Bay.  And, furthermore, whenever

12    another district manager or market manager was on

13    vacation or was not available, then the district

14    managers would oversee the other person's store.  So

15    they were interchangeable.

16         Q.   Okay.  So other than the 12 stores that he --

17    strike that.

18              Mr. Moore -- I'm sorry.  Mr. Smith oversaw

19    approximately 12 stores, and then at some point he

20    moved somewhere south in the East Bay and supervised

21    different stores, and then on occasion when a district

22    manager was on vacation, he would fill in for

23    overseeing that person's store; right?

24         A.   Yes.

25         Q.   So Mr. Smith's authority was limited to the
```

36

Exhibit F, page 000139

1    stores you've just mentioned; in other words, the 12

2    stores he oversaw, the stores where he moved to the

3    East Bay and the stores where he would fill in; right?

4         MR. PARCELLS:  Objection.  Speculation.

5         To the extent you know.

6         THE WITNESS:  Yes, I do not know any other

7    stores that he might have been, so I can't speculate.

8    BY MR. YSLAS:

9         Q.   Okay.  And you can't give me any facts about

10   any authority Mr. Smith had beyond that what you've

11   just testified; right?

12        A.   Yes.

13        Q.   I know from your declaration you spoke to

14   Mr. Smith about the training course.  Right?

15        A.   Yes.

16        Q.   Did you ever personally witness Mr. Smith

17   talk to Mr. Voigt about the training course?

18        A.   No.

19        Q.   At some point you formed the belief that

20   taking the training course was mandatory; right?

21        A.   From the beginning, yes.

22        Q.   Okay.  And the reasons you formed that belief

23   are stated in your declaration; correct?

24        A.   Yes, and some additional ones.

25        Q.   Okay.  We'll get to those soon.  Now,

37

1       A.   Yes.

2       Q.   While working for Kaiser, did you administer

3   immunizations?

4       A.   We were not required, no.

5       Q.   While working for Rite Aid, have you

6   administered immunizations?

7       A.   I have -- they did request for my

8   certificate, which I gave, and the opportunity hasn't

9   presented itself but, yes, I would be available for

10  immunizations.

11      Q.   Okay.   Is it a minimum qualification to

12  become a pharmacist at Rite Aid that you perform --

13  you have the ability to perform immunizations?

14      A.   I believe it's a preferred, because the

15  comment on -- would be that they can -- I believe it's

16  preferred.

17      Q.   Okay.   So at Rite Aid it's a preferred

18  qualification, not a minimum qualification; correct?

19      A.   I believe so.

20      Q.   Okay.   And it's not mandatory that you be

21  able to administer immunizations at Rite Aid; correct?

22      A.   Maybe I should clarify that I'm working for a

23  relief agency contracting for Rite Aid.

24      Q.   Okay.

25      A.   So the certificate I provided was to the

44

1    relief agency.

2         Q.   Okay.  And though -- to your knowledge, you

3    testified that it's a preferred qualification for

4    Rite Aid; right?

5         A.   I assume it's preferred, because when I

6    applied for the position through the relief agency,

7    they did not tell me that it's a mandatory.  They

8    simply requested if I have an immunization

9    certificate.

10        Q.   Okay.

11        A.   So that's my implication.

12        Q.   And the word "mandatory" does not mean the

13   same thing as "preferred"; right?  Those are two

14   different things in your mind; right?

15        A.   Yes.

16        Q.   "Mandatory" means "required"; right?

17        A.   But I have to rephrase it that, working for

18   Rite Aid, they do advertise for immunizations, and

19   they do expect their pharmacists to give the

20   immunizations.  So the expectations are that I will

21   give it.

22        Q.   Okay.  But as listing it as a preferred

23   qualification, as you've already testified, that's

24   different in your mind than a minimum qualification,

25   which makes it mandatory; correct?

45

1    following SOPs, standard operating procedures.

2        Q.   From January 2013 forward, do you know how

3    many divisional managers there were for Wal-Mart in

4    Health & Wellness?

5        A.   Possibly three or four.

6        Q.   When you say "possibly three or four," do you

7    know?

8        A.   I don't know.  I'm assuming there's something

9    like 5,000 Wal-Marts across the US and maybe 7-, 800

10   stores per region.  So it was just an estimate.

11       Q.   Was it an estimate or a guess?

12       A.   It was a guess.  It was a guess.

13       Q.   Okay.  So just to be clear, you really don't

14   know how many regional managers there have been for

15   Wal-Mart --

16       A.   No.

17       Q.   -- at any given time since January 2013;

18   correct?

19       A.   Yes, I don't know for a fact.

20       Q.   To your understanding, did each of those

21   divisional managers then have authority over certain

22   territories?

23       A.   I don't know the details.  I'm assuming -- I

24   don't know what their arrangements are and where

25   their -- their direction is coming from.  So I can't

52

1    say.  It would all be speculation on my part to say

2    what the intricacies are of that.  I don't know.

3        Q.   Okay.  You really have no idea what the

4    divisional managers' scope of authority is; is that

5    correct?

6        A.   I'm not privy to that information.

7        Q.   Okay.  So is it a fair statement to say that

8    you don't have any idea what the divisional managers'

9    scope of authority is?

10       A.   I can guess that it's over their regions, but

11   that's all I can say.

12       Q.   Okay.  Beyond that, you really don't know?

13       A.   I don't know the intricacies of the

14   hierarchy.

15       Q.   Okay.  Since January 2013, at any given time

16   do you know how many regional managers there have

17   been?

18       A.   No.

19       Q.   To your understanding, is the regional

20   manager's authority limited, though, to the

21   territories that they supervise?

22       A.   I can't say for a fact.

23       Q.   Okay.  You really don't know; right?

24       A.   I don't know.

25       Q.   So is it a fair statement to say that you

53

Exhibit F, page 000144

1    don't know the regional managers' scope of authority?

2        A.   I know they're up in the hierarchy of Wal-

3    Mart, and you have regionals reporting to them.   So

4    they disseminate information from that point down.

5        Q.   You mean market managers reporting to them?

6        A.   Market -- well, regionals -- you're talking

7    about divisionals; right?

8        Q.   Let's back up for a second because I think

9    we're getting a little confused now.   We already

10   talked about the divisionals.

11       A.   Oh, okay.

12       Q.   Now I'm moving on to the regional managers.

13   And regional managers report to divisional managers;

14   right?

15       A.   Right.

16       Q.   Okay.   So just focusing on regional managers,

17   you already testified you don't know how many there

18   were.   Do you know anything about the level of their

19   authority -- well, strike that.

20            To your understanding, was the regional

21   managers' authority limited to the territories they

22   covered -- they supervised?

23       A.   I don't understand the intricacies of the

24   Wal-Mart, you know, hierarchy.   All -- so I'm assuming

25   that -- I don't know.   I don't really know the details

54

Exhibit F, page 000145

1    of their duties.

2        Q.   Okay.  So you don't know the details of

3    regional managers' duties; right?

4        A.   No, I don't.  All I know is that direction

5    comes from the top, and it's passed on to different

6    levels.  How it's disseminated, I'm not quite sure.  I

7    just know what came down to me was coming from higher

8    authority passed on down.

9        Q.   Okay.  And you don't know how the

10   communications come from -- from divisionals to

11   regionals to market managers; right?

12       A.   They would have meetings, corporate meetings,

13   where my market manager would be called back to

14   Arkansas, and they would be given direction to come

15   back and report to us as to different -- different

16   organizational changes or programs or whatever.  So

17   I'm assuming that's how the communication was

18   happening, but I don't really know in detail.

19       Q.   Right.  And you were never present during any

20   of those communications --

21       A.   No.

22       Q.   -- correct?

23       A.   Correct.

24       Q.   Okay.  And you don't really know how those

25   communications took place; correct?

55

Exhibit F, page 000146

1        A.   I'm assuming the usual way of meetings and
2    e-mails and phone calls and conferences.
3        Q.   But specifically you don't know the content
4    of those communications; correct?
5        A.   I know there were a lot of conference calls
6    where our market managers would be conferencing with
7    the regionals, and they were telling us that they're
8    in conference calls.  So my estimate -- or my
9    conclusion would be that they were communicating
10   through conference calls with their superiors.
11       Q.   And -- but you didn't personally witness
12   those communications; correct?
13       A.   No, I did not.
14       Q.   Okay.  Now, I'm not sure you answered the
15   specific question I asked.  I'll read some testimony
16   which was relevant and I wanted to follow up on, but I
17   want to go back to my original question, which is that
18   you don't know the scope of regional managers'
19   authority; is that correct?
20       A.   I can't say for a fact.
21       Q.   Okay.  All you know is that they oversee
22   certain territories; right?
23       A.   That they have authority over market
24   managers.
25       Q.   Okay.  And those market managers within the

56

1    territories that they supervise; correct?

2       A.   I guess, yes.

3       Q.   Since January of 2013, do you know how many

4    market managers there have been in the United States

5    for Wal-Mart?

6       A.   No.  It would be an estimate of, say, 15

7    stores per district -- per market manager divided by

8    5,000.  This is the only way I would figure it out.

9    So I don't know for a fact.

10      Q.   Okay.  So your estimate is for Wal-Mart

11   there's about 5,000 pharmacies; is that right?

12      A.   I believe more than that.

13      Q.   Okay.  Well, you used the figure 5,000.  What

14   did you mean?

15      A.   Pharmacies.  Did you say pharmacists or

16   pharmacies?  I didn't hear.

17      Q.   Pharmacies -- well, I said stores, but let's

18   get back on the same page.

19           Is it your approximated -- is it your best

20   estimate that there's approximately 5,000 pharmacies

21   for Wal-Mart in the United States?

22      A.   Yes.

23      Q.   Okay.  And your estimate is that they're

24   divided into markets that consist of approximately 15

25   pharmacies per market; right?

57

Exhibit F, page 000148

1       A.   As an estimate, yes.

2       Q.   Okay.  So I just -- so you know, I was just

3   on my phone on my calculator dividing 5,000 divided by

4   15, and the figure I came up with was 333.

5            So my question is -- to you is:  Is it your

6   best estimate that -- based on your knowledge, that

7   there were about 333, or somewhere around there,

8   markets?

9       A.   Somewhere in the 300 probably, something like

10  that.

11      Q.   Okay.  So your best estimate is somewhere in

12  the 300s is how many markets there have been in

13  Health & Wellness for Wal-Mart since January of 2013;

14  is that fair to say?

15      A.   Based on that estimation.

16      Q.   Yeah.  Okay.  Do you know how many markets

17  there have been at any given time in California since

18  2013?

19      A.   No, I don't.

20      Q.   Do you know how many pharmacies there have

21  been in California with Wal-Mart since January 2013?

22      A.   I believe there might be close to 200.

23      Q.   I just did the same thing.  200 divided by 15

24  is 13.33.  But I don't want you to guess.  What I'm

25  asking -- going to ask you is -- I think I just -- you

58

1    just answered it.  I want to make sure.

2          You don't know how many markets there have

3    been in California since January 2013; right?

4          A.   No, I don't.

5          Q.   Okay.  As we sit here today, do you know the

6    names of any of the divisional managers since

7    January 2013 other than Mr. Patel and Mr. Moore?

8          A.   No.

9          Q.   And other than the limited conversation you

10   had with Mr. Moore, you've never spoken to any other

11   divisional manager; correct?

12         A.   I did not have a conversation with Mr. Moore.

13   It was an e-mail.

14         Q.   I'm sorry.  E-mail.

15         A.   And the other part is I did not speak to

16   anybody else.

17         Q.   Okay.  So other than that e-mail

18   communication you had with Mr. Moore, you've never had

19   any communications with any other divisional managers;

20   correct?

21         A.   Yes.

22         Q.   Other than Mr. Voigt, have you ever spoken to

23   any regional managers?

24         A.   I can't recall because I've been with this

25   company for so -- oh, you're talking about the

                                                              59

```
 1    specific period --
 2        Q.   January --
 3        A.   January --
 4        Q.   I'm sorry.  Let me start it over again.
 5        A.   Oh.
 6        Q.   Since January 2013, other than Mr. Voigt,
 7    have you spoken to any regional managers?
 8        A.   No.
 9        Q.   Since January 2013, other than Mr. Smith,
10    have you spoken to any market managers?
11        A.   I'm trying to think on that.  I possibly have
12    based on the fact that when Jeremy was not available,
13    I would contact whoever was on call with questions
14    that we might have.
15        Q.   Okay.  You never discussed the training
16    course with any market manager other than Mr. Smith
17    since January 2013; correct?
18        A.   Yes.
19        Q.   I know I just said it, but that's a correct
20    statement; right?
21        A.   Yes.
22        Q.   Okay.  Have you ever spoken to anybody as
23    part of Wal-Mart's Health & Wellness quality team?
24        A.   No.
25        Q.   Have you ever spoken to Susanne Hiland,
```

60

Exhibit F, page 000151

```
 1   H-i-l-a-n-d?

 2       A.   No.

 3       Q.   Have you ever spoken to Deanna Seiler,

 4   S-e-i-l-e-r?

 5       A.   No.

 6       Q.   Have you ever spoken to JoLynn Coleman?

 7       A.   No.

 8       Q.   Have you ever spoken to Pam Piotrowski,

 9   P-i-o-t-r-o-w-s-k-i?

10       A.   No.

11       Q.   Have you ever spoken to Alfred Rodriguez in

12   HR?

13       A.   No.

14       Q.   Now, the divisional managers, do you know who

15   they report to?

16       A.   I'm assuming the head of the -- of Wal-Mart.

17   I'm not sure.  I don't know.

18       Q.   Okay.  Have you ever spoken to a person -- to

19   any president or vice president of Health & Wellness

20   at Wal-Mart?

21       A.   No.  And I guess that's who those divisionals

22   would be reporting to.

23       Q.   And you've never spoken to those persons;

24   right?

25       A.   No.
```

61

Exhibit F, page 000152

1      Q.   Is that correct?

2      A.   Yes.

3      Q.   Do you know any pharmacist at Wal-Mart that

4   has not taken the training course?

5      A.   No.

6      Q.   Do you know any pharmacist at Wal-Mart that

7   is not immunization-certified?

8      A.   No.

9      Q.   Do you know what percentage of Wal-Mart

10   pharmacists are not immunization-certified?

11      A.   Based on my knowledge of this company and the

12   experiences that we've had, I would be safe to guess

13   that just about everybody is immunization-trained.

14      Q.   You said "safe to guess." Do you know?

15      A.   I would, again, draw the conclusion based on

16   my experience and the way the presentation was made on

17   the implementation of the immunization program and the

18   preparations and the pressure that was placed on us,

19   that I would -- it would be safe for me to draw the

20   conclusion that's just about everybody is immunized --

21   is certified. Excuse me.

22      Q.   So based on that experience that you had, in

23   your mind, your conclusion is, let's say, 99 percent

24   or more of the pharmacists at Wal-Mart are certified?

25      A.   I would say close to that.

62

Exhibit F, page 000153

1      Q.   Okay.  Other than the experience you're

2    talking about, though, you haven't reviewed any data;

3    you've just -- you're reaching that conclusion based

4    on your experience with Wal-Mart; right?

5      A.   I've been a pharmacist with them for a long

6    time, and I understand the company and its procedures

7    and how they operate, and the way the immunization

8    program was rolled out was no exception to any other

9    program that they had chosen to pursue for their

10    stores.

11      Q.   And based on that, it's your personal belief

12    that 99 percent or more of the pharmacists in Wal-Mart

13    are immunization-certified; right?

14      A.   I would say yes.  Based on the promotions

15    that they have with the greetings on their stores

16    selling immunization to patients, I would say yes.

17      Q.   Okay.  Now, that estimate you've given me of

18    more than 99 percent, would you say that's an estimate

19    or a guess?

20      A.   I would say it's an estimate.

21      Q.   At some point you learned about the

22    availability of taking the training course through

23    Wal-Mart; correct?

24      A.   Yes.

25      Q.   When did you first learn of it?

63

Exhibit F, page 000154

```
 1    the Wal-Mart structure, I was not privy to that
 2    information.
 3         Q.   Okay.  So the answer to my question is no,
 4    you don't know who authored the PAID toolkit or the
 5    training course; correct?
 6         A.   Correct, because nobody was obligated to give
 7    us that information.  So we do not know at that level.
 8         Q.   Okay.  I mean that's fine.  I just want to
 9    make sure I understand what you know and what you
10    don't know.  Okay?  And right now I'm giving you the
11    opportunity to tell me exactly what you know about the
12    development of the PAID toolkit or the training
13    course.
14              Do you understand?
15         A.   Yes.
16         Q.   Okay.  So you don't know who developed the
17    training course; right?
18         A.   No.
19         Q.   Correct?
20         A.   Yes.
21         Q.   You don't know how it was developed or the
22    process that went through developing it; correct?
23         A.   Correct.
24         Q.   Okay.  What you do know is that it became
25    available, and Mr. Smith made statements to you
```

67

Exhibit F, page 000155

1          Q.    Okay.   And that's -- those are the

2     assumptions you're making based on your experience of

3     working for Wal-Mart; right?

4          A.    Yeah.   It's a logical train of thought that

5     you can expand on.

6          Q.    Okay.   So right now I'm trying to give you

7     the opportunity to give me all of the specific

8     knowledge you have regarding the communications that

9     went out in other regions, and you've given me an

10    answer.

11              Is there anything else that you base that

12    knowledge on?

13         A.    20 years of experience with Wal-Mart and

14    their methods -- understanding their methods and their

15    philosophy as a company is what makes me draw those

16    conclusions.

17         Q.    Okay.   Anything else?

18         A.    No.

19         Q.    Okay.   In your mind, is there a -- was there

20    a written policy that stated that taking the training

21    course was mandatory?

22         A.    Not specifically the word "mandatory" in

23    there.

24         Q.    Is there any other document -- is there any

25    document, in your mind, that constitutes a written

71

Exhibit F, page 000156

1    another training session.

2           He told me it was the last one in the

3    district, I would have to go another one in Sacramento

4    if I chose to wait, and that he's under a timeline

5    that he has to have all his stores certified by July.

6       Q.   Okay.  With that amendment, you know, to your

7    statement in the declaration, there's no other

8    statements that Mr. Smith made to you that caused you

9    to believe that taking the training course was

10   mandatory; correct?

11      A.   Correct.

12      Q.   Mr. Smith never told you that if you didn't

13   take the training course, your hours would be reduced;

14   correct?

15      A.   That is correct.  But he did say that from

16   this point on, he will only be hiring -- he made a

17   point to say it during the phone call that from this

18   point on, he will make a point in hiring immunization-

19   trained pharmacists only.

20      Q.   Okay.  For new hires; right?

21      A.   For new hires.

22      Q.   Mr. Smith never told you that if you didn't

23   take the immunization training course, you would be

24   transferred to another pharmacy; correct?

25      A.   No, but I could assume.

81

1      Q.    And you've never heard any market manager or

2    anyone in management ever say that if a pharmacist

3    didn't take the training course or become

4    immunization-certified, their hours would be reduced;

5    correct?

6      A.    Correct.

7      Q.    You've never heard anyone in Wal-Mart

8    management ever say that if a pharmacist didn't take

9    the training course, they would be transferred to

10   another pharmacy; correct?

11     A.    Not in those words, yes, correct.

12     Q.    You've never heard anyone in Wal-Mart

13   management say if a pharmacist didn't take the

14   immunization training course or become immunization-

15   certified, their employment would be terminated;

16   correct?

17     A.    No, but there were indirect threats.

18     Q.    What were those indirect threats?

19     A.    Again, like I mentioned, they were -- he made

20   a point to tell me that he is happy that I signed up

21   to take the course because from this point on, he

22   would be only hiring pharmacists that are

23   immunization-trained.

24           I had also heard -- and I can't quite recall

25   the source -- that there would need to be two

                                                          82

1    pharmacists per pharmacy in order for the program to

2    be implemented.

3          So by putting all those facts together, being

4    an at-will employee, and I was afraid that I could

5    easily be replaced or transferred to accommodate for

6    whatever the needs of Wal-Mart would be to bring in

7    the financial gains to the pharmacy.

8    Q.   Okay.  And the people that -- the person that

9    caused you to form the belief that taking the training

10   course was mandatory was Jeremy Smith; right?

11   A.   He was the person, along with the other

12   comments put together in the documents.

13   Q.   What other comments?

14   A.   The comments that I mentioned about the fact

15   that they would want two pharmacists per store.

16   Q.   Who made that statement?

17   A.   That's what I said.  I can't recall.  It

18   was -- I was discussing these issues with a number of

19   pharmacists, and somebody told me that that comment

20   was made by somebody in management.

21   Q.   The only person in management that ever made

22   a statement to you directly that caused you to believe

23   that taking the training course was mandatory was

24   Jeremy Smith; right?

25   A.   Yes.

83

Exhibit F, page 000159

1    March 2014; right?

2         A.   Correct.

3         Q.   And, by the way, eventually at the end of

4    your employment you were a part-time employee; right?

5         A.   Correct.

6         Q.   And you worked one to two days a week?

7         A.   Yes.

8         Q.   So anywhere from, approximately, 8 to 16

9    hours a week?

10        A.   Mostly 8 but, yes, there were times I would

11   do 16.

12        Q.   And you worked 8 hours a week on occasion for

13   Wal-Mart as a part-time pharmacist; right?

14             MR. PARCELLS:   8 hours a week?

15             MR. YSLAS:   Right.

16             THE WITNESS:   For Ukiah?   Wal-Mart or Kaiser

17   did you mean?

18   BY MR. YSLAS:

19        Q.   I'd said Wal-Mart, actually.   So at the end

20   of your employment there were occasions where you

21   worked just one day a week, which is 8 hours; right?

22        A.   Yes.

23        Q.   And are you aware of other part-time

24   employees working once a week?

25        A.   Betty Christensen would have been also a

95

1    part-timer.

2       Q.   And Ms. Christensen, were there occasions

3    when she, like other part-time employees, just worked

4    8 hours a week?

5       A.   I don't know her schedule.  I know she was

6    part time.

7       Q.   Okay.  Were there other part-time employees

8    working for Wal-Mart during your employment at any

9    time that worked one day a week, 8 hours a week?

10      A.   Michael Schumacher was semi-retired, and he

11   had a haphazard schedule and --

12      Q.   Okay.  And without -- I'm not asking you for

13   a memory contest on names on this one.  I'm just

14   asking you generally.

15           Was it your general knowledge that there

16   would be part-time employees, and sometimes they would

17   work as little as one day a week?

18      A.   I can't say.  I don't know what the part

19   time -- other part-time employees were doing.

20      Q.   Okay.  So you don't know the schedules of all

21   pharmacists around the country, of course; right?

22      A.   Of course not.

23      Q.   Okay.  Based on your experience -- you've

24   testified a lot about your experience with Wal-Mart,

25   so let me ask you about that.

96

Exhibit F, page 000161

1              Do you believe on occasion there were

2    pharmacists that worked one day a week, 8 hours a

3    day -- 8 hours for the week total?

4         A.   I don't know of anybody, per se.  I know as a

5    district we try to have pharmacists more than one day

6    a week.  The -- I don't know if it was a preference or

7    what, but I don't know if there are.

8         Q.   Are you aware of part-time employees working

9    as little as two days a week?

10        A.   There were not that many part-timers in my

11   district.  I don't know -- I'm assuming that part-time

12   work is anything less than -- whatever it was --

13   24 hours, but I can't attest to what shifts exist out

14   there.  I don't really know.

15        Q.   Okay.  Because you don't know the practices

16   happening in places other than where you worked;

17   right?

18        A.   I'm assuming that there would be similar

19   pharmacists to myself somewhere working 8 hours.  It

20   was still the same company.  I can't say for a fact.

21   I don't know what is out there.

22        Q.   Okay.  And when you took the training course,

23   it was 8 hours for the live portion; right?

24        A.   Correct.

25        Q.   Okay.  And then you did self-study, also;

97

Exhibit F, page 000162

1    right?

2        A.   Yes.

3        Q.   And approximately how many hours of self-

4    study?

5        A.   I estimated 20, but it was probably more than

6    that.  So I estimated 20.

7        Q.   Okay.  And is it possible, in your mind, that

8    a part-time employee, let's say, who worked 8 hours in

9    a week took the self-study and like you -- took the

10   self-study, let's say, on an 8-hour day.  Between the

11   8-hour day that they worked -- strike that.

12            Between the 8-hour day that they went to the

13   live portion and the 20 hours, that would be -- the 20

14   hours of self-study, that would be 28 hours; right?

15       A.   Yes.

16       Q.   Okay.  I mean, I'll ask you.  You know, is it

17   possible to you, then, that there would be a part-time

18   employee out there that may have worked 28 hours in a

19   week, you know, 8 hours for the live portion and 20

20   hours for the self-study?

21       A.   It's possible, yes.

22       Q.   Okay.  But you really don't know, because

23   we'd have to go look at their schedule and see what

24   they did in a given week; right?

25       A.   Yes.

98

Exhibit F, page 000163

1      Q.    Okay.  One by one we'd need to sit there and

2    look at the individual's schedule and then figure out

3    if they worked -- you know, how much they worked in

4    that given workweek and how much they did for self-

5    study to figure out how many hours they worked that

6    week; right?

7      A.    I guess.

8      Q.    Did you -- did you -- to maintain your

9    license as a pharmacist, do you have to take

10    continuing education?

11      A.    We did.  And Wal-Mart provided the pharmacist

12    letter for us to take for free as one of the choices.

13      Q.    Okay.  So sort a predicate question to that,

14    though, is:  You have continuing education

15    requirements to maintain your license as a pharmacist;

16    right?

17      A.    Yes.

18      Q.    And you have to complete 30 hours of CE,

19    continuing education, every 2 years; right?

20      A.    Yes.

21      Q.    Okay.  When was your two-year period?

22      A.    It's two thousand -- it goes -- my current

23    license expires two thousand -- March 2017.  So the

24    previous period to that was 2015.

25      Q.    Okay.  And so between March 2013 and

99

```
 1    March 2015, you needed to complete 30 hours of CE;

 2    right?

 3        A.    Correct.

 4        Q.    Now, the training course that you took

 5    through Wal-Mart, did you get credit for any CE as a

 6    result of taking the training course?

 7        A.    It was considered 20 -- 8 for the practical

 8    portion and 12 for the home portion, so 20 hours.

 9        Q.    So the answer to my question is yes, then?

10    You received 20 hours of CE credit; correct?

11        A.    Yes.

12        Q.    And that was a result of taking the training

13    course; right?

14        A.    That was the option given to us, yes.  That

15    was a CE course, correct.

16        Q.    As of, you know, just prior to the time that

17    you took the training course with Wal-Mart in March of

18    2014, had you completed any of your CE at that time?

19        A.    I'm assuming I had because I don't wait until

20    the last minute.  I usually take subjects online, free

21    for the most part, of the Wal-Mart pharmacist letter

22    while I'm working.

23        Q.    Okay.

24        A.    So I can't recall in detail, but I probably

25    had some.  I don't know how many.
```

100

1    the idea of either Washington or Oregon.  So I would

2    get on the computer at home and just check out what

3    opportunities are there.

4         Q.   Okay.  I'm going to show you -- this is

5    Exhibit 7 to Ms. Nikmanesh's deposition, and

6    specifically, it's some of the exhibits to the second

7    amended complaint.  Turn to Exhibit 4, which is a

8    National Certificate Program for Pharmacists.  Let me

9    show you that.

10             Have you ever seen that document before?

11        A.   Yes.

12        Q.   Is there anything about that document that --

13   well, strike that.

14             Do you know who authored that document?

15        A.   It's the American Pharmaceutical Association

16   that puts this out.

17        Q.   So that document is not authored by anyone

18   from Wal-Mart; right?

19        A.   This one?  No.

20        Q.   Okay.  When did you see that document?

21        A.   Excuse me?

22        Q.   When did you see that document?

23        A.   When I logged into the computer to take the

24   training course.

25        Q.   Okay.  Is there anything about that document

103

1      Q.    -- documents before?

2            So, you know, just by way of example, the top

3      of this first page, which is 7-21, says Staff

4      Pharmacist Part-Time Jobs in Massachusetts at Wal-

5      Mart.

6            So my question is:  You don't know who

7      authored that document; correct?

8      A.    It comes from the Wal-Mart Pharmacy Human

9      Resources posting for a job.

10     Q.    Okay.  But you don't know specifically the

11     name of the person who authored it; right?

12     A.    Obviously not, no.

13     Q.    Okay.  And you don't know anything about the

14     circumstances that caused somebody to post that job

15     posting in Massachusetts; right?

16     A.    No.  There's an opening there --

17     Q.    Right.

18     A.    -- part time.

19     Q.    Okay.  You don't have any idea what the

20     intent was in terms of posting that job; posting what

21     the needs of that store were or anything like that;

22     right?

23     A.    They were short-staffed, and they needed a

24     pharmacist.  It could have been a number of situations

25     to explain it, such as pharmacists quit or their

105

1    So I see that as also being the immunization program.

2        Q.   Okay.  Can I see it?

3        A.   Yeah.

4        Q.   Do you know who authored either of these job

5    descriptions?

6        A.   Somebody at the upper echelons of Human

7    Resources that describes the attributes that they want

8    a staff pharmacist or a pharmacy manager to have for

9    their company.

10       Q.   You don't know the person, though?

11       A.   Of course not.

12       Q.   And you couldn't possibly speak to that

13   person's intent other than to read the words in

14   these --

15       A.   Well, anybody --

16            (Reporter interruption in proceedings.)

17            MR. YSLAS:  Sure.

18       Q.   Let's -- you couldn't possibly speak to the

19   person's intent other than to read the words in the

20   job description; right?

21       A.   The intent to me is obvious that they want

22   people that are adaptable and, also, that are able to

23   go along with programs that the pharmacy is putting

24   out to guide and give direction.  Whoever wrote that

25   document did it under the direction of Wal-Mart

108

1      A.    I'm not aware of any policy, per se.  But,

2  again, anybody at the level of Jeremy Smith would not

3  individually speak out because he would endanger

4  himself against the company.

5      Q.    Okay.

6      A.    So my conclusion to that is that this is a

7  company mandate that -- the way that it just filters

8  down to the lower levels, and he was speaking of the

9  company wishes.

10     Q.    As we sit here today, since the time you

11  left, you know, Wal-Mart, are you aware of Wal-Mart

12  ever listing the immunization -- being immunization-

13  certified as a minimum -- openly as a minimum

14  qualification to being a pharmacist; in other words,

15  openly stating it must be taken?

16     A.    No, I'm not aware of that.

17     Q.    Okay.  Ms. Spentzos, since November of 2010

18  until your last day of employment in October of 2014,

19  did you ever take a rest break?

20     A.    No.

21     Q.    Okay.  So it's your testimony during that

22  entire period of time you never took a single rest

23  break; right?

24     A.    Not the way the company policy describes the

25  rest break.

118

```
 1                    REPORTER'S CERTIFICATE

 2

 3          I, Jan M. Roper, a Certified Shorthand

 4    Reporter No. 5705, do hereby certify:

 5              That, prior to being examined, the witness

 6    named in the foregoing deposition, EFFIE SPENTZOS, was

 7    by me duly sworn to testify the truth, the whole

 8    truth, and nothing but the truth.

 9              That said deposition was taken down by me in

10    shorthand at the time and place therein named and

11    thereafter transcribed under my direction, and I

12    hereby certify that the foregoing deposition is a true

13    and correct transcript of my shorthand notes so taken.

14              I certify that a request has been made by, or

15    on behalf of, the witness to review, correct and sign

16    the transcript of these proceedings.

17              I further certify that I am neither counsel

18    for nor related to any party to said action nor in

19    anywise interested in the outcome thereof.

20              IN WITNESS WHEREOF, I have hereunto

21    subscribed my name this 3rd day of July, 2015.

22

23

24    _____

              JAN M. ROPER, RPR, CSR NO. 5705

25
```

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

Exhibit F, page 000170

**EXHIBIT G**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

AFROUZ NIKMANESH, ELVIS
ATENCIO, ANNA NGUYEN, AND
EFFIE SPENTZOS, on behalf of
themselves, the general
public, and all others
similarly situated,

       Plaintiffs,

vs.                Case No.  8:15-cv-00202-AG-JCG

WAL-MART STORES, INC., a
Delaware corporation, and
WAL-MART ASSOCIATES, INC., a
Delaware corporation, and
DOES 1 through 10, inclusive,

       Defendants.

--------------------------------/


DEPOSITION OF MICHAEL DENHAM
Tuesday, July 7, 2015
Sacramento, California



Reported by:
LORRIE L. MARCHANT, CSR No. 10523
RMR, CRR, CCRR, CLR
File No.:  150707LM

1

Exhibit G, Page 000171

1       Q.    And Mr. Smith, the Market 154 that he

2   supervised, what areas did that cover?

3       A.    What areas?  Okay.  Ukiah, Rohnert Park,

4   Windsor, Lake County, Napa, American Canyon,

5   Vacaville, Fairfield, Martinez, originally

6   Richmond, Antioch, Pittsburg, Oakland.

7       Q.    And these are all in Northern California;

8   correct?

9       A.    Correct.

10      Q.    So Mr. Smith has supervised approximately

11  13 pharmacies in Northern California; correct?

12      A.    Yes.  At a later time, if you want to be

13  accurate -- let's see.  One, two, three -- at a

14  later time, three, maybe four, I don't know,

15  small-format stores called Neighborhood Markets

16  were added in.  They have since been split off the

17  district and moved to their own.

18      Q.    Okay.  Also in Northern California?

19      A.    Also in Northern California.  Two in

20  Vacaville, one in Rohnert Park, one in Vallejo, and

21  I don't know exactly where -- when Pleasanton

22  opened up.  I'm sorry.

23      Q.    And so Mr. Smith's authority has been

24  limited to the market that he supervised under the

25  pharmacies you've just described; correct?

17

Exhibit G, Page 000172

1     A.   Correct.

2     Q.   And Mr. Booker's authority has also been

3   limited to the pharmacies that you've described in

4   Market 116; correct?

5     A.   Once he split off from 116, I sort of lost

6   track of him.  I know that at some point they also

7   had some Neighborhood Markets added into their

8   district.  Okay.

9          I also know that -- I think there was

10  another store opened.  Mr. Booker has since left

11  Wal-Mart, so I don't ...

12    Q.   During the time that Mr. Booker was your

13  market manager, his authority was limited to the

14  stores in Market 116; correct?

15    A.   Correct.  Or 119, whatever the number is.

16    Q.   And those are the pharmacies that you've

17  already described; right?

18    A.   Yes.  To the best of my memory.  I can't

19  remember all the ones down in the Valley or down

20  farther south.  I'm sorry.

21    Q.   Is Mr. Smith still your market manager?

22    A.   No.

23    Q.   And who took over for Mr. Smith?

24    A.   A young lady by the name of Rachel Lozano.

25    Q.   When did that happen?

18

1      A.   Officially January 1st of this year.

2   Previous to that, she was in training that I

3   described earlier.

4      Q.   And what market does Ms. Lozano supervise?

5      A.   The 154 one.

6      Q.   Same stores that you've already described

7   as --

8      A.   Yes.

9      Q.   Sorry.  Let me --

10      A.   Sorry.

11      Q.   I promised it was going to happen.  And

12   let's just try to let me finish the question.

13      A.   Okay.

14      Q.   So Ms. Lozano supervises the same

15   pharmacies that you've already described as to

16   Market 154; correct?

17      A.   Correct.

18      Q.   And her authority, then, is limited to her

19   supervision of the stores in Market 154; correct?

20           MR. BUCK:  Objection.  Lack of personal

21   knowledge.

22           If I object, you can still respond to the

23   question to the best of your ability.

24           THE WITNESS:  Okay.  To the best of my

25   ability is really I -- yes.  But I don't know

                                                    19

```
 1      A.   Officially January 1st of this year.
 2  Previous to that, she was in training that I
 3  described earlier.
 4      Q.   And what market does Ms. Lozano supervise?
 5      A.   The 154 one.
 6      Q.   Same stores that you've already described
 7  as --
 8      A.   Yes.
 9      Q.   Sorry.  Let me --
10      A.   Sorry.
11      Q.   I promised it was going to happen.  And
12  let's just try to let me finish the question.
13      A.   Okay.
14      Q.   So Ms. Lozano supervises the same
15  pharmacies that you've already described as to
16  Market 154; correct?
17      A.   Correct.
18      Q.   And her authority, then, is limited to her
19  supervision of the stores in Market 154; correct?
20           MR. BUCK:  Objection.  Lack of personal
21  knowledge.
22           If I object, you can still respond to the
23  question to the best of your ability.
24           THE WITNESS:  Okay.  To the best of my
25  ability is really I -- yes.  But I don't know
```

19

```
 1              Have you ever spoken to Mr. Patel about
 2     the training course?
 3         A.   No.
 4         Q.   Okay.  Have you ever spoken to any
 5     divisional manager about the training course?
 6         A.   No.
 7         Q.   So you've never spoken to any divisional
 8     manager about whether taking the training course is
 9     mandatory; correct?
10         A.   Correct.
11         Q.   Other than Mr. Voigt and Ms. Schmidt, have
12     you spoken to any other regional managers since
13     January 2013?
14         A.   No.
15         Q.   So you haven't spoken to any regional
16     managers about whether taking the training course
17     is mandatory; correct?
18         A.   Correct.
19         Q.   Other than Mr. Booker, Ms. Smith and
20     Ms. Lozano, do you know the names of any other
21     market managers since January 2013?
22         A.   For Wal-Mart, in general?
23         Q.   I'm focusing all my questions on Wal-Mart
24     Health and Wellness.
25         A.   That's what I meant.  I'm sorry.  When I
```

29

 1    say Wal-Mart in general, I meant the Health and

 2    Wellness, because I really don't know anything else

 3    about anybody else.  It's my little -- my little

 4    tunnel vision.  It's my tunnel.  It's what I'm in.

 5         Q.    Okay.  So just to make sure I understand

 6    what you just said, the total of your knowledge is

 7    limited to the tunnel vision of the workspace that

 8    you work in; correct?

 9         A.    Correct.

10         Q.    And that's in Napa, California; correct?

11         A.    Correct.

12         Q.    You really don't know the practices of

13    Wal-Mart beyond the Napa region that you work in;

14    correct?

15         A.    Correct.

16         Q.    So you really don't know the

17    communications made regarding the training course

18    outside of your Napa region; correct?

19         A.    Correct.

20         Q.    So whether or not a market manager said to

21    a pharmacist that -- or did anything to cause the

22    pharmacist to believe that taking the training

23    course was mandatory, you really have no

24    information beyond your own personal knowledge,

25    which is limited to Napa; right?

30

Exhibit G, Page 000177

1      A.    Correct.

2      Q.    And you really have no idea, then, if

3    there's been any uniform practice throughout the

4    United States requiring pharmacists to take the

5    training course; correct?

6      A.    Correct.

7      Q.    It would be complete speculation on your

8    part; right?

9      A.    That's correct.

10      Q.    What you do know is what Mr. Smith told

11    you; right?

12      A.    That's correct.

13      Q.    And I can see from your declaration --

14    well, let's just make this an exhibit.

15           MR. YSLAS:  I'm going to mark --

16           MR. BUCK:  Before you do that, can we take

17    a break?

18           MR. YSLAS:  Let me finish a couple of

19    questions -- well, okay.  Let's go off the record.

20           (Recess taken, from 1:42 to 1:46.)

21           MR. YSLAS:  Back on the record.

22           BY MR. YSLAS:

23      Q.    Mr. Denham, without revealing the content

24    of your discussion, did you speak to your attorney

25    at the break?

31

1   conversation with Jeremy.   That conversation with

2   Jeremy.

3       Q.   And by "Jeremy," you're referring --

4       A.   Mr. Smith.

5       Q.   Sorry.

6       A.   Sorry.

7       Q.   By "Jeremy," your referring to Mr. Smith?

8       A.   Correct.

9       Q.   And six to eight months prior to March of

10  2014 would be approximately July to September of

11  2013; correct?

12      A.   Correct.   That's my thinking out loud,

13  trying to figure out the months and then the year.

14      Q.   So sometime around July through September

15  of 2013, you received an e-mail that made you aware

16  of the training course and made you aware that it

17  was voluntary; correct?

18      A.   Correct.

19      Q.   And do you remember specifically who it

20  came from?

21      A.   I do not.

22      Q.   Do you remember who it was addressed to?

23      A.   All the pharmacists in the chain.

24      Q.   When you say "in the chain," do you mean

25  in the market you were working at?

                                                    42

 1      A.   My understanding is it was sent out to

 2   everybody.

 3      Q.   So when Mr. Smith told you that you should

 4   take the training course and said it in a way that

 5   made you feel that you had to take it, it was

 6   contrary to the e-mail that you previously

 7   received; correct?

 8      A.   Correct.

 9      Q.   And, therefore, it was contrary to the

10   policy that you understood from Wal-Mart, that

11   taking the training course was voluntary; correct?

12      A.   Correct.

13      Q.   Did Mr. Smith tell you if he had received

14   any communications from anyone telling you that --

15   well, Mr. Smith was telling you words that led you

16   to believe that taking the training course was

17   mandatory.

18           Did he give you any idea of where he had

19   gotten that idea from; in other words, someone told

20   him that, or did he come up with it on his own, or

21   did you have any sense of it?

22      A.   No sense at all.

23      Q.   Okay.   You just know what Mr. Smith told

24   you?

25      A.   That's correct.

43

1    you would be terminated if you didn't take the

2    training course; correct?

3         A.   Sounded pretty specific to me.

4         Q.   Mr. Smith never used the words

5    specifically, that you would be terminated if you

6    didn't take the training course; correct?

7         A.   Correct.

8         Q.   Mr. Smith never specifically used the

9    words that your hours would be reduced if you

10   didn't take the training course; correct?

11        A.   Correct.

12        Q.   Mr. Smith never specifically told you you

13   would be transferred if you didn't take the

14   training course; correct?

15        A.   Correct.

16        Q.   Okay.  He used the words that you've

17   described in your declaration and in your

18   deposition testimony here?

19        A.   Correct.

20        Q.   Outside of Mr. Smith, you have no idea if

21   others were told or even it was implied to others

22   that they would be terminated, their hours reduced

23   or transferred in other markets; right?

24        A.   I do not know.  I've had no conversation

25   with others on that specifically.

59

1    manager, the Health and Wellness manager.

2       Q.   Okay.  And that hiring is on an

3    individual, unique basis based on the needs of that

4    particular pharmacy; right?

5       A.   I would hope so.

6       Q.   Do you think so?

7       A.   You want my honest answer?  No.  I think

8    it's just a warm body.

9       Q.   Okay.  But whether or not the person is

10   immunization certified really is an individual --

11   individualized decision made at the store level;

12   right?

13      A.   No.  Made at the district manager level.

14      Q.   Okay.  Right.  The market manager?

15      A.   Market manager, yes.  Sorry.  Using the

16   old terms.

17      Q.   So I'd need to go to every single market

18   manager, let's just say 400, throughout the nation,

19   to figure out if that immunization certification is

20   required?

21      A.   Correct.

22      Q.   Okay.  And if, in fact, there was a

23   requirement that the -- in the market that the

24   pharmacist new hire be immunization certified,

25   would you assume that the job posting would list it

72

Exhibit G, Page 000182

```
 1    as a minimal qualification?

 2         A.   I assume a lot of things.  But, yes.

 3         Q.   Okay.  In other words, part of what I'm

 4    asking you is merely listing for a new hire it

 5    being -- immunization certified being a preferred

 6    qualification wouldn't indicate that it's a

 7    mandatory qualification; is that fair?

 8         A.   That's fair.

 9         Q.   And so, for instance, I'm going to show

10    you a job posting that is attached to Exhibit 5 to

11    the Second Amended Complaint, second page.  I'm

12    going to show you right here (indicating).

13              It's -- if you look at the top of the

14    page, it says, Pharmacy manager in Dallas at

15    Wal-Mart.

16              Now, I assume you have no idea of who

17    prepared this document or anything about it; right?

18         A.   Correct.

19         Q.   Okay.  And you couldn't possibly speak to

20    the intent of the author of this document; right?

21         A.   Correct.  Could you?

22         Q.   But you -- fortunately I get to ask the

23    questions.

24         A.   You get to ask the questions and not

25    answer them.  Okay.  I couldn't resist.  Sorry.
```

73

1      Q.    More laughter, for the record.

2            The job title -- I'm sorry.

3            The -- it says, Additional preferred

4     qualifications -- it says preferred, not minimum.

5     It says, Current immunization certification.

6            Do you see that?

7      A.    No, I can't.  My eyes aren't that good.

8     Sorry.

9      Q.    You're now reaching and looking at it

10    closer?

11     A.    Yes.  Now I can read it.

12            The question becomes the --

13     Q.    So that document, based on your testimony

14    obviously doesn't indicate that being immunization

15    certified is mandatory; correct?

16     A.    What is the date of the document?

17     Q.    Well, okay.  As of the date of the

18    document, which is --

19     A.    No.  That's when it was filed.

20     Q.    No, I know.  November 4th, 2014.

21     A.    Okay.  November 4th, 2014.  All right.

22    Yes.

23     Q.    As of November 4th, 2014, this document in

24    your mind, does not indicate that taking the

25    training course is mandatory; correct?

74

Exhibit G, Page 000184

1        A.   In Dallas, that's correct.

2        Q.   Okay.  And because the words "preferred

3   qualification" in your mind don't mean mandatory;

4   right?

5        A.   Right.

6        Q.   Okay.  Now, getting back to my other

7   question, which was -- what I'm trying to ask you

8   is at the time that you learned about the

9   availability of the training course, you had no

10  idea who designed it, what communications were

11  going down from top management, let's say from

12  divisionals to regionals, as to the course?

13       A.   Well, the course had been designed by the

14  APHA.  That was stated.  That's been around for

15  quite a long time.  So, no, I had no idea what was

16  going on with top management.

17       Q.   Okay.  So here's really what I'm trying to

18  ask you, which is that as we sit here today, you

19  don't have any idea about how the course was rolled

20  out in terms of communications from divisional

21  managers to regional managers to market managers.

22  Do you follow me?

23       A.   I follow.

24       Q.   You really have no idea how that happened;

25  right?

75

Exhibit G, Page 000185

```
 1      A.   I do not.

 2      Q.   And you really have no idea of the intent

 3   of top management in terms of whether the course

 4   was mandatory or not other than the e-mail you were

 5   served -- received in 2013 that it was not

 6   mandatory; is that correct?

 7      A.   That's correct.

 8      Q.   Okay.  So there was no -- well, strike

 9   that.

10           Based on your experience talking to

11   Mr. Smith, does it appear to you that market

12   managers were given the discretion of how they

13   communicated about the training course?

14      A.   No.

15      Q.   Why do you not think that's true?

16      A.   Well, based on the things that Mr. Smith

17   said, and you -- I just -- you take these things as

18   being accurate because he's your supervisor, your

19   boss.

20           Pretty much Mr. Smith indicated that he

21   didn't do anything without the approval of upper

22   management in lots of different things.  And this

23   particular one, did he specifically make that

24   statement or at that specific time?  I have to say,

25   no.
```

76

Exhibit G, Page 000186

1        But Wal-Mart is so extremely

2   compartmentalized that pretty much the top guy

3   tells the next guy down who tells the next guy down

4   who tells the next guy down who tells the next guy

5   down, and probably -- and eventually gets to the

6   bottom of the food chain, which in this case is me.

7        Q.   Okay.  That would be speculation on your

8   part; right?

9        A.   That would be speculation on my part.

10        Q.   It would be speculation on your part about

11   how divisional managers communicated with regional

12   managers; correct?

13        A.   Correct.

14        Q.   It would be speculation on your part how

15   regional managers communicated with market

16   managers; correct?

17        A.   Correct.

18        Q.   And you really have no idea how that

19   occurred anywhere throughout the United States;

20   right?

21        A.   Correct.

22             MR. YSLAS:  Let's take a break.

23             (Recess taken, from 2:49 to 2:54.)

24             BY MR. YSLAS:

25   ///

77

1      Q.   And those --

2      A.   I have one.  I have one that's technically

3   stationed at my store.  You're right.  Irene.

4      Q.   Okay.  And Irene, how often does she work?

5      A.   This is a source of some -- some

6   aggravation on Michael's part.  She rarely works at

7   my store.  I do not know what her regular schedule

8   is because the schedules are done out of Richmond,

9   by a young -- by a lady by the name of

10  Vanessa Rose, who does the schedules for our

11  district, and I understand a number of others.

12     Q.   Let me try it this way:  What's the -- as

13  to personal knowledge, what's the least amount of

14  part-time pharmacists will work for Wal-Mart?  In

15  other words, once a week?  Twice a week?

16     A.   I don't know.  I'm sure that there are

17  some that only work once a week.  I really don't

18  know.  I don't deal with the scheduling on that

19  issue, so it's not a question that I can answer.

20     Q.   Now, the training course is approximately

21  a total of 20 hours a week -- 20 hours total;

22  right?

23     A.   Well, there's a third part that's required

24  but is separate, of course, and that's the

25  CPR/basic life support course that's required

86

Exhibit G, Page 000188

1    before you can give immunizations also.

2        Q.   Okay.   Leaving apart the CPR portion of

3    it, the immunization training course is

4    approximately 20 hours; right?

5        A.   Yes.

6        Q.   So if somebody did all of the live portion

7    and did all the self-study, let's say, 20 hours,

8    and then worked as a part-time employee one day in

9    a week, that would be approximately 28 hours;

10   right?

11       A.   Approximately.

12       Q.   So less than 40 hours a week?

13       A.   Less than 40 hours a week.

14       Q.   Other than the e-mail that you described

15   in 2013, and the communication you received in your

16   own market, you don't know about how the program

17   was communicated elsewhere; correct?

18       A.   No.

19       Q.   That's --

20       A.   Correct.   No, I don't know.   Correct.

21       Q.   Okay.

22       A.   With regard to that last thing, can I say

23   a couple of other things?

24       Q.   If you want to.

25       A.   I would like to.

87

1    mandatory.

2        Q.    Okay.   I understand that's your

3    interpretation.

4        A.    And they did that for everybody.

5        Q.    I understand.

6        A.    Okay.

7        Q.    To your knowledge, no pharmacist at

8    Wal-Mart has been directly told that they would be

9    terminated, their hours reduced or transferred to

10   another store if they didn't take the training

11   course; correct?

12       A.    Correct.

13            MR. YSLAS:  I don't have any other

14   questions.

15            MR. BUCK:  Let me just take a minute to

16   review.  I might have some follow-up.

17            MR. YSLAS:  Okay.

18            (Recess taken, from 3:16 to 3:19.)

19            MR. BUCK:  Back on the record.

20                EXAMINATION BY MR. BUCK

21            BY MR. BUCK:

22       Q.    Michael, you spoke about a few different

23   things that you believe that made the training

24   course not voluntary.

25            Do you remember that?

                                                    92

```
 1                    REPORTER CERTIFICATE

 2           I, LORRIE L. MARCHANT, Certified Shorthand

 3    Reporter, Certificate No. 10523, for the State of

 4    California, hereby certify that MICHAEL DENHAM was

 5    by me duly sworn/affirmed to testify to the truth,

 6    the whole truth and nothing but the truth in the

 7    within-entitled cause; that said deposition was

 8    taken at the time and place herein named; that the

 9    deposition is a true record of the witness's

10    testimony as reported to the best of my ability by

11    me, a duly certified shorthand reporter and a

12    disinterested person, and was thereafter transcribed

13    under my direction into typewriting by computer;

14    that request [ X ] was [  ] was not made to read and

15    correct said deposition.

16           I further certify that I am not interested

17    in the outcome of said action, nor connected with,

18    nor related to any of the parties in said action,

19    nor to their respective counsel.

20           IN WITNESS WHEREOF, I have hereunto set my

21    hand this 8th day of July, 2015.

22

23    _____

             LORRIE L. MARCHANT, RMR, CRR, CCRR, CLR

24           Certified Shorthand Reporter #10523

25
```

102

Exhibit G, Page 000191

**EXHIBIT H**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA — SOUTHERN DIVISION

| | | |
|---|---|---|
| AFROUZ NIKMANESH, ELVIS ATENCIO, ANNA NGUYEN, AND EFFIE SPENTZOS, on behalf of themselves, the general public, and all others similarly situated, | ) ) ) ) ) ) ) | CASE NO.: 8:15-cv-00202 AG-JCG |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| WAL-MART STORES, INC., a Delaware corporation, and WAL-MART ASSOCIATES, INC., a Delaware corporation, and DOES 1 through 10, inclusive, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

DEPOSITION OF BRIAN NGUYEN

Wednesday, July 8, 2015

Los Angeles, California

Reported By:

Jan M. Roper, RPR,

CSR No. 5705

File No.: 150708JR

1

Exhibit H, Page 000192

1    them all.

2        Q.    Those are the only ones you can remember right

3    now?

4        A.    Yes.

5        Q.    Ms. Fisher's authority was limited to

6    supervising those 10 to 12 pharmacies; correct?

7        A.    Yes.

8        Q.    At some point did your market manager change

9    from Ms. Fisher to someone else?

10       A.    Yes.

11       Q.    Who did it change to?

12       A.    Change it to MaryAnn Dabney.

13       Q.    When was that?

14       A.    I believe by the end of last year, 2014.

15       Q.    Ms. Fisher's -- those 10 to 12 stores you're

16   referring to, they're all in Southern California;

17   correct?

18       A.    Yes.

19       Q.    And at some point at the end of 2014, your

20   market manager switched to Ms. Dabney; correct?

21       A.    Yes.

22       Q.    And Ms. Dabney was supervising the same 10 to 12

23   markets that Ms. Fisher was supervising; correct?

24       A.    No.

25       Q.    What pharmacies was Ms. Dabney supervising?

16

Exhibit H, Page 000193

```
 1      A.   Okay.

 2      Q.   So you've never spoken to Mr. Patel, so this may

 3   seem like a little bit of an obvious question, but I just

 4   want to get a clean record of it.

 5           You've never spoken to Mr. Patel about the

 6   training course; correct?

 7      A.   Correct.

 8      Q.   You've never spoken to any divisional manager

 9   about the training course; correct?

10      A.   Right.

11      Q.   Have you ever spoken to any divisional manager

12   at all?

13      A.   No.

14      Q.   So you've never spoken to any divisional manager

15   about the training course; correct?

16      A.   Right.

17      Q.   Have you ever spoken to Mr. Chung at all?

18      A.   Yes.

19      Q.   How many occasions?

20      A.   Quite a few.

21      Q.   Have you ever spoken to Mr. Chung about the

22   training course?

23      A.   No.

24      Q.   So you've never spoken to Mr. Training -- you've

25   never spoken to Mr. Chung about the training course;
```

21

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

Exhibit H, Page 000194

1      Q.   Okay.  He told you that Wal-Mart didn't pay for

2  the self-study portion; correct?

3      A.   Yes.

4      Q.   Did he tell you -- he didn't tell you where he

5  got that information from; right?

6      A.   Right.

7      Q.   Who else was present during that dinner?

8      A.   A lot of store manager in the region.

9      Q.   Do you remember who?

10      A.   I remember -- I know his first name but not last

11  name is Kevin.  Jason Berg.

12          MR. PARCELLS:  Bird?

13          THE WITNESS:  Berg, B-e-r-g.  Yeah, that's the

14  two name that I remember.  I don't remember the rest.

15  BY MR. YSLAS:

16      Q.   That's all you can remember about that

17  conversation; correct?

18      A.   Yes.

19      Q.   Okay.  So you have no idea where Mr. Negrete

20  even formulated that statement; in other words, where he

21  got his information from?

22      A.   That is correct.

23      Q.   Okay.  Now, you've never spoken to any market

24  manager outside of Southern California; correct?

25      A.   Correct.

                                                            30

Exhibit H, Page 000195

1      Q.    You don't even know the names of any market

2   managers outside of Southern California; correct?

3      A.    Correct.

4      Q.    And other than Mr. Chung and Ms. Bhatt, do you

5   know the names of any other regional supervisors?

6      A.    No.

7      Q.    You've never spoken to any regional supervisors

8   other than Mr. Chung and Ms. Bhatt; correct?

9      A.    Correct.

10      Q.    And have you ever spoken to any divisional

11   managers?

12      A.    No.

13      Q.    And other than Mr. Patel, you don't know the

14   names of any other divisional managers; correct?

15      A.    Correct.

16      Q.    And you really have no idea how Health &

17   Wellness is even structured throughout California and the

18   United States; is that fair to say?

19      A.    Yes.

20      Q.    So you don't know anything about the reporting

21   relationship from the divisional managers to the regional

22   managers to market managers; correct?

23      A.    Correct.

24      Q.    Do you know how many pharmacies there are in

25   California?

31

Exhibit H, Page 000196

1    what the practices were; correct?

2        A.    You mean the nonexempt?

3        Q.    No, not the nonexempt.  Other than the fact that

4    you know that they are all hourly, nonexempt --

5        A.    Okay.

6        Q.    -- so other than that --

7        A.    Other than that, yes.

8        Q.    Okay.  So let me make sure I get a transcript

9    I'm trying to keep here.  So let me just rephrase it.

10             Other than the fact that you know that

11   pharmacists in California are hourly, nonexempt, outside

12   of the market that you worked in in Southern California,

13   you have no idea what the practices were in those other

14   markets; correct?

15       A.    Correct.

16       Q.    Okay.  And you really have no idea what

17   communications went on between market managers and

18   divisional managers; correct?

19       A.    Right.  Correct.

20       Q.    And even in your own market, you really don't

21   know what the communications have been between the market

22   manager you reported to, Ms. Fisher or Ms. Dabney, and

23   their supervisor, the regional manager; correct?

24       A.    Correct.

25       Q.    You, in your declaration in Paragraph 7, state,

34

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

1    every pharmacist had to take the training course;

2    correct?

3         A.   No.   In the beginning, it has to be at least one

4    pharmacist per pharmacy to have to take that one, and

5    then eventually they going to make the staff pharmacist

6    one day in due time.

7         Q.   Okay.   The e-mail itself said that at least one

8    pharmacist per pharmacy needed to be immunization-

9    certified; correct?

10        A.   Correct.

11        Q.   The e-mail did not say that every single

12   pharmacist had to be immunization-certified; correct?

13        A.   That's in a later e-mail.

14        Q.   In a later e-mail did Ms. Fisher state that

15   every single pharmacist had to be immunization-certified?

16        A.   He said that your staff need to be certified

17   too.

18        Q.   Your staff in your individual pharmacy?

19        A.   Right.

20        Q.   So other than the e-mails you received from

21   Ms. Fisher and the statement she made to you, is it fair

22   to say that those are the reasons that you believe that

23   taking the training course was mandatory?   Right?

24        A.   Yes.

25        Q.   And there's no other document out there that you

36

Exhibit H, Page 000198

1    think states that taking the training course is

2    mandatory; right?

3        A.    They all say in there it's voluntarily, but when

4    the e-mail send down, it says that you have -- they don't

5    give us a choice to opt out.

6        Q.    Okay.  So we will discuss the e-mail.  What I'm

7    focusing on now is any other documents.  I want to make

8    sure I understand.

9             I think you just testified to it clearly, but to

10   make sure I understand:  In your mind there's no other

11   document out there that you've seen or are aware of that,

12   in your mind, demonstrates that taking the training

13   course is mandatory?

14       A.    In my mind, no.

15       Q.    Okay.  And there's no other statement by anyone

16   other than Ms. Fisher that caused you to believe that

17   taking the training course is mandatory; correct?

18       A.    Correct.

19       Q.    In fact, there were documents that you've seen

20   that you just referenced that indicated that taking the

21   training course was voluntary; correct?

22       A.    I'm sorry.  Rephrase that again.

23       Q.    Sure.  Just a minute.  I'm just going to read

24   what you testified to.  I've got it in front of me.  I

25   asked you:

37

Exhibit H, Page 000199

1    correct?

2        A.   Right.

3        Q.   So, for instance, the market in Northern

4    California, you have no idea who the market manager is or

5    what statements they may or may not have made to pharmacy

6    managers about whether they had to take the training

7    course; correct?

8        A.   Correct.

9        Q.   Your knowledge is limited to what Ms. Fisher

10   told you directly and this statement by Anna made at the

11   training course; correct?

12       A.   Correct.

13       Q.   Did Ms. Fisher -- Ms. Fisher did not tell you

14   how she formulated the view that taking the training

15   course was mandatory; right?

16       A.   Right.

17       Q.   So you have no idea if a regional manager told

18   her that; right?

19       A.   Right.

20       Q.   You have no idea if a divisional manager told

21   the regional manager and then told Ms. Fisher; correct?

22       A.   Correct.

23       Q.   All you really know is what Ms. Fisher told you?

24       A.   Correct.

25       Q.   Now, you're not aware of any written policy, in

                                                          42

1       Q.   Let me -- I'm turning right now to the second

2   amended complaint, which is Exhibit 8 -- Exhibit 8 to

3   Ms. Nikmanesh's deposition, which is Exhibit 5 to the

4   second amended complaint.  And I'm going to flip to the

5   third page, and it says -- it's a posting for pharmacy

6   managers in Dallas.

7            Let me just show you.  I'm going to point here

8   to the bottom where it says Additional -- first it

9   says -- pardon my reach -- Minimum Qualifications, and it

10  lists BS in pharmacy, then it lists pharmacy license.

11           Do you see that?

12       A.   Yes.

13       Q.   And then for Additional Preferred

14  Qualifications -- not minimum but preferred -- it says:

15  One year U.S. pharmacy experience and current

16  immunization certification.

17           Do you see that?

18       A.   Yes.

19       Q.   In your mind, the word "preferred" does not mean

20  the same thing as "minimum" qualification; right?

21       A.   Right.

22       Q.   Okay.  So, in other words, in your mind, this

23  job posting reflects that being immunization-certified is

24  not a mandatory requirement; is that fair to say?

25       A.   It is.

46

Exhibit H, Page 000201

```
 1      Q.   That's fair to say; right?

 2      A.   It is fair to say, yes.

 3      Q.   Because the word "preferred" means something

 4   different than "mandatory"; correct?

 5      A.   Right.

 6      Q.   Okay.

 7      A.   But, of course, it's a job posting without -- if

 8   you compare two pharmacists that applying for the same

 9   position, if one have immunization certificate and the

10   other one doesn't have and, unfortunately, they would

11   hire the one with the immunization certification.

12      Q.   Because it's more preferable; right?

13      A.   Right.

14      Q.   If there were a job posting out there that

15   listed nothing for either at a minimum or preferred

16   qualification, then there would be no advantage to having

17   an immunization certification, in your mind; right?

18      A.   Right.

19      Q.   Looking at Exhibit 6, which is a job

20   description, same thing down here, it says, "Preferred

21   Qualifications:  Current immunization certification."

22           Do you see that?

23      A.   Yes.

24      Q.   So, in your mind, this job description does not

25   reflect that being immunization-certified is required; is
```

47

Exhibit H, Page 000202

1    that correct?

2        A.   Right.  It's preferred.

3        Q.   Which means different than required; right?

4        A.   Right.

5        Q.   I assume -- we looked at the job posting and the

6    job description.

7             You have no idea who prepared those documents;

8    right?

9        A.   Right.

10       Q.   Okay.  You have no idea how they were prepared

11   or what the intent was; correct?

12       A.   Correct.

13       Q.   And turning to a confidential exhibit, which is

14   Exhibit 3 to the second amended complaint, which was

15   marked as Exhibit 8 to Ms. Nikmanesh's deposition, just

16   briefly, this is the PAID toolkit?

17       A.   Yes.

18       Q.   You have no idea who prepared that document or

19   what the intent of that document was; correct?

20       A.   Right.  Correct.

21       Q.   Other than the fact that it sets out procedures

22   for administering immunization certifications; right?

23       A.   Yes, and the checklist.

24       Q.   Nothing in that document or the existence of

25   that document that makes you think taking the training

48

1    course or becoming immunization-certified is mandatory;

2    correct?

3        A.   Right.

4        Q.   As we sit here today, you have no idea if some

5    uniform nationwide mandate went out to all pharmacists

6    from the top requiring them to take the training course;

7    correct?

8        A.   I have no idea.

9        Q.   Okay.  Really, all you know is what Ms. Fisher

10   told you in an e-mail and a conversation?

11       A.   That is correct.

12       Q.   You have no idea how the conversations or

13   communications went down from divisionals to regionals to

14   market managers throughout the country; correct?

15       A.   Correct.

16       Q.   Did you ever speak to anyone on the Health &

17   Wellness quality team?

18       A.   About what?

19       Q.   Anything.

20       A.   Anything?  Yes.  I talked to Mike Peerson, but

21   it's regarding a different issue because Mike Peerson --

22   by the way, Mike Peerson used to be my regional manager

23   when -- it was in 2002.

24       Q.   You never spoke to Mr. Peerson about the

25   training course; correct?

49

1      Q.   So Ms. Fisher.  When Ms. Fisher told you that

2    you had to take the training course, she did not say if

3    you don't take the course, your employment will be

4    terminated; correct?

5      A.   Correct.

6      Q.   Ms. Fisher did not tell you that if you don't

7    take the training course, your hours will be reduced;

8    correct?

9      A.   Not for me, no.

10      Q.   And you're not aware of Ms. Dabney telling

11    anybody else if they don't take the training course,

12    you'll be terminated -- oh, sorry.  Strike that.

13           Ms. Dabney did not tell you that if you don't

14    take the training course, you will be transferred to a

15    different store; correct?

16           MR. PARCELLS:  Excuse me.  Are you referring to

17    Dabney or Fisher?

18           MR. YSLAS:  Fisher.  Sorry.

19      Q.   Ms. Fisher did not tell you that --

20      A.   No, she did not tell me anything except that she

21    just put in the training class for me and tell me that I

22    need to go.

23      Q.   Okay.  So one last just -- I need to get a clean

24    record.

25      A.   Okay.

52

Exhibit H, Page 000205

1        Q.   Ms. Dabney did not -- Ms. Fisher did not tell

2   you that if you take -- if you don't take the training

3   course to become immunization-certified, you'll be

4   transferred to another store; correct?

5        A.   Correct.

6        Q.   In fact, you're not aware of any pharmacist

7   being told if they don't take the training course,

8   they'll be terminated or transferred or have their hours

9   reduced; correct?

10        A.   I have knowledge of one.

11        Q.   Who's that?

12        A.   My wife.

13        Q.   Who told her that?

14        A.   Her pharmacy manager.

15        Q.   Who's that?

16        A.   Thanh, T-h-a-n -- T-h-a-n-h, and his last name

17   is Trinh, T-r-i-n-h.

18        Q.   Okay.  You didn't personally hear that; right?

19        A.   I did not personally hear that, but my wife told

20   me.

21        Q.   What did she tell you specifically?

22        A.   She told me that -- because that one day that

23   she come back and come home and she was -- said that she

24   have to study the immunization, I was, like:  Why?  You

25   don't -- why do you taking the class now?

                                                          53

Exhibit H, Page 000206

1      A.   Yes.

2      Q.   Prior to that time that you took the course, do

3  you recall if you'd taken any continuing education before

4  then in that January 2013-December 2013 time frame?

5      A.   Yes.

6      Q.   Do you recall approximately how many hours?

7      A.   I do it every single month.  So each month is

8  one credit.  So until then it's about 12 -- 11 or 12.

9      Q.   So prior to taking the training course in

10 December 2013, you had not completed your 30 hours;

11 correct?

12     A.   Correct.

13     Q.   You'd completed approximately 11 or 12 hours;

14 right?

15     A.   Correct.

16     Q.   Did you receive continuing education credit for

17 taking the training course?

18     A.   Yes.

19     Q.   Approximately how many hours?

20     A.   I don't remember.  I think it's 18 or 20.

21     Q.   So by taking the training course, you received

22 the benefit of 18 to 20 hours of continuing education

23 credit; correct?

24     A.   Yes.

25     Q.   In Paragraph 4 you've got statements about when

56

Exhibit H, Page 000207

```
 1                    REPORTER'S CERTIFICATE

 2

 3          I, Jan M. Roper, a Certified Shorthand Reporter

 4   No. 5705, do hereby certify:

 5          That, prior to being examined, the witness named

 6   in the foregoing deposition, BRIAN NGUYEN, was by me duly

 7   sworn to testify the truth, the whole truth, and nothing

 8   but the truth.

 9          That said deposition was taken down by me in

10   shorthand at the time and place therein named and

11   thereafter transcribed under my direction, and I hereby

12   certify that the foregoing deposition is a true and

13   correct transcript of my shorthand notes so taken.

14          I certify that a request has been made by, or on

15   behalf of, the witness to review, correct and sign the

16   transcript of these proceedings.

17          I further certify that I am neither counsel for

18   nor related to any party to said action nor in anywise

19   interested in the outcome thereof.

20          IN WITNESS WHEREOF, I have hereunto subscribed

21   my name this 9th day of July, 2015.

22

23

24          _____

            JAN M. ROPER, RPR, CSR NO. 5705

25

                                                          77
```

Exhibit H, Page 000208

**EXHIBIT I**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA — SOUTHERN DIVISION


AFROUZ NIKMANESH, ELVIS          ) CASE NO.:
ATENCIO, ANNA NGUYEN, AND        ) 8:15-cv-00202 AG-JCG
EFFIE SPENTZOS, on behalf of     )
themselves, the general          )
public, and all others           )
similarly situated,              )
                                 )
                Plaintiffs,      )
                                 )
vs.                              )
                                 )
WAL-MART STORES, INC., a         )
Delaware corporation, and        )
WAL-MART ASSOCIATES, INC., a     )
Delaware corporation, and        )
DOES 1 through 10, inclusive,    )
                                 )
                Defendants.      )
_____)



DEPOSITION OF KHANH NGUYEN

Wednesday, July 8, 2015

Los Angeles, California



Reported By:

Jan M. Roper, RPR,

CSR No. 5705

File No.: 150708JR

1

Exhibit I, Page 000209

```
 1    she supervise?

 2        A.    I think she belong to Riverside.

 3        Q.    Do you know what stores Ms. Fisher supervised

 4    while she was your market manager?

 5        A.    My husband's store, also, the 3248.

 6        Q.    Which is La Habra?

 7        A.    La Habra.

 8        Q.    Do you know any other stores she supervised?

 9        A.    I don't recall.

10        Q.    Okay.  Ms. Fisher's authority was limited to the

11    stores she supervised; correct?

12        A.    Uh-huh.

13        Q.    Yes?

14        A.    Can you -- I don't understand that question.

15        Q.    Ms. Fisher supervised approximately 10 to 12

16    stores; is that correct?

17        A.    I believe, yes.

18        Q.    Okay.  And she did not have the authority to

19    supervise stores other than those 10 to 12 stores;

20    correct?

21            MR. PARCELLS:  If you know.

22            THE WITNESS:  I don't know.

23    BY MR. YSLAS:

24        Q.    Okay.  So as we sit here today, you don't know

25    the scope of Ms. Fisher's authority; is that true?
```

14

Exhibit I, Page 000210

1     Q.   Okay.  So you never spoke to Ms. Fisher directly

2   about the training course; correct?

3     A.   Correct.

4     Q.   So Ms. Fisher never told you that you had to

5   take the training course; correct?

6     A.   She e-mailed to pharmacist -- pharmacist

7   manager, and then the pharmacist manager told me that I

8   have to.

9     Q.   Okay.  So Ms. Fisher never directly told you,

10   directly, that you had to take the training course; is

11   that right?

12     A.   No.

13     Q.   No, it's not right?

14     A.   Directly, you mean the e-mail or verbally?

15     Q.   Let's start there.  Ms. Fisher never directly

16   told you in a conversation, not e-mail, that you had to

17   take the course; correct?

18     A.   Correct.

19     Q.   Ms. --

20     A.   But with the e-mail, yes.

21     Q.   Okay.  With the e-mail.  Did Ms. Fisher send the

22   e-mail directly to you?

23     A.   I believe I receive the e-mail with the date

24   that I have to attend with no choice.

25     Q.   Okay.  And was that e-mail directly to you, or

17

Exhibit I, Page 000211

1      A.   Yes.

2      Q.   Did Mr. Trinh specifically tell you that anyone

3   at Wal-Mart would remove you from the position of staff

4   pharmacist if you did not take the training course?

5      A.   He said Wal-Mart will.

6      Q.   Did Mr. Trinh tell you where he gained that

7   understanding?

8      A.   No.

9      Q.   So you have no idea who told him that; right?

10     A.   No.  But I know I have to.

11     Q.   Okay.  Because Mr. Trinh told you and because

12   there was an e-mail from Ms. Fisher; right?

13     A.   Yes.

14     Q.   Other than the conversation Mr. Trinh had with

15   you and the e-mail from Ms. Fisher, nobody else told you

16   that you had to take the training course; right?

17     A.   I have two date that I have to pick.  It's like

18   have to.  I have no choice.

19     Q.   I understand the date.

20     A.   Yes.

21     Q.   Right now I'm talking about the people, okay,

22   that told you.

23          Do you understand?

24     A.   Yes.

25     Q.   So I'm trying to make sure I understand.  The

20

Exhibit I, Page 000212

```
1      A.   Yes.

2      Q.   Okay.  Have you ever spoken to Mr. Chung about

3   the training course?

4      A.   No.

5      Q.   So Mr. Chung has never told you that taking the

6   training course is mandatory; correct?

7      A.   Yes.

8      Q.   Have you ever spoken to Ms. Bhatt or

9   communicated with Ms. Bhatt about the training course?

10     A.   She stopped by two month before Stephanie

11  arranged the course.  She asked me do I sign up for the

12  vaccination.  Have I been vaccinate customer.

13          I say that I wait to make it legalized for the

14  2015, because I feel uncomfortable during that time.

15     Q.   What do you mean you were making it -- that --

16     A.   Because I heard that 2015 every pharmacist have

17  to do it.

18     Q.   I see.  And what did Ms. Bhatt say to you?

19     A.   She say after that -- she didn't say anything.

20     Q.   Ms. Bhatt never told you that taking the

21  training course was mandatory; correct?

22     A.   Yes.

23     Q.   What did Ms. Bhatt say in response to your

24  statement about when the course would be required in

25  2015?
```

22

Exhibit I, Page 000213

1      A.   No.

2      Q.   True?

3      A.   True.

4      Q.   When Mr. Chung was your regional manager, do you

5   know who he reported to?

6      A.   No.

7      Q.   And when Ms. Bhatt was your regional manager, do

8   you know what -- who she reported to?

9      A.   No.

10      Q.   Okay.  So you don't -- do you know the names of

11   any divisional managers at Wal-Mart?

12      A.   (Witness shakes head from side to side.)

13      Q.   No?

14      A.   No.

15      Q.   You have no idea what the practices are in Wal-

16   Mart other than inside the store that you worked in;

17   right?

18      A.   Yes.

19      Q.   So you have no idea if there was ever a uniform

20   policy stating that Wal-Mart pharmacists must be

21   immunization-certified or take the course; correct?

22      A.   I heard you have to.

23      Q.   You heard you have to.  But you don't know if

24   that -- there was a uniform policy applying to everyone

25   in the United States that required it; right?

                                                        24

Exhibit I, Page 000214

```
 1        A.    I heard that later on if you not certified, they
 2    not going to hire you, or if you not certified, they not
 3    going to keep you.   That's what I heard.
 4        Q.    Okay.   That's what you heard later?
 5        A.    Uh-huh.
 6        Q.    Yes?
 7        A.    I heard during that time.
 8        Q.    Who did you hear it from?
 9        A.    From pharmacist, manager -- pharmacist manager.
10    That's the -- during that time that we have to take it.
11    I'm the last patch to take it.
12        Q.    Who told you that specifically?   What are the
13    names?
14        A.    I don't remember pharmacist.   We talk, but we
15    never meet each other.   Only on the phone.   And the
16    pharmacist manager he told me that, too, you have to take
17    it.
18        Q.    The pharmacy manager --
19        A.    Thanh Trinh.
20        Q.    Right.   But you don't know for sure if there was
21    a policy out there that applied to everyone in the United
22    States that required them to take it; correct?
23        A.    Yes.
24        Q.    Is that correct?
25        A.    Yes.   I don't know.
```

25

Exhibit I, Page 000215

1      Q.   You don't know.  And you never saw a writing, a

2   physical writing --

3      A.   Yes.

4      Q.   -- that stated or indicated in any way that

5   taking the training course was required; correct?

6      A.   Yes.

7      Q.   That's correct; right?

8      A.   Yes.

9      Q.   And you're not aware of any document that in any

10  way in your mind indicates that taking the training

11  course or being immunization-certified is required;

12  correct?

13     A.   Yes, but the document make me have to do it.

14  That's the only thing I see.

15     Q.   The only thing you saw is the e-mail that you're

16  referring to --

17     A.   Yes.

18     Q.   -- right?

19          That's the only writing; right?

20     A.   Yes.

21     Q.   Okay.  So Ms. Fisher never told you that all

22  pharmacists had to be immunization-certified; correct?

23     A.   I say I only see the mail, but she didn't say

24  directly.

25     Q.   She did not say directly -- Ms. Fisher did not

26

Exhibit I, Page 000216

1    directly say to you that all pharmacists had to be

2    immunization-certified; correct?

3        A.   Yes.

4        Q.   That's correct; right?

5        A.   But the pharmacist manager told me I have to,

6    yes.

7        Q.   But Ms. Fisher never told you that all

8    pharmacists had to be immunization-certified; correct?

9        A.   Yes.

10       Q.   And you took the home study and test portions of

11   the training course in November of 2014 and December of

12   2014; correct?

13       A.   Yes.

14       Q.   Were you a part-time employee or full-time

15   employee?

16       A.   I'm a full-time.

17       Q.   And you worked approximately 40 hours a week?

18       A.   40 exactly.

19       Q.   Now, November 26, 2014, that would have been

20   around Thanksgiving; right?

21       A.   (Witness nods head up and down.)

22       Q.   Right?

23       A.   Yes.

24       Q.   Do you recall if you worked a full workweek that

25   week?

27

Exhibit I, Page 000217

1      A.   I don't remember.

2      Q.   You'd have to look at the records; right?

3      A.   Yes.

4      Q.   And when you took the home study, do you

5  remember specifically how many hours a day you took it or

6  what days you took it?

7      A.   I know more or less one week.

8      Q.   Okay.  And did you take it -- did you -- in your

9  declaration here, it says it took you approximately 15

10  hours to complete it.

11          Do you recall the -- how many hours a day you

12  studied?

13      A.   Maybe like one-hour-something, two hour.  I know

14  it's -- I know it's more or less than one week because I

15  cannot sit still for the whole day.

16      Q.   But you don't remember how many hours you

17  worked on -- did the home study on one day versus another

18  day; right?

19      A.   No.

20      Q.   Is that correct?

21      A.   Yes.

22      Q.   Let me make sure I understand.  I'll ask you for

23  a "correct" answer, if it's correct.

24      A.   Yes.

25      Q.   You don't know how many hours a day on a

28

```
 1      A.   I don't know.
 2      Q.   Do you know who developed the course?
 3      A.   No.
 4      Q.   You've never spoken to anyone in the Health &
 5  Wellness quality team; right?
 6      A.   No.
 7      Q.   Is that true?
 8      A.   This is what the pharmacy manager always have a
 9  meeting on the phone with the regional -- with the
10  district marketing manager at least twice a week or once
11  a week, but not with the staff pharmacists.  So,
12  therefore, no.
13      Q.   Okay.  So you were not on the phone calls --
14      A.   No.
15      Q.   You were not on the phone calls between the
16  pharmacy manager and the regional manager; correct?
17      A.   Yes.
18      Q.   You were not on the phone calls with the
19  district manager and the regional manager; correct?
20      A.   Yes.
21      Q.   The reason you believe taking the training
22  course was mandatory was the statement Mr. Trinh made and
23  the e-mail you received from Ms. Fisher; correct?
24      A.   Yes.
25      Q.   And nothing else; right?
```

33

Exhibit I, Page 000219

1      A.   Yes.

2      Q.   There's no -- okay.  You've never spoken to a

3   woman named Pam Piotrowski, P-i-o-t-r-o-w-s-k-i; correct?

4      A.   Yes.

5      Q.   You've never spoken to a woman named Susanne

6   Hiland, H-i-l-a-n-d; correct?

7      A.   Yes.

8      Q.   You've never spoken to a woman named JoLynn

9   Coleman; correct?

10     A.   Yes.

11     Q.   You've never spoken to Paul Beahm; right?

12     A.   Yes.

13     Q.   You've never spoken to a woman named Deanna

14   Seiler, S-e-i-l-e-r; correct?

15     A.   Yes.

16     Q.   To maintain your license as a pharmacist, you

17   need to take continuing education; right?

18     A.   Yes.

19     Q.   You have to do 30 hours of continuing education

20   every two years; correct?

21     A.   Exactly, yeah.

22     Q.   And when is your two-year period?  What year and

23   month?

24     A.   I just had to renew my license in June '15.

25     Q.   2015.  So between June of 2013 to June 2015, you

                                                        34

1    had to do 30 hours of continuing education; correct?

2        A.   Yes.

3        Q.   When you took the training course in two

4    thousand -- November and December of 2014, how many hours

5    of continuing education had you done just before you took

6    the course?  Do you remember?

7        A.   22, more or less.

8        Q.   Before you took the training course?

9        A.   Yes.

10       Q.   So at the time you took the training course, you

11   had not finished the 30 hours; right?

12       A.   Yes.

13       Q.   So as a result of taking the training course,

14   you were able to complete your continuing education

15   credit; right?

16       A.   Yes.  I don't know -- yes.

17       Q.   So you received credit for taking the training

18   course; right?

19       A.   Yes.

20       Q.   Continuing education credit; right?

21       A.   Yes.

22       Q.   Do you administer immunizations now at your

23   current job?

24       A.   No.

25       Q.   Mr. Trinh, the conversation you had with him --

35

Exhibit I, Page 000221

1    Mr. Trinh was a pharmacy manager; right?

2        A.   Yes.

3        Q.   I'm going to ask you very specifically what he

4    said.  We've talked about it.  Now I want to ask a couple

5    of very specific follow-up questions.  Okay?

6        A.   Yes.

7        Q.   Mr. Trinh never specifically said you will be

8    terminated if you don't take the course; correct?

9        A.   He say, "You better take it, Khanh, or they go

10   remove you."

11       Q.   Did he say who "they" are?

12       A.   No.  He just say that Wal-Mart.  Usually when we

13   talk, "they" is Wal-Mart.

14       Q.   Okay.  And that's all he said; right?

15       A.   Yes.

16       Q.   Mr. Trinh did not tell you that your hours would

17   be reduced if you did not take the training course?

18       A.   He say they might do that.  And he even picked a

19   date for me.

20       Q.   Did he tell you anything else?

21       A.   No.

22       Q.   Do you know if Mr. Trinh made these statements

23   to anybody else besides yourself?

24       A.   The store, only two of us.  We've been working

25   for 13 years.  So it's only two of us as a pharmacist.

36

Exhibit I, Page 000222

1      Q.   Who is the other pharmacist?

2      A.   Mr. Trinh.

3      Q.   Oh, right.  So I understand.  All you know about

4  is what happened in your own store; right?

5      A.   Yes.

6      Q.   And all you know is what was told to you; right?

7      A.   Yes.

8      Q.   So you're not aware of Mr. Trinh making those

9  statements to anybody else; right?

10     A.   Yes.  But I know my husband told me I better

11  take it too.  I have no choice.

12     Q.   And other than Mr. Trinh -- other than

13  Mr. Trinh -- you're not aware of anybody else at Wal-Mart

14  telling a pharmacist if they don't take the training

15  course, they'll be terminated; correct?

16     A.   Besides my husband?  Does he count as a manager,

17  pharmacist manager?

18     Q.   Did somebody specifically tell your husband

19  that?

20     A.   No.  He told me that I better take it.

21     Q.   Okay.  I'm not asking you if he said you better

22  take it.  What I'm asking about is your own knowledge.

23          Did -- are you -- you're not aware of any other

24  person, besides Mr. Trinh in the conversation he had with

25  you, anybody else in management telling a pharmacist if

37

Exhibit I, Page 000223

1    they don't take the training course, they'll be

2    terminated; is that correct?

3        A.   Yes.

4        Q.   And you're not aware of anyone else besides

5    Mr. Trinh ever saying to another pharmacist that if they

6    don't take the training course or become immunization-

7    certified, their hours will be reduced; correct?

8        A.   But because of the e-mail, I know it's serious.

9    So, therefore, I have to take it.

10       Q.   I understand.  I'm asking a very specific

11   question about what people said.

12            Do you understand?

13       A.   Yes.

14       Q.   My question is:  Other than Mr. Trinh, to your

15   knowledge, nobody else in management said to another

16   pharmacist, If you don't take the training course or

17   become immunization-certified, your hours will be

18   reduced; correct?

19       A.   Yes.

20       Q.   Other than Mr. Trinh, you're not aware of

21   anybody else in management saying, If you don't take the

22   training course, you'll be transferred to another store;

23   correct?

24       A.   Yes.

25       Q.   Other than what you've already told me, is there

38

Exhibit I, Page 000224

1    anything else, in your mind, that shows, demonstrates,

2    that taking the training course was -- or becoming

3    immunization-certified was required?

4        A.    No.

5        Q.    And those things are, just to recap, the e-mail

6    that you described from Ms. Fisher?

7        A.    Yes.

8        Q.    The one statement from Mr. Trinh; right?

9        A.    Yes.

10       Q.    And your husband telling you you better take it;

11   right?

12       A.    Yes.

13       Q.    And nothing else; right?

14       A.    Yes.

15       Q.    And you don't know where Ms. Fisher got the idea

16   that taking the training course was mandatory; right?

17       A.    Yes.

18       Q.    And you don't know where Mr. Trinh got that idea

19   either; correct?

20       A.    Yes.

21       Q.    When you took the training course in November

22   and December of 2014, what was your hourly rate of pay,

23   approximately?

24       A.    You mean how much did I make?

25       Q.    Yes.

39

**SOUND DEPOSITION SERVICES, INC.**
**(888) 297-6863**

Exhibit I, Page 000225

```
 1                    REPORTER'S CERTIFICATE

 2

 3          I, Jan M. Roper, a Certified Shorthand Reporter

 4   No. 5705, do hereby certify:

 5          That, prior to being examined, the witness named

 6   in the foregoing deposition, KHANH NGUYEN, was by me duly

 7   sworn to testify the truth, the whole truth, and nothing

 8   but the truth.

 9          That said deposition was taken down by me in

10   shorthand at the time and place therein named and

11   thereafter transcribed under my direction, and I hereby

12   certify that the foregoing deposition is a true and

13   correct transcript of my shorthand notes so taken.

14          I certify that a request has been made by, or on

15   behalf of, the witness to review, correct and sign the

16   transcript of these proceedings.

17          I further certify that I am neither counsel for

18   nor related to any party to said action nor in anywise

19   interested in the outcome thereof.

20          IN WITNESS WHEREOF, I have hereunto subscribed

21   my name this 9th day of July, 2015.

22

23

24          _____

            JAN M. ROPER, RPR, CSR NO. 5705

25
```

50

Exhibit I, Page 000226

**EXHIBIT J**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

AFROU NIKMANESH, ELVIS          )
ATENCIO, ANNA NGUYEN, AND       )
EFFIE SPENTOS, on behalf of     )
themselves, the general         )
public, and all others          )
similarly situated,             )
                                )
          Plaintiffs,           )
                                )
     vs.                        )   CASE NO.
                                )   8:15-cv-00202-AG-JCG
WAL-MART STORES, INC., a        )
Delaware corporation, and       )
WAL-MART ASSOCIATES, INC., a)
Delaware corporation, and       )
DOES 1 through 10,              )
inclusive,                      )
                                )
          Defendants.           )
_____)

DEPOSITION OF MONICA THAO TRINH

LOS ANGELES, CALIFORNIA

SATURDAY, JULY 11, 2015

DORIEN SAITO, CSR 12568, CLR

1

1      Q.   Are you considered a floater?

2      A.   Yeah.

3      Q.   Yeah.

4      A.   Uh-huh.

5      Q.   Are you full-time?

6      A.   I'm part-time status, but I've been working

7  full-time.  If I -- I mean, ever since the

8  reinstatement, I've been picking up pretty much

9  full-time, forty hours a week, so -- but I -- I mean,

10  that's depending on the needs of the market and if I

11  want to pick up those shifts.

12      Q.   So to some extent, you have control over your

13  own schedule?

14      A.   Yes.  Uh-huh.  Uh-huh.

15      Q.   Now, as a floater, are there times that you

16  have worked, let's say, less than thirty hours a week?

17      A.   Not yet, but -- not yet.

18      Q.   Do you know if other floaters occasionally work

19  less than thirty hours a week?

20      A.   Probably.

21      Q.   But you don't know one way or the other?

22      A.   I don't know.  I don't know, yeah.  I would say

23  yes because there's people who just work one day a week

24  or --

25      Q.   So some part-time or floater pharmacists --

16

Exhibit J, Page 000228

```
 1           MR. EPSTEIN:  Monica, try not to say "uh-huh"
 2    or "huh-uh" because it's hard for the reporter to figure
 3    out which one it is that --
 4           THE WITNESS:  Okay.
 5           MR. EPSTEIN:  Yes or no.
 6           THE WITNESS:  Okay.
 7    BY MR. GRAY:
 8       Q.  It is a little difficult.  Everybody struggles
 9    with it, and I struggle with it too.  But certainly if
10    you can try to say "yes" or --
11       A.  Okay.
12       Q.  -- "no," that would be good.
13       A.  Okay.
14       Q.  And to your knowledge, Ms. Dabney's authority
15    was limited to Market 70; is that correct?
16       A.  Yes.
17       Q.  So to your knowledge, she didn't oversee any
18    stores outside of Orange County; is that correct?
19       A.  Yes.
20       Q.  Do you know who she reported to?
21       A.  Ami Bhatt.  That's the regional.
22       Q.  Regional director; is that correct?
23       A.  Uh-huh.
24       Q.  And her last name is spelled B-h- --
25       A.  B-h-a-t-t.
```

19

1   required?

2       A.   Can you please repeat that.

3       Q.   Sure.

4            Do you recall any email from Joanne or the

5   materials that were included with those emails that told

6   you that the APhA course was mandatory?

7       A.   Yes.

8       Q.   Okay.  And how many of those emails or

9   materials did you receive?

10      A.   I would say six.

11      Q.   Okay.  So roughly six of the twelve or so

12  emails that you received from Joanne Ordoñez indicated

13  that the course was mandatory; is that correct?

14      A.   Yes.

15      Q.   And did she say that -- excuse me.

16           Was it the emails that said that, or was it the

17  materials included with the email that's said that?

18      A.   The emails says it's required.  If you need --

19  if you were be certified, it's required to take the

20  course, the APhA course.

21      Q.   If you want to be certified; is that correct?

22      A.   If you want to be certified.

23      Q.   Right.

24           Okay.  Was there anything in those emails that

25  said you had to become certified?

56

Exhibit J, Page 000230

1    that every store in Market 70 had at least one

2    pharmacist who had become already immunization

3    certified?

4        A.   By March 2014.

5        Q.   Okay.  And you're not aware whether every --

6    literally every pharmacist within Market 70 at some

7    point became immunization certified; is that correct?

8        A.   Can you repeat that again.

9        Q.   You're not aware whether every single

10   pharmacist within Market 70 has become immunization

11   certified at this time?

12       A.   As of March -- March?

13       Q.   No.  No.  At this point, present day.

14       A.   Oh, okay.  Present day, right now, today.

15       Q.   Yes.

16       A.   I'm aware that every store has a pharmacist

17   certified in Market 70.

18       Q.   Okay.

19       A.   But every pharmacist, every store?  I don't

20   know that.

21       Q.   Okay.  That was my question?

22       A.   Okay.

23       Q.   So just to be clear.

24       A.   Okay.

25       Q.   You're not aware right now if every single

65

Exhibit J, Page 000231

1   pharmacist within Market 70 is immunization certified;

2   is that correct?

3       A.   That is correct.  But my guess --

4       Q.   Okay.

5       A.   -- is the majority are.  Very few are not.

6   Maybe a couple.

7       Q.   Okay.  But you don't know one way or the other

8   and how many are?

9       A.   Not exactly --

10      Q.   Okay.

11      A.   -- numbers, yeah.

12      Q.   Do you know anybody who is not immunization

13  certified?

14      A.   I don't.

15      Q.   Okay.  Are you familiar with the immunization

16  certification of any pharmacist in markets outside of

17  Market 70?

18      A.   What do I know about --

19      Q.   Are you -- well, let me put it this way.

20           Do you know one way or the other if any

21  pharmacist outside of Market 70 is immunization

22  certified?

23      A.   Yes.

24      Q.   Okay.  And in which markets do you know

25  pharmacists who either are or are not immunization

66

Exhibit J, Page 000232

1    certified?

2         A.    Market 207.

3         Q.    Okay.   Any other markets?

4         A.    I don't know any other markets.

5         Q.    Okay.   And within Market 207 as you sit here

6    today, are you aware one way or the other whether every

7    single pharmacist within that market is immunization

8    certified?

9         A.    I'm not aware.   If those are the exact words

10   you're saying, every pharmacist, no, I'm not aware.

11        Q.    Okay.   So do you have any knowledge one way or

12   the other if any pharmacist outside of Market 70 or

13   Market 207 is immunization certified?

14        A.    That are immunization certified?

15        Q.    Either they are or are not immunization

16   certified.

17        A.    I know those that are.

18        Q.    And how many pharmacists do you know outside of

19   Market 70 or Market 207 that are certified?

20        A.    Let me count the stores that I've been to.

21              I've probably been to thirteen, fourteen

22   stores.   And all of them give immunizations.   Market 207

23   and then the other market neighborhood, I don't know.

24              MR. EPSTEIN:   I think that --

25              MR. GRAY:   Okay.

67

Exhibit J, Page 000233

1       A.    Uh-huh.

2       Q.    And those two additional markets, Neal's market

3   and Cooper's market, those are markets in California; is

4   that correct?

5       A.    Correct.

6       Q.    So you're not familiar with any pharmacists in

7   markets outside of California; is that correct?

8       A.    That's correct.

9       Q.    Okay.  Are you familiar with any pharmacists

10  within Northern California?

11      A.    That works for Wal-Mart?

12      Q.    Correct.

13      A.    No.

14      Q.    Okay.  Now, the emails that we talked about a

15  little bit earlier from Mary -- MaryAnn and Ms. Ordoñez,

16  the emails that you received prior to taking the APhA

17  course, do you still have those emails?

18      A.    I don't because when I -- when I switched

19  markets, it was wiped out.

20      Q.    Okay.  So you never saved any of those emails

21  to a personal computer or anything like that?

22      A.    I didn't.

23      Q.    Did you receive continuing education credits

24  for taking the APhA course?

25      A.    Yes.

71

Exhibit J, Page 000234

1    immunization certification?

2         A.    No, there's not -- it's -- the paid tool kit

3    will tell you how to get certified.

4         Q.    Okay.

5         A.    But --

6         Q.    Is there anything in the paid tool kit, to in

7    your knowledge, that says whether immunization

8    certification is required for existing Wal-Mart

9    pharmacists?

10        A.    No.

11        Q.    Did you receive the paid tool kit prior to

12   taking the APhA course?

13        A.    Home study or -- I know it's available.  Yes.

14   Yes.

15        Q.    Okay.  So had -- let me put it this way.

16             Had you seen the paid tool kit prior to taking

17   the APhA course?

18        A.    It was available.

19        Q.    Did you review it prior to taking the APhA

20   course?

21        A.    It was pretty long, so I glanced through it,

22   but I didn't go through it thoroughly --

23        Q.    Okay.

24        A.    -- until after my -- my courses.

25        Q.    Okay.  Was there anything in the paid tool kit

94

1      Q.    Okay.

2      A.    -- how they're communicating it to their

3    pharmacists.

4      Q.    But you didn't actually receive any of the

5    communications to the pharmacists in those markets, did

6    you?

7      A.    No.

8      Q.    Okay.  So you don't have any personal knowledge

9    of what the market directors in any other markets

10   besides Market 70, 207, and the two additional markets

11   that we discussed regarding the APhA course; is that

12   correct?

13     A.    Right.

14     Q.    And prior to taking the APhA course, you were

15   never told that you would be terminated if you did not

16   take the course; is that correct?

17     A.    That's correct.

18     Q.    And prior to taking the APhA course, you were

19   never told by anybody at Wal-Mart that you would be

20   given reduced hours if you chose not to become

21   immunization certified; is that correct?

22     A.    No, they never told me that.

23     Q.    Okay.  And you were never told by anybody with

24   Wal-Mart that you would be transferred stores if you

25   chose not to become immunization certified; is that

97

Exhibit J, Page 000236

1    correct?

2         A.    Not in those words.  Not directly in those

3    words.  But I would have -- I would think that if I

4    wasn't certified, my store's numbers would go down.  I

5    would have lower profits, and they would find someone to

6    replace me.  They would try -- they would -- they would

7    find a reason to transfer me or replace me, to have

8    some -- to put somebody in there --

9         Q.    Okay.

10        A.    -- that was certified.

11        Q.    And you formulated that belief on your own?  In

12   other words, nobody told you that; is that correct?

13        A.    Nobody told me that.

14              If I was -- as I said, if I was a manager and I

15   wasn't producing for my store, that would make me look

16   really bad.  I would like I wasn't a team player or a

17   good pharmacy manager.

18        Q.    Did anybody tell you that if you didn't become

19   immunization certified, that you would not be viewed

20   favorably by Wal-Mart?

21        A.    They wouldn't say that.

22        Q.    Okay.  And nobody did say that; is that --

23        A.    Nobody --

24        Q.    -- correct?

25        A.    -- did say that.  That is kind of understood.

98

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

Exhibit J, Page 000237

1    paid for the home study portion, that didn't change your

2    belief as to whether it was voluntary; is that correct?

3        A.   It didn't change my belief, no.

4        Q.   Now, we talked a minute ago about certain job

5    postings for staff pharmacists and pharmacy managers.

6            Do you recall seeing any of those before you

7    took the APhA course?

8        A.   No.

9        Q.   Were you ever told by anybody at Wal-Mart that

10   you would be given priority hours if you took the

11   immunization certification course?

12       A.   No.

13       Q.   Have you ever had any conversations with any

14   Sam's Club pharmacists about immunization certification?

15       A.   No.

16       Q.   Have you ever had any conversations with

17   anybody at Wal-Mart about the relationship, if any,

18   between immunization certification and Medicare ratings?

19       A.   Medicare ratings?

20       Q.   Uh-huh.

21            You don't recall any conversation like that?

22       A.   No, I don't.

23       Q.   And you're aware that Wal-Mart pharmacists can

24   become APhA certified through other courses other than

25   Wal-Mart's APhA course; is that correct?

111

Exhibit J, Page 000238

```
 1                    CERTIFICATE OF REPORTER

 2            I, DORIEN SAITO, CSR 12568, CLR, a certified

 3    Shorthand reporter in and for the State of

 4    California, County of Los Angeles, do hereby certify;

 5            That MONICA THAO TRINH, the witness named in

 6    the foregoing deposition, was, before the commencement

 7    of the deposition, duly administered an oath in

 8    accordance with CCP 2094;

 9            That said deposition was taken down in

10    stenograph writing by me and thereafter transcribed

11    Into typewriting under my direction.

12            That before completion of the deposition,

13    review of the transcript [X] was [ ] was not requested.

14    If requested any changes made by the deponent (and

15    provided to the reporter) during the period allowed are

16    appended hereto.

17          . I further certify that I am neither counsel for

18    nor related to any party to said action, nor in any way

19    interested in the outcome thereof.

20            Dated this 12th day of July, 2015.

21

22

                    _____

23                  CERTIFIED SHORTHAND REPORTER

                    IN AND FOR THE COUNTY OF

24                  LOS ANGELES, STATE OF CALIFORNIA

25

                                                            153
```

**EXHIBIT K**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA — SOUTHERN DIVISION


| | | |
|---|---|---|
| AFROUZ NIKMANESH, ELVIS | ) | CASE NO.: |
| ATENCIO, ANNA NGUYEN, AND | ) | 8:15-cv-00202-AG-JCG |
| EFFIE SPENTZOS, on behalf of | ) | |
| themselves, the general | ) | |
| public, and all others | ) | |
| similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| WAL-MART STORES, INC., a | ) | |
| Delaware corporation, and | ) | |
| WAL-MART ASSOCIATES, INC., a | ) | |
| Delaware corporation, and | ) | |
| DOES 1 through 10, inclusive, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |




DEPOSITION OF KHAWALA ABUELHIJA

Monday, July 13, 2015

Los Angeles, California


Reported By:

Jan M. Roper, RPR,

CSR No. 5705

File No.:  150713JR

1

SOUND DEPOSITION SERVICES, INC.
(888) 297-6863

Exhibit K, Page 000240

1    Q.   Let me ask it this way:  Do you have a --

2    currently do you have a schedule of hours that you

3    typically work in a given week?

4    A.   Yeah.  My main scheduled hours are the weekends,

5    Saturday and Sunday.

6    Q.   And for how long have you had that schedule?

7    A.   Since I moved from Santa Clarita.  So let's say

8    2006 to maybe around 2010.  Sometimes I pick up extra

9    shifts if available now.

10    Q.   How often do you pick up extra shifts?

11    A.   There's no set ratio.  I just -- when they need

12    me, if I'm available and my husband's available, I pick

13    up the shift.

14    Q.   Do you recall, ever since you came to the Irvine

15    store, having worked more than four days in a week?

16    A.   Yeah -- yes.

17    Q.   But your typical schedule is either two or three

18    days a week; is that correct?

19    A.   Mainly two days a week.

20    Q.   And that's been true since about 2010?

21    A.   Yes.

22    Q.   When you first came to the Irvine location, do

23    you recall who your direct supervisor was at that point?

24    A.   Yeah.  Alex Nikmanesh.

25    Q.   Do you recall what her title was at that time?

16

 1    either one-on-one or over the phone with any regional

 2    director other than Anthony Chung or Ami Bhatt?

 3        A.    No.

 4        Q.    Have you ever exchanged any e-mails with anybody

 5    other than Mr. Chung or Ms. Bhatt at the regional

 6    director level?

 7        A.    Not that I recall, no.

 8        Q.    Do you know the names of any regional directors

 9    other than Mr. Chung or Ms. Bhatt?

10        A.    I don't.

11        Q.    Do you know the names of any divisional

12    directors other than the one that you mentioned for your

13    division?

14        A.    I don't.

15        Q.    So you've never had any communication of any

16    type with any divisional director; is that correct?

17        A.    Correct.

18        Q.    And it's your understanding that Ms. Dabney's

19    supervision is limited to Market 70; is that correct?

20        A.    That's my understanding, yes.

21        Q.    And it's your understanding that Ms. Fisher had

22    supervision over two markets for some period of time; is

23    that correct?

24        A.    Correct.

25        Q.    But her -- it's your understanding that her

                                                              22

Exhibit K, Page 000242

1    supervision was limited to those two markets for that

2    time; is that correct?

3         A.    I assume.  I'm not sure.

4         Q.    You don't know one way or the other?

5         A.    Not really.  I'm not sure.

6         Q.    Is it your understanding that Mr. Dukes, when he

7    was the market director for Market 70, that his

8    supervision was limited to that market as well?

9         A.    That's my understanding.

10        Q.    I think you mentioned Khoi Le.  How do you know

11   Mr. Le?

12        A.    He recently been to -- at San Clemente.  I think

13   he took over for a while, but I believe now he's back in

14   Los Angeles.  I saw him, actually -- I'm sorry.  I saw

15   him also in the training course, in the live training.

16        Q.    Okay.  Other than at the live training course,

17   have you ever spoken to Mr. Le either on the phone or in

18   one-on-one conversation?

19        A.    No.

20        Q.    Have you ever exchanged any e-mails with Mr. Le

21   other than those that might have been sent to other

22   pharmacists?

23        A.    No.

24        Q.    So now we're going to talk a little bit more

25   about APhA immunization certification.

23

1    of the notes was through e-mail; is that correct?

2         A.   Correct.

3         Q.   Okay.  But you weren't actually on the

4    conference calls; correct?

5         A.   Correct.

6         Q.   So the forms of communication that you received

7    that suggested to you that you had to become

8    immunization-certified were e-mails from Ms. Dabney,

9    including those that contained conference call notes, and

10   your conversation with Audrey; is that correct?

11        A.   Correct.

12        Q.   Okay.  Is there anything else that indicated to

13   you in any way that you had to become immunization-

14   certified?

15        A.   No.

16        Q.   And you're not aware of any written Wal-Mart

17   document that says specifically that the course is

18   mandatory or that you have to become immunization-

19   certified; is that correct?

20        A.   Correct.

21        Q.   And are you aware of any document that you

22   believe constitutes any Wal-Mart policy suggesting or

23   indicating that pharmacists were required to become

24   immunization-certified?

25        A.   Correct, I'm not aware.

46

Exhibit K, Page 000244

1     Q.   And you're not aware of any communications

2   regarding whether immunization certification was required

3   for pharmacists in any markets outside of your market; is

4   that correct?

5     A.   Correct.

6     Q.   Now, since the time that you took the APhA

7   course, have you spoken to any pharmacists outside of

8   your market about immunizations or immunization

9   certification?

10     A.   I spoke to Sahba -- but she wasn't in our

11   market -- regarding the fact that we didn't get paid.

12   She was in our market, San Clemente store.  Now they're

13   not in our market.  But just to the fact that, you know,

14   we did not get paid for the course, which we all didn't.

15     Q.   I'm sorry.  What was her name?

16     A.   Sahba.

17     Q.   How do you spell that?

18     A.   S-a-h-b-a.

19     Q.   Okay.  Do you know her last name?

20     A.   Christiansen.

21     Q.   Okay.  And when did you have that conversation

22   with Ms. Christiansen?

23     A.   After we took the live seminar together.

24   Because we went to the seminar -- or the training

25   together.  So it was in October after I found out from

47

Exhibit K, Page 000245

1    Ms. Dabney that we're not going to get paid.

2        Q.   So either in very late October 2014 or very

3    early November --

4        A.   Or November.

5        Q.   -- 2014?

6        A.   Correct.

7        Q.   And do you recall any details of that

8    conversation with Ms. Christiansen?

9        A.   No.   Just that we didn't get paid.

10       Q.   So you were just sort of complaining to one

11   another?   Is that a fair characterization of the

12   conversation?

13       A.   Yes.

14       Q.   Okay.   Did you ask her in any way whether she

15   felt that she had to become immunization-certified?

16       A.   I didn't.

17       Q.   Did she tell you that she believed that she had

18   to take the training course?

19       A.   We never talked.   It didn't come up.

20       Q.   So you've never talked to any other pharmacists

21   who indicated that they believed that they had to take

22   the training course?

23       A.   Correct.

24       Q.   Okay.   And nobody from Wal-Mart ever indicated

25   to you that if you did not take the APhA course, that you

48

Exhibit K, Page 000246

1    would be terminated; is that correct?

2       A.   Correct.

3       Q.   And nobody from Wal-Mart indicated to you that

4    if you did not become immunization-certified, that you

5    would receive reduced hours; is that correct?

6       A.   Correct.  It was just my understanding if I

7    don't get certified, I might lose my shifts, if I don't

8    meet the goal of two shots per day, because I'm the only

9    pharmacist there.

10       Q.   Right.  So that was your understanding, but

11    nobody told you that; is that correct?

12       A.   Correct.

13       Q.   Did anybody from Wal-Mart tell you that if you

14    did not become immunization-certified, that you would be

15    transferred to a different store?

16       A.   No.

17       Q.   Did anybody from Wal-Mart tell you that if you

18    did not take the immunization certification course, that

19    any of your other working conditions would be affected in

20    any way?

21       A.   No.

22       Q.   Now, I think we talked earlier about continuing

23    education credits.

24           Do you know how many credits you received for

25    participating in the certification course?

49

Exhibit K, Page 000247

```
 1      A.   Yes.   20 hours.

 2      Q.   And as a pharmacist in California, are you

 3   required to obtain a certain number of CE credits in a

 4   given period?

 5      A.   Yes.

 6      Q.   And how many total hours are you required to

 7   obtain during that period?

 8      A.   We need 30 hours in 2 years.

 9      Q.   Okay.   And when is your specific deadline for

10   that two-year period?

11      A.   July 21 of 2014, when I had to get my license.

12      Q.   It was July 2014; is that right?

13      A.   Correct.   Yeah, 2014.   July 21, 2014.

14      Q.   Okay.   And so there's another deadline in July

15   2016; is that correct?

16      A.   Correct.

17      Q.   So the 20 hours that you received for the APhA

18   course fell into the current period of time; is that

19   correct?

20      A.   Right.   Correct.

21      Q.   For the July 2016 deadline; right?

22      A.   Correct.

23      Q.   And at that point in October 2014, do you recall

24   if you had done any CE hours for this current period?

25      A.   I don't recall, but the period just started
```

50

```
 1                    REPORTER'S CERTIFICATE

 2

 3            I, Jan M. Roper, a Certified Shorthand Reporter

 4    No. 5705, do hereby certify:

 5            That, prior to being examined, the witness named

 6    in the foregoing deposition, KHAWALA ABUELHIJA, was by me

 7    duly sworn to testify the truth, the whole truth, and

 8    nothing but the truth.

 9            That said deposition was taken down by me in

10    shorthand at the time and place therein named and

11    thereafter transcribed under my direction, and I hereby

12    certify that the foregoing deposition is a true and

13    correct transcript of my shorthand notes so taken.

14            I certify that a request has been made by, or on

15    behalf of, the witness to review, correct and sign the

16    transcript of these proceedings.

17            I further certify that I am neither counsel for

18    nor related to any party to said action nor in anywise

19    interested in the outcome thereof.

20            IN WITNESS WHEREOF, I have hereunto subscribed

21    my name this 13th day of July, 2015.

22

23

24            _____

              JAN M. ROPER, RPR, CSR NO. 5705

25
```

65

Exhibit K, Page 000249